**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No. 08-360 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **PAUL ALVIN SLOUGH,** | : | |
| **NICOLAS ABRAM SLATTEN,** | : | |
| **EVAN SHAWN LIBERTY, and** | : | |
| **DUSTIN LAURENT HEARD,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE
OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS**

Nearly four months after receiving the entire grand jury record upon which the superseding indictment is based, and years after receiving voluminous discovery, the defendants now ask the Court to dismiss the superseding indictment for purportedly failing to state a cause of action (the "instant Motion to Dismiss"). The defendants generically complain that the superseding indictment fails to "apprise [them] of the charges they must defend" and "identify the offense conduct for which the grand jury found probable cause." See Defs.' Mem. at 2. They also complain that they will somehow be subjected to "unfair surprise" absent the requested relief (id. at 3), although exactly how remains a mystery. Given the extensive procedural and substantive history of this litigation, however, their grievances ring hollow, and the Court should deny their motion.

**Background**

1.      At approximately noon, on September 16, 2007, several Blackwater security contractors, including the defendants, opened fire in and around Nisur Square, a busy traffic circle in the heart of Baghdad, Iraq (hereinafter known as the "Nisur Square Shooting"). When

they stopped shooting, fourteen Iraqi civilians were dead and at least eighteen more were injured. Contrary to the defendants' suggestion, they were not mere participants in a two-sided "firefight" that day.  Rather, the evidence will establish that the defendants fired their deadly weapons first, and then continued to fire them in a unilaterally reckless and excessive manner at Iraqi civilians who presented no threat to them whatsoever.

2.      On December 4, 2008, a grand jury empanelled in the United States District Court for the District of Columbia returned a thirty-five count indictment (the "original indictment") jointly charging the defendants and Donald Ball with fourteen counts of voluntary manslaughter, in violation of 18 U.S.C. §§ 1112, 2, and 3261(a)(1) (the Military Extraterritorial Jurisdiction Act ("MEJA")); twenty counts of attempted manslaughter, in violation of 18 U.S.C. §§ 1113, 2, and 3261(a)(1); and one count of using and discharging a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c), 2, and 3261(a)(1).  As alleged then and now, the charges arose from the defendants' involvement in the Nisur Square Shooting while contracted by the United States Department of State, "which employment related to supporting the mission of the United States Department of Defense in the Republic of Iraq."  Orig. Ind. at ¶ 1.

3.      On January 7, 2009, then-presiding United States District Court Judge Ricardo Urbina set trial for February 1, 2010.  In the lead up to trial, the defendants received thousands of pages of discovery related to the charges they were facing, including the grand jury record upon which the original indictment was based.

4.      On December 31, 2009, one month before trial was to commence and after the government's production of discovery to the defendants was essentially complete, Judge Urbina granted the defendants' motion to dismiss the original indictment based on <u>Kastigar</u> grounds.

2

After the government successfully appealed Judge Urbina's dismissal of the original indictment, the case was remanded to this Court for further proceedings.

5.      On October 17, 2013, a grand jury empanelled in the United States District Court for the District of Columbia returned a thirty-three count superseding indictment against the four defendants.  The superseding indictment charges each of the defendants with multiple counts of voluntary manslaughter and attempted manslaughter, and one count of using and discharging a firearm in relation to a crime of violence.  As was alleged in the original indictment, the charges in the superseding indictment are brought pursuant to MEJA and arise from the defendants' involvement in the Nisur Square Shooting while contracted by the United States Department of State, "which employment related to supporting the mission of the United States Department of Defense in the Republic of Iraq."  Super Ind. at ¶ 1.

