**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| v. | ) |
|  | )    No. 1:08-cr-360-RCL |
| PAUL A. SLOUGH, | ) |
| NICHOLAS A. SLATTEN, | ) |
| EVAN S. LIBERTY, and | ) |
| DUSTIN L. HEARD, | ) |
|  | ) |
| Defendants. | ) |

_____

**DEFENDANTS' MOTION TO COMPEL**
**PRODUCTION OF EVIDENCE AND**
**INCORPORATED POINTS AND AUTHORITIES**

Paul Slough, Nicholas Slatten, Evan Liberty, and Dustin Heard ("Defendants"), through

counsel, respectfully move under Federal Rule of Criminal Procedure 16 to compel the

production of discovery within the possession of the government.  Specifically, Defendants

request that the government make available all vehicles allegedly damaged during the Nisur

Square firefight for inspection in the United States.  In addition, Defendants move to compel the

production of all data, including the "3ds Max files," used to create the government's computer

generated animations.  The facts and legal arguments supporting this motion are set forth herein.

**BACKGROUND**

On September 16, 2007, the Defendants were in Baghdad, Iraq, serving as members of a

tactical security team (designated "Raven 23") that was providing protection for United States

Department of State personnel.  Shortly before noon that day, a car bomb exploded in downtown

Baghdad near a meeting attended by a State Department official.  Upon learning of the bombing,

the Raven 23 team departed the "Green Zone" to secure a safe return route for the official.  After

arriving at a Baghdad location known as Nisur Square, Raven 23 came under attack and returned

fire.  During the course of this engagement, the government alleges that numerous Iraqis were killed and wounded.

Several weeks following the incident, the government began contacting alleged victims and witnesses of the Nisur Square incident in order to purchase the more than twenty Iraqi vehicles allegedly involved in the shooting incident.  The vehicles purchased by the government were kept in an area within the International Zone called Forward Operating Base Prosperity.  In or around March 2008 and again in May 2009, the government, protected by State Department and U.S. military assets, conducted an extensive investigation of Nisur Square and the vehicles allegedly damaged during the incident.  During its examination of the vehicles, the government performed a bullet trajectory analysis of some of the purported bullet holes on eleven of the vehicles.  The analysis involved taking hand measurements of the vehicles and the locations of impacts the examiners concluded were bullet holes.

Based on this trajectory analysis and underlying data, the original trial team created computer-generated evidence ("CGE") of what the government claimed was a demonstrative purporting to show bullet trajectories into certain of the Iraqi vehicles and the particular Raven 23 vehicles from which the bullet trajectories purportedly originated ("2009 CGE").  That team also designated for trial multiple experts to testify about the government's trajectory analysis and computer generated animations.

Shortly after the original indictment was returned in 2008, each defendant requested that the government provide him with all discovery to which he is entitled under Rule 16.  In addition, on July 1, 2009, Defendants requested "all information, including an original usable copy and all underlying data, relating to any computer-generated evidence ("CGE") that the government may seek to use at trial or at any hearing in the above-captioned case," and

delineated specific categories and types of information.  Letter from Steven J. McCool to Kenneth Kohl at 1 (July 1, 2009) (Attach. A). After numerous conferences with the government regarding its compliance with its Rule 16 obligations, Defendants filed a motion to compel. Defendants sought to compel, *inter alia*, information related to the government's CGE and any and all reports or examinations and tests within the government's possession, custody, or control, including expert "bench notes."  Def.s' Mot. to Compel at 15-20 (ECF No. 103).  On September 14, 2009, the Court granted Defendants' motion and ordered the government to disclose the requested data.  Status H'rg Tr. 49:3-23, Sept. 14, 2009 (Attach. B).  On October 15, 2009, the government produced much, but not all, of the requested information.

