## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 08-360 (RCL)** |
| | ) | |
| **PAUL A. SLOUGH,** | ) | |
| **NICHOLAS A. SLATTEN,** | ) | |
| **EVAN S. LIBERTY, and** | ) | |
| **DUSTIN L. HEARD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

*but this redacted copy*
*we file this date.*
*Royce C. Lamberth*
*U.S.D.J.  4/8/14*

### MEMORANDUM OPINION

Before the Court is the defendants' oral motion of October 25, 2013 to dismiss the superseding indictment [304] returned against them. The defendants allege that the government obtained the superseding indictment in violation of *Kastigar v. United States*, 406 U.S. 441 (1972), by using the defendants' compelled statements, or information derived directly or indirectly from them, to secure the indictment. This Court conducted a six-day *Kastigar* hearing beginning on December 4, 2013, to determine whether the government used the defendants' compelled statements or any evidence derived from them before the grand jury.

Upon consideration of the testimony presented at the *Kastigar* hearing, the post hearing briefs submitted by the government, Gov't Br., Dec. 30, 2013, ECF No. 372; Gov't Reply, Jan. 28, 2014, ECF No. 382, and the defendants, Defs.' Br., Jan. 17, 2014, ECF No. 376, the entire record herein, and the applicable law, the Court will DENY defendants' motion to dismiss the indictment.

### I.    BACKGROUND

Both the District Court and the Court of Appeals for the District of Columbia Circuit have previously described the factual background of this case. *United States v. Slough*, 677 F. Supp. 2d 112, 116–129 (D.D.C. 2009) ("*Slough I*"), *vacated*, 641 F.3d 544, 555 (D.C. Cir. 2011) ("*Slough II*"); *Slough II*, 641 F.3d at 547–49. Here, the Court will highlight only the relevant facts and procedural background. In 2007, the defendants all served as security contractors employed by Blackwater Worldwide. *Slough I*, 677 F. Supp. 2d at 116. At the time, Blackwater provided security services for U.S. government personnel in Iraq. *Id.* The defendants were all members of a Blackwater Tactical Support Team called "Raven 23" that operated in Baghdad to support other Blackwater security teams. *Id.*

Raven 23 consisted of a convoy of four vehicles. *Id.* "Defendants Liberty, Slough and Slatten were positioned in the third vehicle as the driver, turret gunner and designated defensive marksman (or sniper) respectively." *Id.* "Defendant Heard was the rear turret gunner in the fourth vehicle." *Id.*

"On September 16, 2007 a car bomb exploded near the Izdihar Compound in Baghdad, where a U.S. diplomat was conferring with Iraqi officials. American security officials ordered a team from Blackwater Worldwide to evacuate the diplomat to the Green Zone." *Slough II*, 641 F.3d at 547. In order to secure a safe evacuation route for the diplomat and the other Blackwater team, Raven 23 "took up positions in Nisur Square, a traffic circle located just outside the [Green] Zone in downtown Baghdad," and attempted to stop traffic. *Slough I*, 677 F. Supp. 2d. at 116. Shortly afterwards, "a shooting incident erupted, during which the defendants allegedly shot and killed fourteen [Iraqi civilians] and wounded twenty others." *Id.* The key factual dispute in this case is

whether the defendants' actions were a reasonable response to a threat to the convoy: the government maintains the defendants' shots were unprovoked, but the defendants claim that Raven 23 came under attack by insurgents. *Id.*

After Raven 23 returned to the Green Zone, the Department of State's Diplomatic Security Service ("DSS") interviewed each member of Raven 23 about the incident in Nisur Square. *Slough II*, 641 F.3d at 548. On September 18, 2007, all the members of Raven 23 gave written sworn statements about the incident to DSS. *Id.* All the statements used a standard "form that included a guarantee that the statement and the information or evidence derived therefrom would not be used in a criminal proceeding against the signer." *Id.* In their immunized statements, ████████████████████

████████████████████████████████████. Gov't App. J. 7, 11, 15, 19–20. ██████████████████████████████████████

████████████████████████████████████████

████████████. *Id.* at 19. The government previously conceded that the Court must treat these written sworn statements as compelled under *Garrity v. New Jersey*, 385 U.S. 493 (1967). *Slough II*, 641 F.3d at 548. Subsequently, the September 18 statements were leaked to the media. *Id.* Multiple news sources quoted the September 18 statements, including the defendants' statements, and one news source posted a full copy of defendant Paul Slough's statement online. *Id.* at 548–49. In light of the substantial media attention in both the United States and Iraq focused on the Nisur Square incident, several of the government's witnesses were exposed to the defendants' compelled statements.

The defendants moved to dismiss the original indictment under *Kastigar*. After a

three week *Kastigar* hearing, the District Court, Judge Ricardo Urbina presiding, granted the defendant's motion and dismissed the indictment. *Slough I*, 677 F. Supp. 2d at 166. Upon appeal, the Court of Appeals for the District of Columbia Circuit found that Judge Urbina failed to apply the correct legal standard under *Kastigar* and vacated and remanded the case for a new *Kastigar* hearing. *Slough II*, 641 F.3d at 554–55.

In order to avoid any *Kastigar* taint on remand, the government essentially started the case again from a clean slate. The government replaced the original prosecutors with new attorneys assigned to separate filter and trial teams. Gov't Br. at 21. The filter team reviewed all documentary and tangible evidence to verify it was not tainted before passing it to the trial team. *Id.* at 21–22. The filter team also conducted interviews of every witness to ensure that the trial team was not exposed to any potentially tainted testimony. *Id.* at 22. As a part of this process, the filter team sat in on subsequent witness interviews by the trial team and interceded as appropriate to prevent witnesses from tainting the trial team with any tainted testimony. *Id.* The filter team also examined members of the grand jury to ensure that none of them knew about the defendants' immunized statements. *Id.*; Gov't App. B103 at 5–6. The trial team, which made its charging decisions solely from the evidence cleared by the filter team, presented the filtered evidence to the grand jury, which returned a superseding indictment. Gov't Br. 22; Superseding Indictment, October 17, 2013, ECF No. 304. The superseding indictment charges the defendants with (1) multiple counts of voluntary manslaughter in violation of 18 U.S.C. §§ 1112, 3261(a)(1); (2) multiple counts of attempted manslaughter in violation of 18 U.S.C. §§ 1113, 3261(a)(1); and (3) using and discharging firearms during and in relation to crimes of violence in violation of 18 U.S.C.

§§ 924(c), 3261(a)(1).  *Id.*

The defendants moved to dismiss the superseding indictment as tainted under *Kastigar*.  Accordingly, this Court held a six-day *Kastigar* hearing to determine if the government made any improper use of the defendant's compelled statements.

## II.   LEGAL STANDARD

"No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The government may however displace a witness's valid claim of the privilege against self-incrimination by granting the witness immunity from the use of the testimony or any information derived from it in any future prosecution.  *Kastigar v. United States*, 406 U.S. 441, 453 (1972).  Use and derivative use immunity places "'the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege.'"  *Id.* at 458–59 (quoting *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 79 (1964)).