6.      Significantly, long before Judge Urbina dismissed the original indictment on Kastigar grounds, the defendants sought and failed to have the original indictment dismissed pursuant to a Motion to Dismiss for Lack of Jurisdiction under MEJA [Dkt. No. 34, January 13, 2009] (the "first Motion to Dismiss").  In their pleadings in support of their first Motion to Dismiss, the defendants advanced many of the same arguments advanced in the instant Motion to Dismiss.  They acknowledged that the original indictment directly quoted from section 3267(1)(a)(ii)(II) of MEJA by alleging that the defendants' "employment related to supporting the mission of the United States Department of Defense in the Republic of Iraq."  See Dkt. No. 34-1 at 5.  They asserted, however, that "[o]ther than naming the country of Iraq, this statutory quotation states a pure legal conclusion, containing no facts that state in what way Defendants' employment allegedly related to supporting the mission of the Department of Defense."  Id. at 6.

3

They argued that the original indictment's "verbatim quotation of the statutory language providing jurisdiction (here, that Defendants' employment 'related to supporting the mission of the Department of Defense,' 18 U.S.C. § 3267(1)(A)(ii)(II); Indictment ¶1.a.) is not conclusive on a motion to dismiss." Id. at 11.   Relying on United States v. Hess, 124 U.S. 483, 486 (1888) and Russell v. United States, 369 U.S. 749, 765 (1962), the defendants then urged Judge Urbina: "[J]ust as 'it is not sufficient that the indictment shall charge the offense in the same generic terms as in the [statute]; but it must state the species; it must descend to the particulars,' . . . so also the Court must look to the Indictment's factual allegations, not its legal conclusions, to determine whether the Indictment invokes the Court's jurisdiction." Id. (citations omitted).   In the very next sentence, the defendants quoted again from the Supreme Court's decision in Hess for the proposition that: "[F]acts are to be stated [in the indictment], not conclusions of law alone." Id. (quoting Hess, 124 U.S. at 486).

7.     In its opposition to the first Motion to Dismiss, the United States directly responded to the defendants' assertion that the jurisdictional allegations in the indictment were defective.  See Dkt. No. 51 at 15-19.  Specifically, the United States discussed the Supreme Court's decision in Hamling v. United States, 418 U.S. 87, 117 (1974) (setting forth the prevailing legal standard when considering whether an indictment is legally sufficient), other federal court decisions applying the Hamling standard, and the defendants' heavy reliance on pre-Hamling authority.  Id.  In addition, while not required to, the United States also discussed how it expected the evidence at trial to establish the jurisdictional elements of MEJA and identified some of the particular evidence that it may seek to introduce in doing so.  Id. at 2-3, 7-9, 30-34.

8.      In a notice related to its opposition to the first Motion to Dismiss, the United States supplemented its proffer as to how it may seek to establish the jurisdictional elements of MEJA.  <u>See</u> Dkt. No. 54.  Specifically, the United States identified two items of documentary evidence:  (i) an excerpt of the National Defense Authorization Act for Fiscal Year 2006, which mandated that the President of the United States submit a quarterly report to Congress on the Iraq war effort detailing "[t]he current military mission and diplomatic, political, economic, and military measures that are being or have been undertaken to successfully complete or support that mission . . . "; and (ii) a related Report to Congress prepared by the Department of State, dated April 6, 2006, which emphasized that "[d]eveloping effective national and provincial governance in Iraq is a key component of Iraqi self-reliance and defeating the insurgency" and described how various Department of State reconstruction and assistance projects, for which Blackwater contractors provided security, supported that goal.  <u>Id.</u> at 1-2

9.      On February 17, 2009, after receiving extensive briefing from the parties and hearing oral argument on the first Motion to Dismiss, Judge Urbina denied the motion from the bench.  In doing so, Judge Urbina noted that "[c]ases that have been informative and useful in the Court's analysis on this point include the <u>Hamling</u> case, the <u>Stavroulakis</u> case [952 F.2d 686, 693 (2d Cir. 1992)] . . . and <u>Russell</u>."  Tr. at 45.  The Court held that where the "question of federal subject matter jurisdiction is intermeshed with questions going to the merits, the issue should be determined at trial."  <u>Id.</u> at 45-46.