On November 4, 2009, Defendants requested that the government make all vehicles on which it conducted trajectory examination available for inspection.  On November 24, 2009, Defendants notified the government of significant deficiencies in the government's production of information related to its CGE.  Letter from Steven J. McCool to Kenneth Kohl (Nov. 24, 2009) (Attach. C). The CGE materials produced by the government contained an animation of the vehicles moving vis-à-vis each other, a camera "fly through" over Nisur Square, and a segment purporting to show a number of bullet trajectories between the Blackwater convoy and a number of Iraqi vehicles.  The government did not provide, however, the 3ds Max file used to create its animation, which Defendants explained was necessary for them to evaluate the timing, trajectories and relative distances between vehicles and other objects.  Defendants, therefore, requested "copies of the original 3ds Max files used to create the computer generated animations. These files should include all the vehicles shown in the animations including the trajectories and bullet impact locations."  *Id*. at 2.  On December 10, 2009, Defendants further requested that the government identify and produce the data used to create the CGE and all assumptions and

opinions that serve as the basis for the CGE.  Letter from Steven J. McCool to Kenneth Kohl (Dec. 10, 2009) (Attach. D).  Prior to the government producing these additional materials, the original indictment was dismissed.

Shortly after the new indictment was returned in 2013, Defendants renewed by letter dated November 19, 2013, all of their prior Rule 16 and *Brady* requests, including the specific requests related to the government's CGE and trajectory analysis.  Letter from Thomas Connolly to John Crabb (Nov. 19, 2013) (without attachments) (Attach. E).  Defendants noted that "[a]lthough the former trial team produced some responsive materials, [Defendants] respectfully request[ed] that the members of the current trial team comply with their obligation to conduct an independent review of all materials in the government's possession and produce all responsive materials not previously produced."  *Id*. at 1.

On February 28, 2014, Defendants again requested the 3ds Max files used to create the government's 2009 CGE, and that the government make the Iraqi vehicles available for inspection in the United States.  Letter from Thomas Connolly to Anthony Asuncion (Feb. 28, 2014) (Attach. F).  On March 13 and 21, 2014, Defendants and the government met and conferred regarding Defendants' outstanding discovery requests.  The government informed Defendants that it would not bring the Iraqi vehicles back to the United States; if Defendants or their experts wanted to examine the vehicles they would have to do so in Baghdad, Iraq.  The government also informed Defendants that it intended to introduce CGE at trial; however, because the 2009 CGE prepared at the direction of the prior trial team was based on potentially tainted material, the current trial team claimed to have not seen the original animation.  The government stated that it was producing a new CGE ("2014 CGE"), but that it would not be available by the March 28, 2014, deadline set by the Court.  The government was unable to give

Defendants a deadline by when the 2014 CGE and all of its underlying data would be produced to Defendants.  The government further stated that its production of CGE-related materials would not include the 3ds Max files for either the 2009 CGE or the 2014 CGE.  In the government's view, the 3ds Max files were akin to expert "bench notes" and it was not going to disclose that to the defense.

On March 28 2014, the government disclosed its anticipated experts.  Among those experts are two previously undisclosed witnesses, Suzanne Brown and Jacob Cabelli, both of whom are identified as "Visual Information Specialist."  Letter from T. Patrick Martin to Defense Counsel (Mar. 28, 2014) (Attach. G).  Ms. Brown and Mr. Cabelli are designated as CGE experts who are in the "process" of building a 3D model and animation that includes the "relative" locations of certain Iraqi vehicles, victims, some of the physical evidence, and "overlays of certain trajectory analysis."  *Id.* at 2-3.  The government notes that it will not provide Defendants a copy of the CGE animation until it discloses its exhibit list—April 25, 2014, just six weeks before the scheduled trial date.

Defendants move to compel the immediate production of the Iraqi vehicles and all CGE-related materials, including the underlying 3ds Max files, all of which is critical to Defendants' ability to prepare their defense.  As the Court will recall, at the January 31, 2013, status hearing, the government pressed the Court to schedule an earlier trial date, claiming that the government would be prepared for a September 2013 trial.  Now, more than six months after the government's originally requested trial date, the government still has not completed discovery, and has not even provided a date by which it will do so.  What is more, it does not even intend to disclose its experts' reports and analysis until just before trial.  This type of delay and gamesmanship cannot be sanctioned.  The government has charged Defendants with

extraordinarily serious offenses.  It has a corresponding obligation to facilitate the preparation of their defense through Rule 16 disclosures.  So far, the government has failed in regard to its trajectory analysis of the vehicles and the corresponding CGE through which it anticipates demonstrating that analysis.