If the government later wishes to prosecute one previously granted use and derivative use immunity for the conduct underlying the immunized testimony, it "must prove, by a preponderance of the evidence, that 'all of the evidence it proposes to use was derived from legitimate independent sources.'"  *Slough II*, 641 F.3d at 550 (quoting *United States v. North*, 910 F.2d 843, 854 (D.C. Cir. 1990) ("*North I*"), *withdrawn and superseded in part on other grounds, United States v. North*, 920 F.2d 940, 941 (D.C. Cir. 1990) ("*North II*")).  This is to say that the government must show that it has not made any use of the immunized testimony—that the testimony of the government's witnesses has not "been shaped, altered, or affected by [exposure to] the immunized testimony."  *North I*, 910 F.2d at 863.  The government may shoulder this burden through

the "use of any techniques" and may "show in any fashion that a witness's testimony was not influenced by the immunized testimony." *North II*, 920 F.2d at 943. As the government has charged each defendant individually, even though the charges are all presented in a single indictment, the Court must assess the "extent and possible harmfulness of [any] taint . . . individually." *Slough II*, 641 F.3d at 553.

In the simplest circumstance, the government may satisfy the *Kastigar* requirement by showing that its witnesses were "never exposed to immunized testimony" or that the government's "investigators memorialized (or 'canned') a witness's testimony" prior to any exposure to the defendant's immunized statements. *Slough II*, 641 F.3d at 550 (quoting *Slough I*, 677 F. Supp. 2d at 132). "But a failure by the government to make either showing does not end the district court's inquiry." *Id.* The district court must parse the government's evidence "witness-by-witness" and, "if necessary, . . . line-by-line and item-by-item." *North I*, 910 F.2d at 872. Ultimately, the Court must "separate the wheat of the witnesses' unspoiled memory from the chaff of [the defendant's] immunized testimony." *Id.* at 862. In other words, a witness's testimony is untainted if the government shows that the testimony does not overlap with the defendant's immunized statement. *Slough II*, 641 F.3d at 550. Finally, even if the witness's testimony does overlap with the defendant's compelled statement, the government may show that the witness has an independent source for the testimony, such as the witness's own firsthand perception of events. *Id.* at 551.

If the government fails to carry its *Kastigar* burden with respect to any evidence it has presented to the grand jury, it must show that the failure is harmless beyond a reasonable doubt. *North I*, 910 F.2d at 873. If the evidence is not harmless beyond a

reasonable doubt, the Court must dismiss the indictment. *Id.*

## III.    ANALYSIS

For expediency, this Court's *Kastigar* hearing focused solely on whether any witness presented tainted testimony to the grand jury. The Court will hold another *Kastigar* hearing closer to trial (or during trial) to resolve any remaining *Kastigar* issues related to trial witnesses. The defendants present four arguments that the government presented tainted testimony to the grand jury: first, that government witness Jeremy Ridgeway shaped his testimony ███████████████████████████████████

████████████████████; second, that the government presented tainted evidence from Col. David Boslego developed by the original (tainted) trial team █████████

██████████████████████; third, that the government failed to show that testimony of Iraqi witnesses summarized for the grand jury was untainted; and fourth, that the government failed to show that testimony ████████████████████████

███████████ was untainted ███████████████████████. The defendants have waived all other *Kastigar* challenges to the indictment beyond those four specifically raised in their post-*Kastigar*-hearing brief. Defs.' Br. 15 n.47. The defendants specifically reserve their rights to challenge any evidence under *Kastigar* at trial. *Id.* The Court will address each of defendants' arguments in turn.

### A.   *The Court Finds that Jeremy Ridgeway Did Not Shape His Testimony* █

████████████████████████████████████████

The defendants argue that Jeremy Ridgeway was exposed to the defendants' immunized statements and shaped his testimony before the grand jury ████████████

████████████████████████████████. In their written

7

immunized statements given to DSS, ███████████████████████████

████████████████████████████.

In his immunized statement, Paul Slough stated ██████████████

███████████



Gov't App. J at 7.

In his immunized statement, Nicholas Slatten ████████████████

███████████

Gov't App. J at 11.[1]

In his immunized statement, Evan Liberty stated ████████████████

███████████

─────────────────────

[1] ██████████████████████████████████████████

████████████



Gov't App. J at 15.

In his immunized statement, Dustin Heard stated



Gov't App. J at 19–20.

Jeremy Ridgeway was a fellow member of Raven 23 and served as the front turret gunner in the fourth vehicle. *Kastigar* Hr'g Tr. 24, Dec. 9, 2013 (PM). Initially, Ridgeway told the DSS investigators that Raven 23 did take incoming fire. Gov't App. H at 33. On December 5, 2008, Ridgeway pleaded guilty before Judge Urbina to one count of voluntary manslaughter and one count of attempted voluntary manslaughter. Plea Agreement, *United States v. Ridgeway*, No. 08-cr-341 (RCL) (D.D.C. Dec. 4, 2008), ECF No. 11; Superseding Information, *Ridgeway*, No. 08-cr-341 (RCL), ECF No. 11. After

deciding to plead guilty, Ridgeway changed his story and told the government that Raven 23 took no incoming fire.  Gov't App. B42 at 108–10.  The defendants contend that Ridgeway was exposed to their immunized statements and, in light of pressure from prosecutors who did not believe Ridgeway's original statement to DSS, changed his testimony so as to ████████████████████████████ curry favor with the prosecutors.

Before turning to Ridgeway's exposure to the defendants' immunized statements and analyzing Ridgeway's grand jury testimony, the Court makes three initial observations.  First, the Court finds it curious that the defendants' arguments in their post-*Kastigar* brief focus exclusively on Ridgeway's



*See supra*; Gov't App. B122 at 9 (████████████████████████████).

████████ *See supra*; Gov't App. B122 at 9.  The Court concludes this focus on ████ is likely due to Ridgeway's ██████████████████████████ refuting his own written statement to DSS.  The defendants' theory of *Kastigar* taint for Ridgeway should apply regardless of ████, so the Court will analyze Ridgeway's grand jury testimony

accordingly.

Second, the defendants' brief appropriately equates Ridgeway's statements about ███████████████████████████████████████████████. Ridgeway testified ████████████████████████████████████. *See* Gov't App. B42 at 122 ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████. Thus, any statement by Ridgeway that ██████████████ ████████████ is equivalent to saying █████████████████████. Again, the defendants' theory of *Kastigar* taint—that Ridgeway's ████████████████ was shaped by exposure to defendants' immunized statements—should apply the same regardless of what words Ridgeway used to indicate █████████████. The Court will analyze Ridgeway's grand jury testimony accordingly.