10.     On October 16, 2009, the defendants filed another motion to dismiss, entitled "Defendants' Motion to Dismiss Case for Failure to State an Offense under the Military Extraterritorial Jurisdiction Act."  <u>See</u> Dkt. No. 146.  Again relying on <u>Hess</u> and <u>Russell</u>, the

defendants effectively advanced the same arguments set forth in their first Motion to Dismiss and now in the instant Motion to Dismiss.  Compare Dkt. No. 34-1 at 5-6, and 11, Dkt. No. 146 at 4-9, and Dkt. No. 389 at 1-3, 5-14.  Judge Urbina did not rule on the "Defendants' Motion to Dismiss the Case for Failure to State an Offense under the Military Extraterritorial Act" prior to dismissing the indictment on Kastigar grounds on December 31, 2009.

11.     After the case was remanded to this Court for further proceedings, the government's trial team proceeded with a thorough assessment of the evidence in the case before seeking and securing a superseding indictment.  In the course of doing so, it produced to the defendants an additional 5,000 pages of discovery, including scores of FBI 302s of witness interviews.  On June 10, 2013, the United States sought and obtained authority from this Court to disclose to the defendants grand jury materials, including transcripts and minutes from the deliberating and filter grand juries, on a rolling basis in advance of returning the superseding indictment.  From June 10, 2013, through November 1, 2013, the United States produced to the defendants the entire grand jury record (over 2,500 pages) upon which the superseding indictment was based.  A large portion of the grand jury record consisted of materials (often with filter redactions) that had been produced to the defendants several years ago before the original indictment was dismissed.

## Legal Argument

A.     **The Superseding Indictment Easily Meets the Hamling Sufficiency Standard by Alleging Each of the Elements of the Charged Offenses and Fairly Informing the Defendants of the Charges Against Them.**

Although not even cited by the defendants in the instant Motion to Dismiss, in Hamling, the Supreme Court enunciated the legal standard for determining whether an indictment states a

cause of action.  Namely, the <u>Hamling</u> Court held that under the Fifth and Sixth Amendments of the Constitution:

> an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. . . .  It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words themselves, fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.

Id. at 117.  Thus, to satisfy the <u>Hamling</u> standard, "an indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  <u>Stavroulakis</u>, 952 F.2d at 693 (citations and internal quotation marks omitted); <u>accord</u> <u>United States v. Haldeman</u>, 559 F.2d 31, 123 (D.C. Cir. 1976) ("[t]he validity of alleging the elements of the offense in the language of the statute is, of course, well established"); <u>United States v. Thomas</u>, 348 F.3d 78, 82 (5th Cir. 2003) ("an indictment is sufficient if it contains the elements of the charged offense, fairly informs the defendant of the charges against him, and ensures that there is no risk of future prosecutions for the same offense") (citations omitted); <u>United States v. Davis</u>, 336 F.3d 920, 922 (9th Cir. 2003) ("In cases where the indictment tracks the words of the statute charging the offense, the indictment will be held sufficient so long as the words unambiguously set forth all the elements necessary to constitute the offense."); <u>United States v. Akers</u>, 215 F.3d 1089, 1101 (10th Cir. 2000) ("[I]t is generally sufficient that the indictment set forth the offense in the words of the statute itself, as long as those words, of themselves fully, directly and expressly . . . set forth the elements necessary to constitute the offense intended to be punished") (internal quotation marks omitted).

To enforce these constitutional requirements, Federal Rule of Criminal Procedure 7(c)(1) provides in part that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"  That is precisely what the superseding indictment does here.  The introductory paragraphs not only allege that the defendants' "employment related to supporting the mission of the United States Department of Defense in the Republic of Iraq," but also that they were "present and residing outside the United States in connection with [such] employment"; that they "were not nationals of nor ordinarily residents in the Republic of Iraq"; and, that the conduct alleged in the superseding indictment constitutes offenses that would be punishable by imprisonment for more than one year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States.  Super Ind. ¶¶ 1.a-c., 3.  No more is necessary.