## ARGUMENT

The Federal Rules of Criminal Procedure impose obligations on the government to make evidence available to the defense.  Specifically, Rule 16 provides, *inter alia*, that the government must disclose to the defendants or permit the defendants to inspect "tangible objects" and the results or reports of any physical examination or scientific test or experiment if the item is within the government's possession, custody, or control and the item is "material to preparing the defense" or the government intends to use the item in its case-in-chief at trial.  Fed. R. Crim. P. 16(a)(1)(E)-(F).  The "materiality" standard is not a heavy one to meet.  Evidence is "material" regardless of whether it is exculpatory or inculpatory, for "it is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths."  *United States v. Safavian,* 233 F.R.D. 12, 15 (D.D.C. 2005) (quoting *United States v. Marshall,* 132 F.3d 63, 67 (1998)).  Indeed, information is "material" if there is any indication that it may play an "important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."  *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993).

"Rule 16 is intended to provide a criminal defendant 'the widest possible opportunity to inspect and receive such materials in the possession of the Government as may aid him in presenting his side of the case."  *Safavian*, 233 F.R.D. at 15.  What is more, "Rule 16 establishes 'the *minimum* amount of discovery to which the parties are entitled' [and] 'is not intended to

limit the judge's discretion to order broader discovery in appropriate cases.'" *United States v. Karake*, 281 F. Supp. 2d 302, 306 (D.D.C. 2003) (emphasis added) (quoting the Advisory Committee Note to Fed. R. Crim. P. 16.

The present dispute involves two categories of clearly discoverable material. First, Defendants request that the Iraqi vehicles allegedly shot by Defendants be made available in the United States for inspection. To date, these vehicles have been unavailable to the defense in light of the significant security risks and cost associated with traveling to Baghdad. Second, Defendants request the immediate production of the government's CGE and related data. There is no dispute that Defendants are entitled to the raw data used to create the CGE. Rather, the dispute is whether Defendants are entitled to the 3ds Max files that are the foundation of the government's 2009 and 2014 CGEs. With respect to both items, Rule 16 mandates their production to the defense.

### *Iraqi Vehicles*

It is beyond dispute that the Iraqi vehicles allegedly involved in the Nisur Square shooting are subject to Rule 16's disclosure obligations. The government is in possession of this evidence and plainly intends to use it in its case-in-chief. Effective preparation of a defense and cross examination of the government's witnesses can only be achieved if Defendants are given access to these vehicles. Defendants must be afforded the opportunity to perform their own inspection, including, *inter alia*, an examination of impact marks and a laser scan of each vehicle, which guarantees a higher level of accuracy for trajectory analysis than the hand measurement method employed by the government. *See* Declaration of Eugene Liscio ¶ 8 (Attach. H).

The government does not dispute Defendants' right to inspect the vehicles; nor could it. Letter from Kenneth Kohl to Defense Counsel at 15 (Apr. 13, 2009) (Attach. I). "Fundamental

fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing . . . examine a piece of critical evidence whose nature is subject to varying expert opinion."[1] *Barnard v. Henderson*, 514 F.2d 744, 746 (5th Cir. 1975); *see also United States v. Willock*, 696 F. Supp. 2d 536, 570 (D. Md. 2010) (noting the need for a defendant's experts to be able to "perform their own independent study of the toolmark evidence itself").

The dispute between the parties, therefore, solely concerns the type of access to which Defendants are entitled.  In the government's view, it has discharged its obligation by making the cars available to Defendants 5000 miles away in Baghdad.  In this case, however, that will not do.  While the government can certainly marshal the resources necessary so its experts can inspect the vehicles in Iraq, Defendants cannot, and are, therefore, effectively denied access to evidence critical to their defense.  The practical considerations involved in traveling and operating in Baghdad are not simply airfare and hotel accommodations; if it were, this motion would be unnecessary.  Rather, in order to inspect the vehicles in their current location, Defendants and their counsel would be required to go to exceptional lengths—at great expense— to attempt to secure the appropriate personal protection and, even if those arrangements could be made, they still necessarily would expose themselves to a serious and significant safety risk.

Baghdad was the most dangerous place in the world in 2007, and remains an extremely dangerous place today.  The State Department has issued a travel warning that advises U.S.