Third, ███████████████████████████████████████ ████████████████████████████████████ much of Ridgeway's testimony does not overlap with the defendants' compelled statements and so could not be tainted. For example, Ridgeway testified that, ██████████████████████████████ ████████████████████████████████████████ *Id.* at 63–64. Critically, Slough's immunized statement has no antecedent details ██████ ███████████████████████████████████████. As Ridgeway's additional details do not overlap with Slough's immunized statement, that testimony could not be tainted. *See Slough II*, 641 F.3d at 550 (citing *North I*, 910 F.2d at 872). As the defendants have waived any other *Kastigar* objections to Ridgeway's testimony beyond those specifically raised in their brief, the Court need not list every

point at which Ridgeway's testimony does not overlap with defendants' compelled statements. *See* Defs.' Br. at 15 n.47 ("The Court need not parse the entirety of the rest of those witnesses' testimony, or the testimony of other witnesses, that is not challenged herein.").

As an initial matter, the Court must determine whether Ridgeway was exposed to the defendants' statements. Ridgeway has admitted to reading the statements of defendants Paul Slough and Nicholas Slatten, so the Court finds that Ridgeway was exposed to those statements. *Kastigar* Hr'g Tr. 17–18, 20–21, Dec. 9, 2013 (PM).

As to defendants Dustin Heard and Evan Liberty, however, the evidence presented by the government leads this Court to conclude that Ridgeway was not exposed to those statements. Ridgeway's recollection of whether he has read Heard's immunized statement has been inconsistent: in an interview with the prior trial team in 2008, Ridgeway said he may have read Heard's statement, Def. App. 273, while during this Court's *Kastigar* hearing, Ridgeway did not recall reading any statements of Raven 23 members other than Slough and Slatten. *Kastigar* Hr'g Tr. 18, 22, Dec. 9, 2013 (PM). The Court finds that Ridgeway's lack of any specific recollection of reading Heard's statement telling, especially where Ridgeway does specifically recall other statements he read or news reports he saw about the Nisur Square incident. For example, Ridgeway recalls reading Slough's statement online, *id.* at 20–21, reading Slatten's statement on paper, *id.* at 17–18, and seeing news reports on YouTube about M4 ammunition magazines and M203 grenade casings with Evan Liberty's name written on them that were left at Nisur Square, *id.* at 32. Thus, as to Heard's statement, the Court finds by a preponderance of the evidence that Ridgeway was not exposed to Heard's immunized

statement and is therefore untainted with respect to Heard under *Kastigar*. As to defendant Evan Liberty, the defendants argue that since Ridgeway read an online news article that posted Slough's immunized statement, Ridgeway likely also read other online news articles that quoted Evan Liberty's immunized statement. Such speculation is insufficient to show that exposure exists for *Kastigar* purposes. *See Slough II*, 641 F.3d at 551 ("[T]he defendant bears the burden of laying 'a firm foundation resting on more than suspicion that proffered evidence was tainted by exposure to immunized testimony.'") (quoting *North II*, 920 F.2d at 949 & n.9) (internal quotation marks omitted). Again, the Court finds Ridgeway's lack of any recollection of reading Liberty's statement telling, especially when he does recall seeing a news story on YouTube that mentioned ammunition magazines and grenade casings with Liberty's name on them left at the scene. *Kastigar* Hr'g Tr. 32, Dec. 9, 2013 (PM). Thus, the Court also finds by a preponderance of the evidence with respect to Liberty that Ridgeway was not exposed to Liberty's statement and is therefore untainted under *Kastigar*.

While the Court finds that Ridgeway was exposed to Slatten's statement, as Ridgeway admitted to reading it, *id.* at 17–18, the Court also finds that Slatten has waived his *Kastigar* defense with respect to Ridgeway. At this Court's *Kastigar* hearing, Ridgeway testified that before he and Slatten turned in their written statements at the embassy, they were standing outside in a courtyard and read each other's statements. *Id.*; *see also* Def. App. 272 (interview notes of FBI Special Agent Carolyn Murphy from October 30, 2008 indicating that Ridgeway and Slatten exchanged statements to ensure that they made sense prior to walking over to the embassy). This Court credits

Ridgeway's testimony.   Ridgeway further testified that Slatten's disclosure of his statement to Ridgeway was voluntary: no one told or forced Slatten to share his immunized statement with Ridgeway.   *Kastigar* Hr'g Tr. 18, Dec. 9, 2013 (PM). Slatten's voluntary act of sharing his statement with Ridgeway waives his Fifth Amendment claim under *Kastigar* with respect to Ridgeway. *See United States v. Kuehn*, 562 F.2d 427, 430 (7th Cir. 1977) (noting that the Fifth Amendment privilege against self-incrimination "may be waived by the person reciting the incriminating facts").   As the Court finds that Slatten voluntarily disclosed his statement to Ridgeway, the Court must conclude that Slatten has waived his *Kastigar* claim with respect to Ridgeway's testimony.

The Court now turns to Ridgeway's grand jury testimony.   Since the Court found that Ridgeway was exposed to Slough's immunized statement, the government must show by a preponderance of the evidence that Ridgeway's testimony does not overlap with Slough's statement or that Ridgeway has an independent basis for the testimony, such as his own perception of events.   In his grand jury testimony, Ridgeway specifically ███████████████████████████████████████.   The Court will address each in turn.

Ridgeway's first ██████████████████████████████████████
███████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████

Gov't App. B42 at 74.

This testimony occurs in the context of Ridgeway describing ██████████████████

████████████████████████████████████   ██████   ██████

████████    *Id.* at 72–74.  Ridgeway's testimony links his visual perception of ██

████████  with his aural perception that ██████████████████

████████████████████████████████████.

As none of the defendants' compelled statements describe ████████████, that

element of Ridgeway's testimony does not overlap with the defendants' compelled

statements and could not be tainted.   Moreover, the Court finds Ridgeway has an

independent basis for his testimony as he explicitly linked the testimony that ██████

████████  to his perceptions of what he heard during the incident.  *See Slough II*,

641 F.3d at 552 ("Moreover, a witness's testimony need not have *any* exterior antecedent,

i.e., any precursor other than the witness's perceptions of what happened.").  Thus, the

Court finds by a preponderance of the evidence that this testimony was not tainted.

Ridgeway again ██████████████████████████:

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████

Gov't App. B42 at 79.

Ridgeway's testimony here describes ██████████████████████

████████████████████████.  *Id.* at 77–79.  From context,

Ridgeway's testimony again does not overlap with the defendants' compelled statements:

Ridgeway includes additional non-overlapping details, namely ██████████████

████████████████████████████████

[2] ████████████████████████

15

██████████████. *Id.* at 78–79. Further, Ridgeway also has an independent and untainted basis for his testimony since he again linked his testimony about the ███████████████ to his aural perception that ████████████████████████ ████████████. Thus, the Court finds by a preponderance of the evidence that this testimony was not tainted.

Ridgeway next ████████████████



Gov't App. B42 at 83.

This section of Ridgeway's testimony ████████████████ ████████████████████████. *Id.* Again, Ridgeway's testimony includes additional details beyond those given in the defendants' immunized statements and therefore does not overlap with them: none of the defendants' immunized statements mention ████████████████, and none of the defendants' statements mention ████████████████ ████████████████████. *See* Gov't App. J. at 5–20. As Ridgeway's statement does not overlap with the defendants' immunized statements, Ridgeway's testimony cannot be tainted under *Kastigar*. Ridgeway's perception of events also provides an independent and untainted basis for his testimony as his statement about ████████████ occurs as a part of his description of what he witnessed during the Nisur Square incident. Therefore, the Court finds this testimony

untainted by a preponderance of the evidence.