The superseding indictment also alleges additional facts concerning jurisdiction.  In its first paragraph, the indictment alleges: who the defendants' employer was, namely, Blackwater Worldwide; which federal agency Blackwater Worldwide contracted with, namely, the State Department; the nature of the defendants' employment, namely, the provision of personal security services; and where the defendants supported the mission of the Department of Defense, namely, Iraq.  Super Ind. ¶ 1.a.  The superseding indictment further sets out with particularity the precise date and location where the alleged offenses occurred; the identities of the victims; and the substantive offenses, assimilated by MEJA, that the alleged misconduct entails.  These allegations, particularly those relating to jurisdiction, more than satisfy the Hamling standard, serve to preclude pretrial dismissal on the ground of failure to allege an offense, and provide adequate notice to the defendants.  See United States v. Vega Molina, 407 F.3d 511, 527 (1st Cir.

2005) (Hobbs Act indictment legally sufficient under <u>Hamling</u> as it tracked the Act's jurisdictional language and therefore adequately put defendant on notice of that element).

Relying primarily on pre-<u>Hamling</u> case law—<u>Hess</u> (1888) and <u>Russell</u> (1962)—the defendants nonetheless assert that, as in addition to tracking the elements of the offense, the indictment must "descend to the particulars" of the jurisdictional allegations so as to demonstrate precisely how their employment supported the mission of the Department of Defense. <u>See</u> Defs.' Mem. at 5-9 (citing <u>Russell</u>, 369 U.S. at 765 (quoting <u>Hess</u>, 124 U.S. at 487)). The <u>Russell</u> decision, however, has been confined to the specific offense of which the defendants in that case were charged (i.e., refusing to answer certain questions when summoned before a congressional committee), which bears no resemblance to MEJA. In that case, the Supreme Court deemed legally insufficient an indictment that alleged the refusal to respond to a question "pertinent to the question under inquiry" before a Congressional Committee without further particularizing the subject of the inquiry. The <u>Russell</u> Court reasoned that such allegations were "central to every prosecution under the statute [and] guilt depends . . . crucially upon such specific identification of fact." 369 U.S. at 764.

More recently, however, in <u>United States v. Resendiz-Ponce</u>, 549 U.S. 102 (2007), the Supreme Court revisited its decision in <u>Russell</u> and confined its holding to the particular statute that it construed there. The Supreme Court reasoned that, because the relevant Congressional hearing's subject was frequently uncertain, particularization of the subject matter of the inquiry was necessary both to afford fair notice to defendants and to ensure that any conviction would arise out of the theory of guilt presented to the grand jury. 549 U.S. at 109-110. The <u>Resendiz-Ponce</u> Court expressly declined to extend <u>Russell</u>'s reasoning concerning factual averments to

cases where "guilt does not depen[d] so crucially upon such a specific identification of fact." Id. (internal quotation marks and citations omitted).  And, it observed that "[w]hile detailed allegations might well have been required under common-law pleading rules, . . . they surely are not contemplated by Rule 7(c)(1) . . . ." Id.

Even before the Supreme Court's limiting of Russell in Resendiz-Ponce, the Fifth Circuit relied upon similar reasoning in United States v. Kay, 359 F.3d 738 (5th Cir. 2004), which is also instructive here.  In Kay, the defendants were charged with violations of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, et seq., which, in pertinent part, prohibited payments to foreign officials to "obtain or retain" business.  At issue was whether the indictment was legally insufficient as a consequence of its failure to aver how alleged bribes paid to Haitian officials were linked to the getting or keeping of business in that nation.  Or, in the Kay court's words, "whether the lack of detail in that part of the indictment that deals with th[e] [business nexus] element is more like the absence of detail as to how the crime was committed than a failure to specify what the crime was." Id. at 758-759.