---

[1]  For this reason, the government cannot discharge its obligation to produce the vehicles by referring Defendants to its production of photographs and videos of the vehicles.  The materials produced by the government to date do not reveal critical information necessary to the defense expert's analysis, such as the angle or depth of the bullet holes, the scale of each impact, subsequent impact sites along the bullet path, and the trajectory rods placement.  *See* Liscio Decl. ¶ 9 (Attach. H).

citizens against traveling to Iraq.  U.S. Dep't of State, *Iraq Travel Warning* (March 6, 2014),

*available at* http://travel.state.gov/content/passports/english/alertswarnings/iraq-travel-

warning.html (last visited March 31, 2014).  It has cautioned that "[t]he ability of the Embassy to

respond to situations in which U.S. citizens face difficulty, including arrests, is extremely

limited."  *Id.*  Its travel warning further states:

> U.S. citizens in Iraq remain at ***high risk for kidnapping and terrorist
> violence***.  Methods of attack have included roadside improvised explosive devices
> (IEDs), including explosively formed penetrators (EFPs); magnetic IEDs placed
> on vehicles; human and vehicle-borne IEDs; mines placed on or concealed near
> roads; mortars and rockets; and shootings using various direct fire weapons. . . .
> ***Numerous insurgent groups, including al-Qaida in Iraq, also known as the
> Islamic State in Iraq and Syria, remain active and terrorist activity and violence
> persist in many areas of the country at levels unseen since 2007***.

*Id.* (emphasis added).  *Even within the restricted International Zone*, which is under the control

of the Iraqi government, the State Department warns that U.S. citizens "should continue to

exercise good personal safety precautions."  *Id.*  The State Department also states that while

some U.S. and third-country business people travel throughout Iraq, they do so under "restricted

movement conditions and often with security advisors and protective security teams."  *Id.*

    The risks associated with traveling to Baghdad are especially significant for counsel and

other individuals associated with Defendants because of the sensitivity of the events underlying

this prosecution.  Moreover, entry, exit, and movement within Iraq are strictly enforced by the

government of Iraq.  Consequently, the travel plans of defense counsel, if they were to travel to

and within Iraq, would be available to elements within Iraq who might wish to do harm to

anyone seeking to protect Defendants' constitutional rights.

    A protective security team would be mandatory to ensure the safety of defense counsel

and defense experts.  Not only is a private security team beyond the financial resources of

Defendants (estimated costs for the travel and necessary security measures are in excess of

$45,000), upon learning the mission details, the private security companies contacted declined to provide services. This then caused the defendants' expert to decline a trip to Iraq to inspect the vehicles.  *See* Declaration of William Coffield in Support of Defendants' Motion to Compel (Attach. J).

Defendants previously requested that the Court require the government to provide to defense counsel the same level of protection in Iraq as the prosecutors receive during their site visits.  That request was denied (ECF No. 163), and Defendants do not repeat it here.  Instead, Defendants simply request that the government transport the Iraqi vehicles that were allegedly involved in the Nisur Square incident, and which the United States now owns, to the United States so that the defense has access to that important evidence equal to that afforded the government.  Under the unusual circumstances of this case, it is unreasonable for the government to leave these critical pieces of evidence in Iraq, while at the same time it issues dire travel warnings to any citizen contemplating travel to that country *and* refuses to facilitate the protective measures that would be required for defense counsel to access this evidence safely in Iraq.  Rule 16 requires the government to "permit" Defendants' to inspect this evidence, and maintaining it in a location where defense counsel realistically cannot travel is equivalent to prohibiting the inspection altogether.

"A criminal trial, like its civil counterpart, is a quest for truth.  That quest will more often be successful if both sides have an equal opportunity to [access] . . . the information from which the truth may be determined."  *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966). Where the Government is able to marshal its vast resources and machinery to accuse and try an individual charged with a crime, that individual may not be left to his own less robust resources if doing so would leave him unable to defend against the charge at trial. *See Gideon v.*

*Wainwright*, 372 U.S. 335, 344 (1963).  Thus, courts have held that defendants are entitled to the assistance of counsel,[2] investigators,[3] and experts,[4] and that where such assistance is necessary to a defense and the defendant cannot afford it, the government must provide such assistance to ensure a fair trial.  Courts have similarly imposed obligations on the government to ensure defendants have reasonable access to evidence in the government's possession in situations far less extreme then those presented here.