Next, the Court turns to pages 90–91 of Ridgeway's grand jury testimony:



Gov't App. B42 at 90–91.

As a preliminary matter, only defendants Slatten and Liberty mention ███████████ in their immunized statements, so Ridgeway's testimony on pages 90–91 does not overlap with, and could not be tainted by, Slough's statement or Heard's statement. *See supra.* Both Slatten and Liberty described █████████████████████, though neither described █████████████████████ ████████████████. As the details of Ridgeway's description of ███ ████████████ have no antecedent in either Slatten's or Liberty's statements, Ridgeway's testimony does not overlap with those statements and could not be tainted by them. To the extent that Ridgeway's responses about ████████████ are limited to his description of ████████████, Ridgeway's testimony does not overlap with any of the defendant's compelled statements and is untainted. Alternatively, Ridgeway's testimony here also serves as ██████████████████, which the Court will address in conjunction with Ridgeway's final two ████████████.

The Court will now address the final two instances ████████████ ████████████████████



Gov't App. B42 at 99–100.



*Id.* at 108–09.

On pages 99–100 of his grand jury testimony, ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████. On pages 108–110 of

Ridgeway's grand jury testimony, ███████████████████████████████████

███████████████████████████████████████████████████████. *See*

*also* Gov't App. H at 33 (Ridgeway's statement to DSS). █████████████████

███████████████████████████████████████████████████████████████

████████████████████████████ Based on the evidence submitted by the

government, the Court finds Ridgeway's testimony on pages 90–91, 99–100, and 108–09 to be untainted.   In each case, ███████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████. ████████████ the Court concludes that Ridgeway has an independent basis for his testimony, namely his firsthand perception of the Nisur Square incident. "Where two independent sources of evidence, one tainted and one not, are possible antecedents of particular testimony, the tainted source's presence doesn't ipso facto establish taint. (Moreover, a witness's testimony need not have *any* exterior antecedent, i.e. any precursor other than the witness's perceptions of what happened.)" *Slough II*, 641 F.3d at 551.  Implicitly, accepting the defendants' theory of Ridgeway's exposure and taint under *Kastigar* would require the Court to find that Ridgeway's original statement to DSS was truthful and that his testimony before the grand jury and before this Court was untruthful.

Ultimately, the Court's determination rests on its assessment of Ridgeway's credibility as a witness.  Ridgeway testified before this Court's *Kastigar* hearing for over a day.  *See Kastigar* Hr'g Tr. Dec. 9, 2013 (PM); *Kastigar* Hr'g Tr. Dec. 11, 2013 (AM); *Kastigar* Hr'g Tr. Dec. 11, 2013 (PM).  The defendants had ample opportunity to question Ridgeway about his exposure to their immunized statements and about how and why he repudiated his earlier statements ██████████████████████.  In observing Ridgeway during the *Kastigar* hearing, this Court found Ridgeway credible. On that basis, the Court also credits Ridgeway's testimony before the grand jury.  Thus the Court finds by a preponderance of the evidence that Ridgeway's testimony was untainted because he had an independent basis for his testimony.

The Court concludes by a preponderance of the evidence that the challenged portions of Ridgeway's testimony were untainted because the testimony did not overlap with the defendants' compelled statements and because Ridgeway's firsthand perception of events provided an independent basis for his testimony.

**B. The Court Finds that Colonel Boslego Did Not Shape His Testimony** ▮

Defendant's second claim of *Kastigar* error is that Col. David Boslego, an army investigator who arrived at Nisur Square shortly after the incident, presented tainted testimony ▮▮▮▮▮▮▮▮▮▮. Specifically, the defendants object to Col. Boslego's testimony ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. The defendants allege that Col. Boslego's testimony was tainted under *Kastigar* either directly through Boslego's own exposure to the defendants' immunized statements or indirectly through tainted questions by the original trial team. After examining the evidence and Col. Boslego's testimony, the Court finds that Col. Boslego's testimony was not tainted either directly or indirectly.

In their written immunized statements given to DSS, both defendants Slough and Heard ▮▮▮▮▮▮▮. In his immunized statement, defendant Slough stated ▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮

Gov't App. J at 7.

In his immunized statement, Dustin Heard stated ▮▮▮▮▮▮



Gov't App. J at 19.

Defendants Slatten and Liberty ███████████████████████████████. Gov't App. J. at 9–16.

Turning to the defendants' argument that Col. Boslego was tainted by direct exposure to the defendants' immunized statements, the Court finds that Col. Boslego's testimony was not tainted.  As above, the government may show that a witness is untainted by showing the witness was not exposed to the immunized statements, that the witness's testimony was memorialized prior to exposure, that the witness's testimony does not overlap with the content of the immunized statements, or that the witness has an independent and untainted source for the testimony.  As a preliminary matter, the Court finds that Col. Boslego's testimony does not overlap with Slatten's or Liberty's compelled statements as neither Slatten nor Liberty ██████████████████████.  Consequently, Col. Boslego's testimony could not be tainted with respect to Slatten or Liberty.

The government's proffered evidence further shows that Col. Boslego's testimony could not be tainted with respect to Slough or Heard.  Defendants contend that Col. Boslego may have been exposed to the defendants' statements through a PowerPoint presentation prepared by a Blackwater intelligence analyst and given to the Department

of Defense by DSS, Def. Br. 44, or through exposure to media reports that quoted the

defendants' compelled statements, Def. Br. 45.  Defendants' contention, however, is

merely speculative and is contradicted by testimony in the record.  *See* Gov't App. G1 at

18–19 (testimony of Col. Boslego at the prior *Kastigar* hearing denying any exposure to

the defendants' immunized statements through the media or otherwise); *see also Slough*

*II*, 641 F.3d at 551 ("[T]he defendant bears the burden of laying 'a firm foundation

resting on more than suspicion that proffered evidence was tainted by exposure to

immunized testimony.")  (quoting *North II*, 920 F.2d at 949 & n.9) (internal quotation

marks omitted).

Further, Col. Boslego's testimony does not overlap with Slough's or Heard's

compelled statements for two reasons.  First, despite the defense brief's numerous claims

to the contrary,



. *See* Gov't App. J. at 9 (                                  ); *id.* at 26 (                         ); *id.* at 37 (                ); *id.* at 61 (                ); *id.* at 65 (                                  ); *id.* at 74 (                ); *id.* at 80 (                         ).  Therefore, any

testimony Col. Boslego offered concerning                         could not possibly

overlap with Slough's immunized statement and could not be tainted.