Addressing that issue, the Kay court acknowledged Russell's requirement of factual particularization in the indictment to matters that relate to the very "core of criminality" under the particular statute at issue. Id. at 756 (citing Russell, 369 U.S. at 771).  However, noting that "there are many crimes that include nexus elements, such as effects on interstate commerce or the use of the mails in connection with a scheme to defraud," (id. at 759), it observed that "the nexus element [of federal criminal statutes] cannot be said to go to the core of criminality." Id. Consequently, "the courts appear to take the approach that those kinds of nexus elements can be alleged without factual detail and still not violate the Fifth or Sixth Amendments." Id. at 759.

Reasoning that "the [FCPA] indictment's sufficiency hinges on a determination whether the business nexus element of the crime is core" (id. at 760), it concluded that:

> [A]s important to the statute as the business nexus element is, it does not go to the FCPA's core of criminality. When the FCPA is read as a whole, its core of criminality is seen to be bribery of a foreign official to induce him to perform an official act in a corrupt manner. The business nexus element serves to delimit the scope of the FCPA by eschewing applicability to those bribes of foreign officials that are not intended to assist in getting or keeping business . . . .  Therefore, the indictment's paraphrasing of the FCPA's business nexus element passes the test for sufficiency, despite alleging no details regarding what business is sought or how the results of the bribery are meant to assist[.]

Id. at 761.  Here, specificity as to how the defendants' work as Blackwater contract employees "related to supporting the mission of the United States Department of Defense in Iraq" (Indictment ¶ 1.a.), is neither a fact that is central to the issue of their criminal culpability for the charged offenses (Resendiz-Ponce, 549 U.S. at 108) nor does it go to MEJA's "core of criminality." Kay, 359 F.3d at 757.  Thus, just as the "core of criminality" in Kay involved the payment of a bribe, the charges here involve the commission of armed manslaughter and attempted manslaughter, in violation of the federal statutes assimilated by MEJA.  And, just as the "business nexus" in Kay was merely intended to "delimit the scope of the FCPA" (id. at 761), the requirement under MEJA that the defendants' overseas employment relate to supporting the mission of the Department of Defense is likewise merely a jurisdictional hook designed by Congress to define the breadth of that statute.  As such, the relational nexus in MEJA is not only virtually indistinguishable from the "business nexus" in Kay, it is indistinguishable from jurisdictional elements that the Kay court expressly identified as the "kind of nexus elements that can be alleged without factual detail . . . ." 359 F.3d at 759.  See also

11

Vega Molina, 407 F.3d at 527 (indictment legally sufficient where jurisdictional element tracks the statutory language).  Consequently, even if Russell were to govern the disposition of the defendants' motion to dismiss, which it does not under Hamling and Resendiz-Ponce, the indictment in this case would still pass muster as the jurisdictional elements of MEJA have no bearing whatsoever upon the core criminality of the offenses charged thereunder.

      **B.**      **Because the Defendants Have More Than Sufficient Notice of the Charges (and Evidence) Against Them, Including the Alleged Jurisdictional Elements of MEJA, a Bill of Particulars is Unnecessary.**

It is completely within the court's discretion to determine whether the government should provide a defendant with a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure.  See United States v. Trie, 21 F. Supp. 2d 7, 21 (D.D.C. 1998).  When warranted, a bill of particulars is meant to "ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges."  United States v. Butler, 822 F.2d 1191, 1993 (D.C. Cir. 1987); see also Trie, 21 F. Supp. at 21 (D.D.C. 1998) (noting that a court should grant a motion for a bill of particulars only when "necessary to prevent unfair surprise at trial") (citing United States v. Espy, 989 F. Supp. 17, 34 (D.D.C. 1997)).  "It is not the function of a bill of particulars to provide detailed disclosure of the government's evidence in advance of trial."  United States v. Brodie, 326 F. Supp. 2d 83, 91 (D.D.C. 1994) (internal citations omitted); see also United States v. Ramirez, 54 F. Supp. 2d 25, 29 (D.D.C. 1999) (a bill of particulars is "not a discovery tool;" rather, it provides "clarification of the indictment, not the government's proof of its case") (citations omitted).  "When the indictment is sufficiently detailed, or the requested information is available in some other form

12

[e.g., Rule 16 discovery], a bill of particulars is not required." <u>Brodie</u>, 326 F. Supp. 2d 83, 91-92

(citing <u>Butler</u>, 822 F.2d at 1993).   Indeed, the defendants' access to such voluminous and

relevant discovery "weakens the case for a bill of particulars."   <u>United States v. Glover</u>, 583 F.