For instance, in *United States v. Knellinger*, the court rejected the government's argument that the defendants had reasonable access to the defendant's computer hard drive at the FBI offices in Richmond, Virginia.  471 F. Supp. 2d 640, 647-48 (E.D. Va. 2007).  The court found that the defense's experts "could not reasonably be expected to agree to conduct the required analysis given the extremely burdensome practical effects" of having to perform their analysis at the government's chosen location.  *Id.* at 648.  To ensure that the defendants had reasonable access to the hard drive, the court ordered the government to produce a physical copy for defense examination at the defense experts' facilities.  *Id.* at 649-50; *see also United States v. Hill*, 322 F. Supp. 2d 1081, 1092 (C.D. Cal. 2004), *aff'd* 459 F.3d 966 (9th Cir. 2006) (holding that requiring the defense expert "to travel repeatedly between his office [in another state] and the government's lab—and obtain permission each time he does so—is unreasonably burdensome"); *United States v. Renshaw*, 1:05-CR-00165, 2007 WL 710239 (S.D. Ohio Mar. 6, 2007) (ordering the government to make a copy of all discovery material available to defense counsel in

---

[2] *See, e.g.*, *Gideon*, 372 U.S. at 340-45 (lawyer at trial); *Douglas v. California*, 372 U.S. 353 (1963) (lawyer on direct appeal).

[3] *See, e.g.*, *Smith v. Enomoto*, 615 F.2d 1251 (9th Cir. 1980) (investigator).

[4] *See, e.g.*, *Ake v. Oklahoma*, 470 U.S. 68, 76-83 (1985) (psychiatric expert in capital trial and sentencing); *see also United States v. Chandler*, 894 F.2d 463 (D.C. Cir. 1990).

Cleveland, Ohio, when trial was to take place in Cincinnati); *United States v. Leichtfuss*, 331 F.Supp. 723, 740 (N.D. Ill. 1971) (requiring the government to make the requested Selective Service records available in an office located conveniently near the courthouse for defense inspection). Moreover, in the civil context, the court in *Jagex Ltd. v. Impulse Software*, found it unreasonable to require defense counsel to travel to the United Kingdom when the plaintiff could produce the evidence domestically. 273 F.R.D. 357, 359 (D. Mass. 2011).

If this is the rule in both civil and criminal cases where only expense and inconvenience are involved, the same rule must surely apply here where a critical concern for the safety of defense counsel and investigators exists. The government has chosen to prosecute this case in the District of Columbia. Critical evidence to which the defense is entitled is located in Iraq, where it is not merely burdensome but extremely dangerous to access. The government should be required to make that evidence available in the United States.

### Computer-Generated Evidence

The parties' dispute concerning the government's CGE is narrow but significant. The government acknowledges its obligation to produce all of the underlying data on which its CGE is based.[5] So for instance, the underlying data the government has agreed to produce should include data such as bullet trajectory measurements, measurements of Nisur Square, and the

---

[5] While the government acknowledges this obligation, it has indicated that it will not make the required disclosure by the March 28 deadline set by the Court. The government's failure to meet this Court imposed deadline, to which the government agreed, will prejudice Defendants' ability to analyze and respond to the government's expert disclosures both by Defendants' expert disclosure deadline and trial. As Defendants' expert noted in his declaration, analyzing the government's CGE and its underlying data in a case of this complexity is a significant and time consuming exercise. Liscio Decl. ¶ 10. Currently, we are two months away from trial and the government has indicated it does not intend to disclose the CGE-related materials until April 25, 2014.

evidence, if any, used to place the Blackwater and Iraqi vehicles within Nisur Square—both in terms of physical space and time.