Second, with respect to Slough's ███████████████████████

and Heard's ████████████████████████, Col. Boslego's testimony still

does not overlap with the defendants' compelled statements.   Col. Boslego ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████.  *See, e.g.*, Gov't App. B23 at 19–22 (██████████

████████████████████████████████████████████████████

████████); *id.* at 39–40 (███████████████████████████████████

████████); *id.* at 40–41 (███████████████████████████████████

████████████████████████).  Col. Boslego's opinions do not overlap with

Heard's ████████████████████████ or Slough's statement ██████████████

████████████: Col. Boslego did not testify that ████████████████████

██████████████████████████████████████.  Instead, Col.

Boslego merely ████████████████████████████████████████████

█████████████████████████.  To be sure, █████████████████████

████████████████████████████, but *Kastigar* is not a guarantee

that the government's witnesses will not offer testimony inconsistent with, or harmful to,

the defendants' claims ████████████████.  *Kastigar* merely guarantees that neither the

government nor its witnesses shall make any use of the defendants' compelled

statements, and the government has ably shown that Col. Boslego did not do so.

With respect to the defendants' claims that Col. Boslego's testimony ██████

████████████████████ was tainted, the Court applies the same analysis as above to

find that Col. Boslego was not directly exposed to, and made no use of, the defendants'

compelled statements.  Again, defendants' speculative allegations that Col. Boslego was exposed to their statements do not present the "firm foundation resting on more than suspicion" that Col. Boslego's testimony could be tainted.  *See Slough II*, 641 F.3d at 551 (quoting *North II*, 920 F.2d at 949 & n.9)).  Further, Col. Boslego's testimony concerning ██████████████ does not overlap with the defendants' compelled statements. Defendants' object to five elements of Col. Boslego's testimony concerning ████████ ██████████████, Gov't App. B23 at 16–19; ███████████████████████ ████████████████████████████████████████████████████████████ ██████, *id.* at 40; ████████████████████████████████████ ████████████████████████████████████, *id.*; ████████████ ████████████████████████████████████, *id.* at 56; ████████████ ████████████████████████████████████████████████████████ ██████████, *id.* at 34.  The defendants' compelled statements spoke to none of these issues, so Col. Boslego's testimony concerning these subjects does not overlap with the defendants' compelled statements and could not be tainted.  Again, the defendants misunderstand the nature of Boslego's testimony and the protection granted by *Kastigar*. Boslego did not testify as to ████████████████████████████████. Instead, he offered ████████████████████████████████████ ██████████████—subjects that the defendants *never addressed* in their compelled statements.  To be sure, ████████████████████████████████████ ██████████████, but *Kastigar* merely guarantees that the government and its witnesses shall make no use of the defendants' compelled statements.  The Court finds by a preponderance of the evidence that Col. Boslego did not do so.

Defendants also argue that Col. Boslego's testimony may be indirectly tainted through the original prosecutors' questions to him. Under this theory, the defendants contend that the original prosecutors were only motivated to ask about ████████ ███████████ due to their exposure to the defendants' compelled statements. Defs.' Br. 41–43, 49. The defendants fail to recognize, however, that the original prosecutors encountered both these issues prior to their initial exposure to the defendants' immunized statements. Gov't Reply 14–15. Further, the *Kastigar* should not bar prosecutors from questioning witnesses about any issue so long as the prosecutors inevitably would have done so if not exposed to a defendant's immunized statement. *See Slough II*, 641 F.3d at 552 ("Immunity, properly construed, 'leaves the witness *and the Federal Government* in substantially the same position as if the witness had claimed his privilege.' To preserve that symmetry, obviously courts cannot bar the government from use of evidence that it would have obtained in the absence of the immunized statement." (quoting *Kastigar* 406 U.S. at 458–59) (citations omitted)). Given that the government had to prove probable cause that the defendants didn't act in self-defense in order to secure the indictment, *see* 18 U.S.C. § 1112, it is obvious that the government would have investigated any potential claim of self-defense the defendants might raise. Any investigation of the Nisur Square incident, given its circumstances, would include examining the possibility of ████████ ███████████████. *See Slough II*, 641 F.3d at 552 ("Indeed, when armed guards shoot a number of people in a crowd, it doesn't take Hercule Poirot to start wondering what the crowd was doing.").

Lastly, the defendants argue that Col. Boslego was motivated to testify by his exposure to the defendants' compelled statements. To the extent the Court finds Col.

Boslego was not exposed to the defendants' compelled statements, *see supra*, Col. Boslego could not have been motivated to testify by exposure to the compelled statements. Further, the Court also finds that, even if Col. Boslego were exposed to the defendants' compelled statements, he still would given the same testimony. *See* Gov't Reply 18 (noting that the FBI originally contacted Boslego and asked him testify—as opposed to Col. Boslego contacting the FBI—and that Boslego said he absolutely would testify regardless of what he saw in the media about the case).

### C. The Court Finds that the Government Proved that the Summary of Iraqi Witness Testimony Read to the Grand Jury Was Untainted

The defendants next argue that the government failed to show that the testimony of eight Iraqi witnesses that the government summarized for the grand jury was not tainted. The defendants contend that the testimony of another Iraqi witness, Mohammed Al-Kinani, shows that the eight challenged witnesses were likely tainted. Defs.' Br. 64–66. Specifically, the defendants allege that Col. Faris, the official in charge of the Iraqi investigation of the Nisur Square incident and the liaison between the American prosecutors and the Iraqi witnesses, tainted the eight challenged witnesses by exposing them to the defendants' compelled statements. *Id.* at 62–66. The government's witnesses acknowledged that Col. Faris was tainted by exposure to the defendants' statements. *Kastigar* Hr'g Tr. 52, Dec. 12, 2013 (AM). At the *Kastigar* hearing, the defendants questioned Mr. Al-Kinani about an incident in November 2012 in which Col. Faris contacted "Al-Kinani at his home in Michigan and encouraged [him] to solicit a payment of at least $200,000 from Blackwater" in exchange for not testifying. Def. Br. 64; Def. App. 55–56; *Kastigar* Hr'g Tr. 6–12, Dec. 4, 2013 (PM). According to Al-Kinani, Faris

also said that he had spoken with other Iraqi witnesses who would agree not to testify in exchange for money and insinuated that he had influence over some Iraqi witnesses. Def. App. 56. In light of Al-Kinani's testimony, the defendants' argue that Col. Faris must have tainted the other Iraqi witnesses and that the government's failure to confront Col. Faris on this issue demonstrates the failure of the government's filter process.

Both of defendants' arguments fail, however. As the government noted in its reply brief, the filter and testimonial interviews for the eight challenged Iraqi witnesses all took place on or prior to July 12, 2012, while the phone call from Col. Faris to Al-Kinani only occurred in November 2012. Gov't Reply 30. Thus, all eight witnesses' testimony was "canned" prior to that incident and any possible taint that could have occurred at that time. Moreover, the government filter team asked each witness about any conversations he may have had regarding the Nisur Square incident. *Id.* at 23–24. Obviously, this would include conversations the challenged witnesses had with Col. Faris, if any, and the filter team followed up with other questions as appropriate if a witness mentioned any conversations with Col. Faris about the incident. *Kastigar* Hearing Tr. 71–72, Dec. 12, 2013 (PM). The government's filter interviews of Iraqi witnesses—not limited solely to the eight the defendants challenge here—successfully identified several witnesses who had spoken with Col. Faris or attorney Susan Burke[3] about the events at Nisur Square. Gov't Reply 24 & n.24. Ultimately, the defendants' argument that Col. Faris must have tainted the eight challenged witnesses is purely speculative.