Supp. 2d 5, 13 (D.D.C. 2008).

Here, the defendants claim that absent a bill of particulars concerning the government's

particular evidence of the jurisdictional elements of MEJA, they will somehow be unfairly

surprised at trial.   This claim is meritless for several reasons.   First, it is beyond dispute that the

government has provided extensive, ongoing, and timely discovery to the defendants throughout

the course of this litigation.   This production has included early <u>Jencks</u> material in the form of

FBI 302s of fact witnesses and the complete grand jury record upon which the superseding

indictment was based.

Second, as set forth in the Background section above, the government has already

indicated on several occasions since the defendants were first indicted on December 4, 2008,

how it expects the evidence at trial to establish the jurisdictional elements of MEJA.   For

instance, the government generally proffered in its opposition to the defendants' prior Motion to

Dismiss on jurisdictional grounds [<u>see</u> Dkt. No. 51] that documentary evidence would show that

the defendants' employment supported the mission of the Department of Defense in Iraq

because: (1) the Department of Defense and Department of State carried out co-dependent roles

in achieving the overarching mission of the United States in Iraq—that is, eliminating a violent

and destabilizing insurgency while establishing a viable and functioning democratic government;

and (2) the provision of security services by the Department of State (including Blackwater

contractors) to Embassy personnel, military personnel, and other United States government

13

civilian employees, relieved the Department of Defense of the responsibility for furnishing such services.  Dkt. No. 51 at 32-34.  It then supplemented this proffer by identifying two particular items of documentary evidence that it may seek to introduce to establish the jurisdictional elements of MEJA.  See Dkt. No. 54 (i.e., the excerpt of the National Defense Authorization Act for Fiscal Year 2006 and a related Report to Congress prepared by the Department of State, dated April 6, 2006.  All of the documentary evidence concerning the jurisdiction elements of MJEA that is currently within the trial team's possession has been produced in discovery.

In addition, the defendants are also aware of certain testimonial evidence bearing on the jurisdictional elements of MEJA.  For example, accounts by certain Department of Defense and Blackwater individuals serving in Iraq before and at the time of the Nisur Square Shooting established in the grand jury and will establish at trial that: (1) the provision of security services by the Department of State (including Blackwater contractors) relieved the Department of Defense of the responsibility for furnishing such services; and (2) in specific instances, Blackwater contractors were requested and did respond to assist Department of Defense military forces under attack by hostile forces in Baghdad.

In short, although the defendants may desire an exhaustive itemization of MEJA evidence, they are not entitled to one because "[i]t is not the function of a bill of particulars to provide detailed disclosure of the government's evidence in advance of trial."  Brodie, 326 F. Supp. at 91.  The superseding indictment and the discovery materials provide the defendant with more than sufficient notice of the nature of the charges against them, including the jurisdictional elements of MEJA.  Nothing further is required or warranted.

## **Conclusion**

Accordingly, the government respectfully asks the Court to deny the defendants' Motion to Dismiss the Indictment for Failure to State an Offense or, in the Alternative, for a Bill of Particulars.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar Number 447889

By:     _____/s/_____
T. Patrick Martin
Assistant United States Attorney
D.C. Bar Number 471965
Thomas.Martin@usdoj.gov

_____/s/_____
Anthony Asuncion
Assistant United States Attorney
D.C. Bar Number 420822
Anthnoy.Asuncion@usdoj.gov

_____/s/_____
Christopher Kavanaugh
Assistant United States Attorney
VA Bar Number 73093
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
Christopher.Kavanaugh@usdoj.gov