The dispute between the parties concerns whether the government must also produce the computer file, called the 3ds Max file, used to produce the government's CGE.  As Defendants' expert, Eugene Liscio explains in the attached declaration, without access to the 3ds Max file used to create the 2014 CGE, he cannot verify whether the animation the government produces accurately reflects the underlying data.  Liscio Decl. ¶¶ 6-7.  And without the 3ds Max file used to create the 2009 CGE, Defendants cannot compare and contrast the competing versions (2009 versus 2014) of the government's animation.  To the extent there are differences between the animations—both of which are presumably based on attempted accurate physical measurements and application of consistent scientific principles to those measurements—such differences would undermine the accuracy and trustworthiness of the CGE's representation of the evidence. Any such differences are material to the preparation of the defense and also constitute exculpatory evidence within the government's constitutional disclosure obligation under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.  *See Safavian*, 233 F.R.D. at 14, 15-16 (holding that the government "must always produce" "any information in the possession of the government . . . that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses").  Given the powerful effect that animated evidence that purports to reenact charged crimes can have upon a jury—and the significant potential for unfair prejudice that such evidence presents if it is not subject to thorough scrutiny by opposing experts—production of the underlying 3ds Max file is essential to the fairness of these proceedings.

3ds Max is a well-known modeling and animation program used in forensics for crime and accident scene reconstruction.  Liscio Decl. ¶ 5.  The 3ds Max file is where the 3D model is constructed (*i.e.*, modeled and textured) and assembled in a virtual space.  *Id.*  From that original 3D model, 3ds Max can then calculate and create various renderings or views of the event modeled, in two-dimensional still or video images.  *Id.*  As Mr. Liscio states in his declaration:

> Analyzing a 3D model once it has been rendered into a two-dimensional form, such as a video or still image, is extremely difficult because one cannot extrapolate from the two-dimensional form the original three-dimensional model. Before the model is rendered into a two-dimensional form, however, it is easily measured and analyzed.  Useful data, such as dimensions, angles, vehicle speed and position, timing, distances, trajectory measurements, and other technical data are available in the 3ds Max file, and can be extracted, compared, and analyzed. Without access to the government's 3ds Max files, however, there is no way of verifying whether the CGE is based on the correct data, such as trajectory measurements, vehicle location measurements, or witness testimony.   There is also no way of assessing whether the data underlying the CGE was correctly inputted.  The 3ds Max file is also necessary to determine the extent to which the CGE deviates from the underlying data or is based on assumptions.

*Id.* ¶ 7.

The 3ds Max files fall squarely within the government's Rule 16 obligations.  *See United States v. Marshall*, 132 F.3d at 67; *United States v. Lloyd*, 992 F.2d at 351.  First, the files are necessary to test the accuracy of the CGE and prepare Defendants' impeachment and rebuttal of this evidence and the testimony of any experts.  Second, the 3ds Max files will assist Defendants in assessing the very foundation and authenticity, and hence admissibility, of the government's CGE.  The government's 2009 CGE purports to show bullet trajectories into several Iraqi vehicles and the Blackwater vehicles from which those bullets allegedly originated.  Because of potential taint issues, the current trial team is creating a new animation, the 2014 CGE, that presumably will depict information similar to what was contained in the 2009 CGE.  The 3ds Max file for the 2009 CGE will be essential for analyzing the 2014 CGE.  Indeed, if there are variations and inconsistencies between the CGEs, which are supposedly based on consistent

scientific principles and hard data, the government would be unable to establish the requisite foundation for its use of CGE.

Courts confronted with discovery disputes in similar circumstances have recognized a defendant's right to the production of the computer software and files on which the government's computer generated evidence is based. *See, e.g.*, *United States v. Budziak*, 697 F.3d 1105, 1111-13 (9th Cir. 2012); *United States v. Dioguardi*, 428 F.2d 1033, 1038 (2d Cir. 1970) ("It is quite incomprehensible that the prosecution should tender a witness to state the results of a computer's operations without having the program available for defense scrutiny and use on cross-examination if desired."); *Bartley v. Isuzu Motors Ltd.*, 151 F.R.D. 659, 660 (D. Col. 1993) ("When one party seeks to present a computer study, in order to defend against the conclusions that are said to flow from these efforts, the discovery party not only must be given access to the data that represents the computer's work product, but he also must see the data put into the computer, the programs used to manipulate the data and produce the conclusions, and the theory or logic employed by those who planned and executed the experiment."); *Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257, 1267 (N.D. Ohio 1980) ("Certainly, where, as here the expert reports are predicated upon complex data, calculations and computer simulations which are neither discernible nor deducible from the written reports themselves, disclosure thereof is essential to the facilitation of effective and efficient examination of these experts at trial.").