The defendants also argue that the similarity of some Iraqi statements to the Iraqi

---

[3] Susan Burke represented 68 Iraqis in a settlement with Blackwater that compensated for injuries or deaths of family members due to Blackwater violence in Iraq. *Susan L. Burke*, Burke PLLC, http://burkepllc.com/attorneys/susan-l-burke/ (last visited Mar. 25, 2014).

National Police show that Col. Faris influenced testimony, Defs.' Br. 66–67, but again this is mere speculation.

The defendants do identify one example of an Iraqi witness that fabricated part of his testimony: Farid Walid Hasoun Al-Kasab. *Id.* at 67–68. Curiously, the defendants do not object to Al-Kasab's testimony on *Kastigar* grounds. *Id.* Contrary to the defendants' assertions that Al-Kasab represents a failure of the government's filter process, Al-Kasab actually represents the success of the government's filter process. The government successfully identified Al-Kasab's fabricated and possibly tainted testimony and segregated that testimony from Al-Kasab's firsthand observations of the Nisur Square incident. Gov't Reply 31. The government presented only Al-Kasab's firsthand observations to the grand jury. *Id.*

The Court will now examine each of the eight challenged Iraqi witnesses in turn.

1.   *Ali Galaf Salman Mansur Al-Hamidi*



Ali Galaf Salman Mansur Al-Hamidi ▮▮▮▮▮▮▮▮▮. Gov't App. B122 at 87. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *Id.* Al-Hamidi testified that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Al-Hamidi's testimony includes additional details that do not overlap with Slough's, Slatten's, or Liberty's compelled statements and therefore could not be tainted:  none of these defendants' immunized statements mention ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See*

Gov't App. J at 7, 11, 15.  Al-Hamidi's testimony overlaps with Defendant Heard's statement, however, as Heard says in his statement that ███████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████.  Gov't App. J at 19.  The government's filter interview found that Al-Hamidi may have been exposed to the defendants' statements through the media but that he had not learned anything about the incident through conversations with others.  Gov't App. E at 20–21.  Al-Hamidi also stated in his filter interview that he could separate his firsthand observations from the incident from any information he learned in the media because he was very close to the scene of the incident.  *Id.* at 21.  To the extent that Al-Hamidi's testimony that the government summarized for the grand jury overlaps with the defendants' compelled statements, the Court finds by a preponderance of the evidence that Al-Hamidi based his testimony solely on his firsthand observations and that the testimony was therefore untainted under *Kastigar*.

   2.   *Majed Salman Abdel Kareem Al-Gharbawi*

The government presented a brief summary of Al-Gharbawi's testimony to the grand jury.  Gov't App. B122 at 87.  The government's filter interview with Al-Gharbawi indicated that he only received news by television.  Gov't App. E at 76.  The only news coverage Al-Gharbawi saw about this case on television was that this case had been dismissed.  *Id.*  Al-Gharbawi also saw television reports of the reactions of Iraqi witnesses to the news that this case had been dismissed.  *Id.*  Al-Gharbawi said he had described what he had seen in the incident to his family but that nobody had told him anything about the incident.  *Id.*  Accordingly, the Court finds that Al-Gharbawi was not

exposed to the defendants' compelled statements and that his testimony is therefore untainted.

### 3.   *Mohammed Hassan Mohammed Askar Al-Arakawazi*

The government summarized Al-Arakawazi's testimony for the grand jury. Gov't App. B122 at 88. Al-Arakawazi ███████████████████████████████████████ ████████████████. *Id.* The government conceded in its reply that Al-Arakawazi may have been exposed to the defendants' compelled statements through the media. Gov't Reply 26. Al-Arakawazi testified that ████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████. Gov't App. E at 19. In part, Al-Arakawazi's testimony does not overlap with the defendants' compelled statements in that ██████████████████████ ████████████████████████. Gov't App. B122 at 88. Al-Arakawazi's testimony that ██████████████████████████████████████████ does overlap with the defendants' compelled statements. *Id.* Al-Arakawazi stated in his filter interview that he could separate his firsthand observations from anything he may have learned from the media. Gov't App. E at 19. In light of this testimony and Al-Arakawazi's close proximity to the incident, the Court finds by a preponderance of the evidence that Al-Arakawazi testified solely based on his firsthand observations of the incident and that his testimony is therefore untainted.

### 4.   *Jennan Hafidh Abid Al-Razzaq*

The government summarized Al-Razzaq's testimony for the grand jury. Gov't App. B122 at 89. The government conceded that Al-Razzaq may have been exposed to the defendants' compelled statements through the media. Gov't Reply 27. Specifically,

Al-Razzaq recalled one news report that included a diagram of the incident  . Gov't App. E at 9–10. Al-Razzaq stated that she discussed the incident with family members but that she did not discuss Blackwater's version of events since she was present at the scene and observed the incident personally. *Id.* at 9. Certain elements of Al-Razzaq's testimony—

—do not overlap with the defendants' compelled statements and so could not be tainted. Gov't App. B122 at 89. Al-Razzaq's testimony that

does overlap with the defendants' compelled statements. *Id.*

In her filter interview, Al-Razzaq stated that she could separate in her mind what news she saw about the incident on television from her own personal observations of the incident given that it was very hard for her to forget what she saw. Gov't App. E at 11. In light of Al-Razzaq's testimony, and since the government limited its summary to Al-Razzaq's personal observations from that day, *see* Gov't App. B122 at 89, the Court finds by a preponderance of the evidence that Al-Razzaq based her testimony solely on her personal observations and that her testimony was untainted.

5.    *Ahmed Hadi Haran*

The government summarized Haran's testimony for the grand jury. *Id.* The government's filter interview indicated that Haran watched some news reports on television about the Nisur Square incident but that those reports only noted that an

American security contractor had fired on Iraqi civilians. Gov't App. E. at 61. Haran recalled seeing nothing on television about Blackwater's version of events. *Id.* Haran recalled conversations with coworkers about the incident, but none of Haran's colleagues mentioned ███████████████████████████████████████████████████████. *Id.* at 62. Haran also testified that he was shown photos of the defendants and their names at the embassy but that he had not heard anything about statements made by the defendants. *Id.* Given Haran's testimony, the Court finds by a preponderance of the evidence that he was not exposed to the defendants' immunized statements and that his testimony summarized for the grand jury was untainted.