In opposing Defendants' request for the 3ds Max files used to generate the government's animations, the government likened Defendants' request to a demand for "bench notes." Even accepting that analogy for present purposes, there should be no question that the government must produce these files. During the September 14, 2009, hearing on Defendants' motion to

compel, the Court ordered that all expert materials, including the "bench notes" and CGE

materials, be produced.  Sept. 14, 2009 Tr. at 46:3-17, 49:3-23 (Attach. B).  Indeed, the

government conceded that while it did not at that time possess "any bench notes," those notes

were "something that [the government] will produce with our expert reports in this case."  *Id.* at

46:14-16.  And the government did produce bench notes, including some 3ds Max files of the

individual vehicles.  The government did not produce, however, and is now refusing to produce,

the 3ds Max files for the fully constructed 3D model.  The government's 3ds Max files of its

completed model are critical to Defendants' preparations for trial.  Without them, Defendants

cannot verify the accuracy of the government's animation nor adequately prepare to address its

admissibility or cross examine the government's experts.

## CONCLUSION

For the reasons stated, Defendants request that this Court compel the Government to

transport the vehicles to the United States and immediately produce not only the underlying data

for its CGE animation, but the 3ds Max files used to create them.


Dated: April 3, 2014                                    Respectfully submitted,

/s/ William Coffield                                    /s/ Brian M. Heberlig
William Coffield (No. 431126)                           Brian M. Heberlig (No. 455381)
Coffield Law Group LLP                                  Michael J. Baratz (No. 480607)
1330 Connecticut Avenue, N.W., Suite 220                Bruce C. Bishop (No. 437225)
Washington, DC  20036                                   Linda C. Bailey (No. 985081)
Telephone:  (202) 429-4799                              Scott P. Armstrong (No. 993851)
                                                        Steptoe & Johnson, LLP
*Counsel for Defendant Evan S. Liberty*                 1330 Connecticut Avenue, N.W.
                                                        Washington, D.C.  20036-1795
                                                        Telephone:  (202) 429-3000

                                                        *Counsel for Defendant Paul A. Slough*

 /s/ David Schertler                                              /s/  Thomas G. Connolly

David Schertler (No. 367203)
Danny Onorato (No. 380043)                     Thomas G. Connolly (No.420416)
Lisa Schertler (No. 430754)                        Steven A. Fredley (No. 484794)
Schertler & Onorato, L.L.P.                         Jared P. Marx (No.1008934)
575 – 7th Street, N.W., Suite 300 South      Anne K. Langer (No. 501389)
Washington, D.C.  20004                            Wiltshire & Grannis LLP
Telephone:  (202) 628-4199                       1200 Eighteenth Street, N.W., Suite 1200
                                                                       Washington, D.C.  20036
*Counsel for Defendant Dustin L. Heard*      Telephone:  (202) 730-1300

                                                                       *Counsel for Defendant Nicholas A. Slatten*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of April 2014, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

Anthony Asuncion
T. Patrick Martin
Christopher Kavanaugh
John Crabb, Jr.
David Mudd
United States Attorney's Office
for the District of Columbia
555 Fourth Street, NW
Washington, DC 20530

/s/ William F Coffield
William Coffield (No. 431126)
Coffield Law Group LLP
1330 Connecticut Avenue, N.W., Suite 220
Washington, DC  20036
Telephone:  (202) 429-4799
Counsel for Defendant Evan S. Liberty

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>PAUL A. SLOUGH, )<br>NICHOLAS A. SLATTEN, )<br>EVAN S. LIBERTY,  and )<br>DUSTIN L. HEARD, )<br><br>        Defendants. ) | No. 1:08-cr-360-RCL |

## **PROPOSED ORDER**

This matter came before the Court on the Defendants Motion to Compel Production of

Evidence.  For good cause shown, Defendants' motion is **GRANTED**; and

**IT IS ORDERED** that the government shall make all vehicles allegedly damaged during

the Nisur Square firefight that are within the possession, custody, or control of the government

available for inspection in the United States;

**IT IS FURTHERED ORDERED** that the government shall produce to Defendants all

3ds Max files used to create the government's Nisur Square animation and any other computer

generated evidence.

**SO ORDERED,** this _____ day of _____, 2014.

_____
Royce C. Lamberth
United States District Judge