    6.    *Hassan Jaber Salman*

The government summarized Hassan Jaber Salman's testimony for the grand jury. Gov't App. B122 at 90–91. The defendants specifically object to Salman's testimony that, ██████████████████████████████████████████████████████████ *Id.* at 90; Defs.' Br. 61. The government's filter interview of Salman indicated that he may have been exposed to the defendants' immunized statements. When asked about statements by the Blackwater guards or their reason for shooting, Salman said that the statements were mentioned on television and that he had seen a report that ██████████████████████████████████. Gov't App. E at 162. Salman also said that the prior government prosecutor for this case, AUSA Kenneth Kohl, had told him that ███████████████████████. *Id.* Salman could not recall ██████ ███████████████████. *Id.* Salman also saw a Blackwater spokeswoman, Ana Terel, on the internet who explained that ████████████████████████████████████████ ████████████████████████████████. *Id.*

Salman also indicated that he could separate what he saw and heard the day of the incident from what he learned about the incident later.  *Id.*  Assuming *arguendo* that Salman's testimony ███████████ was tainted, even though it is unclear from the notes of Salman's filter interview which ████████████████████████, the Court finds any *Kastigar* error harmless beyond a reasonable doubt.  Salman's testimony provides only a thin description of ████████████████.  Gov't App. B122 at 90.  Further, Salman's testimony that ████████████████████████ would be consistent with ████████████████.  It is clear to this Court that the government summarized Salman's testimony not for any salience it had with respect to ██████████ but instead because Salman was a victim of the incident: Salman's other testimony indicated ████████████████████████ ██████████████████.  *Id.* at 91; Indictment, ECF No. 304.  Salman's scant testimony about ██████████ contributed nothing beyond the detailed and copious testimony about ██████████ already in the record, and the Court is certain that even without Salman's testimony a rational grand jury would still find probable cause to indict on those counts.  Thus, even assuming Salman's statement about ██████████ constitutes use under *Kastigar*, that use is harmless beyond a reasonable doubt.

The Court notes that it finds no *Kastigar* error with respect to Salman's remaining testimony because the Court finds it was based solely on Salman's firsthand observations. The defendants also failed to challenge Salman's remaining testimony and have therefore waived any *Kastigar* challenge to the use of that testimony before the grand jury.

7.   *Sayf Sa'ad Al-Shujari*

The government summarized Al-Shujari's testimony for the grand jury.  Gov't

App. B122 at 91.  The government's filter interview with Al-Shujari indicated that he may have been exposed to the defendants' compelled statements through the media. Gov't App. E at 34.  Al-Shujari recalled a news report or reports in which the Blackwater guards alleged ███████████████████████████████████████████ ██████████████████████████████████.  *Id.*  Al-Shujari learned no other details of the Blackwater guards' version of events through the media.  *Id.*  In conversations with others, Al-Shujari heard both rumors about the incident and the Blackwater guards' claim ██████████████████████████████████.  *Id.* at 35.  Al-Shujari also stated that he could separate what he saw of the Nisur Square incident from what he learned later through the media or through conversations with others.  *Id.*    In light of this testimony, and because Al-Shujari's firsthand observations of the incident were an independent and untainted basis for his testimony, the Court finds by a preponderance of the evidence that Al-Shujari's testimony was untainted.

    8.    *Afrah Sattar Ghafil*

    The government summarized Afrah Sattar Ghafil's testimony for the grand jury. Gov't App. B122 at 92.  The government's filter interview with Ghafil indicated that she may have been exposed to the defendants' compelled statements.  Ghafil saw news reports that the Blackwater guards said ██████████████████████████████ ██████████████, but Ghafil maintained that the reality was quite different.  Gov't App. E at 22.  Ghafil stated that she had conversations with others about the news accounts of the Nisur Square incident, but Ghafil testified that she learned no new information about the incident through these conversations.  *Id.* at 23.  When the government filter team asked Ghafil about her recollection of events, Ghafil stated that she relied on her own

recollection of events and did not rely on what she knew of Blackwater's version of events to help her memory. *Id.* at 24. Given this testimony, and given that Ghafil's firsthand observation of events serves as an independent and untainted basis for her testimony, the Court finds by a preponderance of the evidence that Ghafil's testimony summarized for the grand jury was untainted.

**D. *The Court Finds that the Government Has Proven that Testimony that ███████████████████ Was Untainted***

Defendants' final claim of *Kastigar* error before the grand jury is that the government failed to show that the testimony of five members of Raven 23 that ████ ████████████████████████████ was untainted by the witnesses' exposure to Slatten's immunized Statement. Specifically, the defendants challenge the testimony of Jeremy Ridgeway, Matthew Murphy, Kevin Rhodes, Jeremy Krueger, and Jeremy Skinner. ██████████████████████████ ███████



Gov't App. J at 11.

The Court will address each of the five challenged witnesses in turn.

*1. Jeremy Ridgeway*

Jeremy Ridgeway testified ███████████████████████ ████████████████████████████████ █████████████████████████████



Gov't App. B42 at 105.

As the Court concluded above, the Court finds that Ridgeway was exposed to Slatten's statement but that Slatten has waived any *Kastigar* challenge to Ridgeway's testimony because Slatten voluntarily shared his immunized statement with Ridgeway. *See supra* Subpart III.A.

The Court also finds that, even absent Slatten's waiver of his *Kastigar* claims with respect to Ridgeway's testimony, Ridgeway's specific recollection of ███████████ provides an independent and untainted basis for Ridgeway's testimony. Ridgeway's description ████████████████████████████████████████████. Nevertheless, Ridgeway has a specific and independent recollection that ███████████ ██████████: When asked why he recalled this comment, Ridgeway testified that "[i]t was a graphic comment. I remember it vividly." *Kastigar* Hr'g Tr. 48, Dec. 9, 2013 (PM). Ridgeway also recalls where and when ████████████████. *Id.* at 47–48. That Slatten's immunized statement might serve as an alternate antecedent for Ridgeway's testimony does not establish that Ridgeway's testimony is tainted. *Slough II*, 641 F.3d at 551. To the contrary, the Court concludes that Ridgeway's specific recollection of ███████████ is an independent and untainted basis for his testimony. The Court thus finds by a preponderance of the evidence that Ridgeway's testimony would be untainted even if Slatten had not waived his *Kastigar* claims with respect to Ridgeway.

2.    *Matthew Murphy*

Matthew Murphy testified before the grand jury that ███████████████

███████████████████████. The defendants object specifically to the

following testimony:



Gov't App. B8 at 54.

The government concedes that Murphy was exposed to Slatten's immunized statement.
Gov't Br. 63–64.  The defendants argue that the Court must find Murphy's testimony
tainted because "Murphy conceded that he was unable to testify that none of what he
knows about Slatten's conduct came from Slatten's statement."   Defs.' Br. 76.
Defendants' argument, however, is erroneous and misstates the *Kastigar* standard.
Murphy's concession rephrased is that some of what he knows about Slatten's conduct
came from his immunized statement, which is simply to say that Murphy was exposed to
Slatten's statement.   As the District of Columbia Circuit and this Court have held,
"[w]here two independent sources of evidence, one tainted and one not, are possible
antecedents of particular testimony, the tainted source's presence doesn't ipso facto
establish taint."  *Slough II*, 641 F.3d at 544.   This is to say that (1) exposure to an
immunized statement and (2) use of that immunized statement are not the same thing:
where exposure to an immunized statement does not ripen into use of that immunized
statement, no *Kastigar* violation occurs.   Murphy's testimony in his filter interview
demonstrates, ██████████████████████████ that he and Slatten spoke
with one another, that Murphy had an independent and untainted basis for his testimony.

*See* Gov't App. E at 118 (describing Murphy's certainty that the conversation with Slatten occurred because Murphy remembered the conversation as a "significant and tense moment" and noting Murphy's assertion that his memory of this conversation was "not at all influenced by" Slatten's statement). Murphy's assertion that his memory of the conversation was not influenced by his exposure to the immunized statement is credible because Murphy's recollection of the conversation includes details ███ ██████████████████ that do not appear in his immunized statement, namely ███ ████████████████████████████████████ Gov't App. B8 at 47. The Court finds by a preponderance of the evidence that Murphy's clear and independent recollection of his conversation with Slatten provides an independent and untainted basis for his testimony.

### 3.   *Kevin Rhodes*

Kevin Rhodes testified before the grand jury ██████████████████████ ██████████████████████. Gov't App. B25 at 41–42. The government put forward evidence that Rhodes was never exposed to Slatten's immunized statement. *See Kastigar* Hr'g Tr. 36–37, 39, Dec. 5, 2013 (PM) (noting that Rhodes did not see any Raven 23 member's immunized statement and that his media exposure was limited). In contrast, the defendant failed to come forward with a "firm foundation resting on more than suspicion," *Slough II*, 641 F.3d at 551 (quoting *North II*, 920 F.2d at 949 & n.9) (internal quotation marks omitted), that Rhodes was exposed to Slatten's statement. Defs.' Br. 77–80. Consequently, the Court finds by a preponderance of the evidence Rhodes was not exposed to Slatten's statement, so Rhodes's testimony about Slatten could not be tainted. Even if Rhodes were exposed to Slatten's testimony, the Court

finds by a preponderance of the evidence that Rhodes had an independent and untainted basis for his testimony, namely that he heard Slatten ███████████████. *See, e.g., Kastigar* Hr'g Tr. 61, Dec. 5, 2013 (PM) (noting that Rhodes was near enough to overhear Slatten's conversation with others).

### 4.    Jeremy Krueger

Jeremy Krueger testified before the grand jury that ██████████████████ ████████████████████. Gov't App. B20 at 153–55.  The defendants argue that Krueger was exposed to Slatten's immunized statement indirectly through Matthew Murphy.  *See* Gov't App. E at 113 (describing Murphy's testimony during his filter interview that he discussed Slatten's statement with Krueger and with other members of Raven 23).  Accepting for the sake of argument that Krueger was exposed to Slatten's statement, the Court finds that Krueger had an independent and untainted basis for his testimony, specifically that he heard Slatten ██████████████.  During Krueger's re-cross examination during the *Kastigar* hearing, Krueger testified that he had a "specific recollection of hearing [Slatten]" ████████████████████████. *Kastigar* Hr'g Tr. 79, Dec. 6, 2013 (AM); *see also* Gov't App. E at 89 ("[Krueger] is certain that he heard SLATTEN make the referenced statement, but he could not recall if SLATTEN said it directly to him or if he overheard SLATTEN talking to others.").  Thus, the Court finds by a preponderance of the evidence that Krueger had an independent and untainted basis for his testimony that he heard Slatten ██████████ ████████████.

### 5.    Jeremy Skinner

Jeremy Skinner did not testify before the grand jury that ████████████████

███████████████████. Defs.' Br. 82; Gov't Reply 43–44.  Instead, the government

mistakenly asserted during its summary of the evidence against Slatten that ████████

████████████████████████████████████████████████████████████

Gov't App. B121 at 22.  There is no *Kastigar* error, however, with respect to Skinner:

Skinner cannot have used Slatten's statement in his testimony in violation of *Kastigar* if

Skinner never gave any testimony against Slatten.  Further, the government's mistaken

statement about Skinner's testimony is not error under *Kastigar*.  *Kastigar* prohibits use

of a defendant's compelled statement, but a prosecutor's erroneous summary before the

grand jury of which witnesses testified against the defendant is not use of the defendant's

compelled statement.  Thus, the Court applies the harmless error standard to the

government's mistaken statement about Skinner's testimony during its summary of

evidence for the grand jury.  The government repeatedly instructed the grand jurors that

the summary was not evidence and that their recollection of the evidence controlled.  *Id.*

at 14, 37, 64.  The Court presumes that the grand jury properly followed the instructions,

*see Marshall v. Lonberger*, 459 U.S. 422, 428 n.6 (1983), and therefore concludes that

inclusion of the mistaken statement about Skinner's testimony is merely cumulative and

not prejudicial.  The Court therefore concludes that the government's mistaken statement

about Skinner's testimony in its summary of evidence concerning Slatten was harmless

error.

## IV.   CONCLUSION

The Court finds it disturbing that it has taken seven years of hard-fought litigation

to finally reach the June trial date set in this case.  If the Department of State and

Diplomatic Security Service had tried deliberately to sabotage this prosecution, they

could hardly have done a better job. It is incredible the way these defendants were coerced into making statements to DSS agents. The impropriety of this was well settled law at the time. Even more egregious, though, was the leaking to the news media of all the statements given. Yet it appears there has been no investigation of these circumstances and no one has been held accountable. Nor is there any reason to think anyone learned a lesson from this fiasco or that any steps have been taken to avoid a repetition.

The Court is aware that Congress made a deliberate choice in the Oliver North case to proceed with immunized testimony, knowing full well from the Independent Counsel that it might, as it did, make a successful prosecution of Oliver North impossible because of *Kastigar*. *See North I*, 910 F.2d at 863 ("Even before the congressional Iran/Contra committees began taking testimony, the IC recognized this problem in his memorandum to the committees concerning use immunity: '[A]ny grant of use and derivative use immunity would create serious—and perhaps insurmountable—barriers to the prosecution of the immunized witness.'" (alteration in original)).

Here it does not appear any such analysis was performed. It is unclear to the Court whether the DSS or the State Department even had the authority to grant immunity to the defendants in exchange for their testimony absent approval from the Attorney General. *See* 18 U.S.C. § 6004(a) (allowing agencies to grant immunity upon approval from the Attorney General). Nor is the Court aware if the State Department or DSS sought any legal advice regarding the decision to grant immunity—a decision that was questionable at best. The injustice done to the alleged victims of this incident by the last seven years of litigation has been totally unwarranted. The Court requests that the United

States Attorney for the District of Columbia request that the Inspector General of the State Department fully investigate and provide a report on this matter.

For the foregoing reasons, the Court finds by a preponderance of the evidence that neither the government nor its witnesses made any use of the defendants' immunized statements before the grand jury or that any such use was harmless beyond a reasonable doubt.  Therefore, the defendants' oral motion to dismiss the indictment for violations of *Kastigar* will be DENIED.

A separate Order consistent with this Memorandum Opinion shall issue this date.


_____
ROYCE C. LAMBERTH
United States District Judge


Date:  March 26, 2014