**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No. 08-360 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **PAUL ALVIN SLOUGH,** | : | |
| **NICHOLAS ABRAM SLATTEN,** | : | |
| **EVAN SHAWN LIBERTY, and** | : | |
| **DUSTIN LAURENT HEARD,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL PRODUCTION OF "EVIDENCE"**

Pursuant to Federal Rule of Criminal Procedure 16, the defendants have moved the Court to compel the production of certain "evidence" to which they claim they are entitled (the "Motion to Compel").  First, at great expense, they make an untimely request of the Court to compel the government to transport 11 victim vehicles from Baghdad, Iraq, to the United States so they can inspect them here instead of in Iraq, where they have been located since the inception of the investigation.  Second, the defendants ask the Court to compel the production of the FBI's working computer program files used to create digital exhibits for use at trial.  The defendants' requests are without merit, and the Court should deny their Motion to Compel.

**Background**

1.  At approximately noon, on September 16, 2007, several Blackwater security contractors, including the defendants, opened fire in and around Nisur Square, a busy traffic circle in the heart of Baghdad, Iraq (hereinafter known as the "Nisur Square Shooting").  When they stopped shooting, fourteen Iraqi civilians were dead and at least eighteen more were injured.  Contrary to the defendants' suggestion, they did not come "under attack" in Nisur Square,

prompting them to return fire in self-defense.  Rather, the evidence will show that they fired their deadly weapons first, and then continued to fire them in a unilaterally reckless and excessive manner at Iraqi civilians who presented absolutely no threat to them whatsoever.

<u>The Iraqi Victim Vehicles</u>

2.      While investigating the Nisur Square Shooting, the Federal Bureau of Investigation ("FBI") identified the Iraqi victim owners of numerous civilian vehicles that the defendants and other Raven 23 members had shot during the incident.  In October 2007 and again in 2008, the FBI travelled to Baghdad and was able to purchase from their Iraqi victim owners or otherwise acquire eleven (11) of the vehicles (collectively, the "11 Victim Vehicles").

3.      Shortly after securing custody and control over the 11 Victim Vehicles, the FBI photographed and videotaped them on multiple occasions to preserve the evidence of their condition.  Several of the Iraqi victims also took photographs or videotaped their damaged vehicles shortly after the shooting and supplied these images to the FBI.  All of the FBI-generated or otherwise procured photographs and video footage of the 11 Victim Vehicles have been produced to defendants.  By the government's count, that production has included videotaped footage of 10 of the 11 Victim Vehicles (Bates Nos. USAO_009060-61; USAO_009065; USAO_009067-70; USAO_009072-73), over 2000 close-up photographs of the 11 Victim Vehicles, including the hand measurements taken of the apparent gunfire damage to them (Bates Nos. USAO_010612-012549;  USAO_018504-018600), as well as several videotaped recordings of some of the 11 Victim Vehicles that were abandoned on the scene shortly after the shooting.

4.      In addition, in approximately March 2008 and June 2009, Douglas Murphy, an FBI expert in the fields of firearms, bullet trajectory analysis, and shooting incident reconstruction, travelled to Baghdad to inspect and obtain precision measurements of the apparent bullet holes to the 11 Victim Vehicles.  In the course of his examination of the 11 Victim Vehicles, Mr. Murphy took detailed "bench notes" of his measurements and other observations.  He also authored multiple Reports of Examination setting forth his observations and conclusions, which included graphic diagrams depicting his trajectory analysis on the vehicles.  The materials that Mr. Murphy generated from his examinations of the 11 Victim Vehicles were substantial and produced to the defendants in October 2009 (Bates Nos. USAO 026401-026600).

5.      Since their acquisition by the FBI, the 11 Victim Vehicles have remained in Baghdad.  On April 13, 2009, the government advised the defendants that the 11 Victim Vehicles were being stored in government facilities in Baghdad and available there for the defendants' inspection.  See Defs' Mot, Att. I at 15.

6.      In June 2009, defense counsel notified the prior trial team of their intention to send a defense team to Iraq for the purpose of collecting information and interviewing witnesses. Defense counsel also asked the government to supply security measures for the defense team while there.  Although the government declined to do so, it did forward defense counsel's request to the Department of State, who on September 1, 2009, supplied defense counsel with important information to assist them in their planned trip, to include a list of over forty-five (45) private security companies believed to be licensed to operate in Iraq.  See Att. A.  On September 30, 2009, the Department of Defense provided supplied defense counsel, through the prior trial

team, a separate list of twenty-nine (29) private security companies believed to be licensed to operate in Iraq. <u>See</u> Att. A.

7.      Shortly thereafter, on October 2, 2009, the defendants filed a motion with Judge Urbina, seeking a court order requiring the government to provide security measures for pretrial investigation in Baghdad, Iraq, by the defendants' counsel, investigators, and their experts (the "defense team"). <u>See</u> ECF No. 141.  On November 16, 2009, Judge Urbina granted in part and denied in part the defendants' motion. <u>See</u> ECF No. 163.  Significantly, in denying the defendants' primary request for court-ordered security measures in Iraq, Judge Urbina found:

> The court declines to speculate as to whether there may be circumstances in which fundamental fairness and due process require the government to take a more direct role in providing security measures to defense counsel conducting a pretrial investigation in a hostile foreign war zone. <u>See</u> Gregory, 369 F.2d at 188.  Whatever those circumstances might be, they are not present in this case, given that (1) the government has identified for the defendants licensed personal security companies that are the primary providers of personal security services to U.S. government personnel in Baghdad; (2) these companies can provide for the defendants the same security services that they currently provide to U.S. government personnel; (3) the defendants have made no showing that these private security companies are unable to provide the security necessary for their investigation; and (4) the defendants have acknowledged their ability to pay for such services. Accordingly, the court denies the defendants' request for an order requiring the government to provide security to the defense team for their pretrial investigation in Iraq.

Id. at 9.

8.       Despite the government's provision of a great deal of information on how to organize a defense team investigative trip to Iraq, including a list of numerous private security

companies that could supply the necessary security measures while in Iraq, the defense team apparently did not to travel to Iraq.

9.      For more than four years, from late 2009 through February 28, 2014, the defense team made no further inquires of the government as to the 11 Victim Vehicles and, to the government's knowledge, made no attempts to travel to Iraq to conduct any pretrial investigation activities, including the inspection of the vehicles.  Then, in Mr. Connolly's February 28, 2014 letter, for the first time ever, the defendants asked that the government transport the 11 Victim Vehicles to the United States for their inspection.

10.      Since receiving the defendants' Motion in early April, the government has sought cost estimates to transport the 11 Victim Vehicles and the Raven 23 Command Vehicle to the United States by ground/water or air.  See Att. B, Hess Decl. at ¶3.  Based on past experience with similar shipments, it will cost approximately $190,000 and take seven months to ship the vehicles door-to-door via surface and ocean carriers.  Id. at ¶4.  The seven-month estimate does not account for potential delay caused by unanticipated legal or political considerations beyond the United States government's control.  Id.  Transporting the 11 Victim Vehicles and Raven 23 Command Vehicle by air carrier would cost over $1.7 million and take approximately six weeks, absent unanticipated legal or political considerations beyond the United States government's control).  Id.

### 2009 "Computer Generated Evidence"

11.      It is the new trial team's understanding that the prior trial team asked the FBI's Operational Projects Unit to generate numerous digital exhibits for use at trial.  See Att. C, Ernst Decl. at ¶2.  These computer-generated exhibits included various static diagram exhibits, and

apparently, a demonstrative exhibit and animation of moving vehicles and Raven 23 vehicles firing sequenced shots at various civilian vehicles during the shooting incident (the "2009 Shooting Animation") (collectively, the "2009 Exhibits"). Id. The filter team has cleared some, but not all, of the 2009 Exhibits for use by the new trial team. Id. Importantly, the filter team has not cleared the 2009 Shooting Animation created by the FBI, and the new trial team has never seen it. Id. In prior discussions with defense counsel, the new trial team inquired as to whether the defendants would waive any Kastigar objections they may have to the 2009 Shooting Animation in connection with their discovery-related requests concerning it, and defense counsel indicated the defendants will not. Accordingly, the 2009 Shooting Animation is not available to the new trial team for any purpose, including for use as evidence at trial.

12.     On September 14, 2009, it appears clear that Judge Urbina ordered the prior trial team to produce the finished computer-generated trial exhibits (i.e., the "2009 Computer Generated Evidence") and the underlying data forming the basis for those exhibits by October 15, 2009. See Att. D, 9/14/09 Stat. Hrg. Trans. at 31:19-21 (Mr. Schertler: "I think that goes to the heart of both our requests for all the information underlying the computer-generated evidence . . .") (emphasis added) and 49:9-22 (Court setting an October 15, 2009 deadline for disclosure of the "computer-generated evidence"). It is equally clear, however, that Judge Urbina did not order the government to produce the "3ds Max files" (i.e., computer software program tools) used to construct the digital exhibits. Indeed, the defendants did not even request the working "3ds Max files" used to construct the digital exhibits until November 24, 2009. Compare Defs' Mot. Att. A, McCool 7/1/09 Ltr. (demanding the underlying data that may have been used to construct the digital exhibits) and Defs' Mot. Att. C, McCool 11/24/09 Ltr. at 1 (demanding

"trajectories in a digital format that can be measured via a 3D CAD package or 3ds Max" or "the software used to construct the trajectories and copies of the **working files**) (emphasis added). Therefore, the prior trial team fully complied with Judge Urbina's September 14, 2009 order by producing all the finished computer-generated exhibits, including the 2009 Shooting Animation, and all underlying raw data used to construct them on October 15, 2009.  See Att. E, Govt.'s Ltr. dated October 15, 2009; see also Att. C, Ernst Decl. at ¶6-7.  It remains unclear to the new trial team how the defendants can still assert otherwise or, for that matter, why alleged discovery shortcomings relevant only to the 2009 Shooting Animation matter now.

2014 "Computer Generated Evidence"

13.     As indicated in its Expert Disclosures, the new trial team has asked the FBI's Operational Projects Unit ("OPU") to create new computer-generated exhibits for its potential use at trial.  See Defs' Mot. Att.  at 1-2; see also Att. C, Ernst Decl. at ¶4.  These will include digital "approximate to scale" two- and three dimensional static diagrams of Nisur Square depicting the approximate locations of significant landmarks, the Raven 23 convoy vehicles, victim vehicles, victims, and other physical evidence discovered on the scene.  Id.  The FBI is also creating digital diagrams of the Raven 23 convoy vehicles and their member occupants.  Id. As indicated above, the FBI has already created, based on Mr. Murphy's work in 2008 and 2009, digital diagrams depicting Mr. Murphy's trajectory analysis for the 11 Victim Vehicles.  See Att. C, Ernst Decl. at ¶3.  Each of the proposed trial exhibits has been or will be based only on "clean" data and information that the filter team made available to the trial team.  Id. at ¶2.  For purposes of this opposition alone, the government has attached "DRAFT" examples of some of the potential digital exhibits at Attachment F.  See Att. F.  The new trial team anticipates that the

final two- and three dimensional diagrams of Nisur Square, diagrams of the Raven 23 convoy vehicles and their member occupants, and diagrams depicting Mr. Murphy's trajectory analysis on the 11 Victim Vehicles will be completed by May 2, 2014.

14.     Separately, the new trial team has also asked OPU to create a new demonstrative exhibit and animation depicting the Raven 23 Command Vehicle firing sequenced shots at multiple civilian vehicles at the outset of the shooting incident (the "2014 Shooting Animation"). Significantly, the government would not seek to admit any such moving animation into evidence at trial.  Rather, the government would only seek to use any 2014 Shooting Animation as a summary demonstrative exhibit and animation during its closing argument.

15.     Finally, while the FBI is utilizing various computer software programs (e.g, the "3ds Max files") to create the final "approximate to scale" two- and three dimensional diagrams, and would utilize such programs to construct any demonstrative exhibit and animation, these software programs are simply the tools used to create the digital exhibits.  See Att. C, Ernst Decl. at ¶5.  The various computer software programs are commercially available to the defendants and their expert, Mr. Liscio.  Id.  It is also the government's understanding that Mr. Liscio, through the defendants, has been supplied with all the raw source data upon which the digital exhibits are or will be based.  Id. at ¶6.  Because the computer software program tools and computer-generated working files are distinct from the final digital exhibits, the government does not intend to produce them, including the demanded 3ds Max working files, to the defendants.[1]

---

[1]  Contrary to the defendants' assertions, the government does not believe the 3ds Max working files are akin to an expert's "bench notes."  See Defs' Mot. at 5.  Rather, the 3ds Max file is a working computer program file consisting of computer code and data inputs used to create digital exhibits.  See Att. B, Ernst Decl. at ¶5-6.

**Legal Argument**

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E), the government must permit the defendant, upon his request, to inspect and to copy or photograph a document and tangible object if the item is within the government's possession, custody or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant. Fed. R. Crim. P. 16(a)(1)(E). Here, the government will not seek to use at trial the particular items the defendants seek to inspect or copy—that is, the 11 Victim Vehicles in Baghdad[2] and the 3ds Max files (i.e., working computer software files) used to create various trial exhibits—and the items were not obtained from or belong to the defendants. Accordingly, Rule 16(a)(1)(E) only provides for the production of these items to the defendants for inspection or copying to the extent they are "material" to preparing their defense.

In <u>United States v. George</u>, 786 F.Supp. 11 (D.D.C. 1991), this Court correctly articulated the "materiality" standard under former Rule 16(a)(1)(C), the predecessor to current Rule 16(a)(1)(E):

> The central requirement of Rule 16(a)(1)(C) is that the defendant must show that the documents or evidence sought to be discovered are material to the preparation of his defense. Although this hurdle is not a high one, "the evidence must not simply 'bear some abstract logical relationship to the issues in the case . . . . There must be some indication that pretrial disclosure of the disputed evidence would [enable] the defendant **significantly to alter the quantum of proof in his favor**.'" <u>United States v. Secord</u>, 726 F.Supp. 845, 846 (D.D.C. 1989) (quoting <u>United States v. Ross</u>, 511 F.2d 757, 762–3 (5th Cir.1975), <u>cert</u>. <u>denied</u>, 423 U.S. 836, 96

---

[2] While the government will not seek to introduce the 11 Victim Vehicles into evidence at trial, it will seek to introduce photographs and other items of evidence concerning the 11 Victim Vehicles, the majority of which has already been produced in discovery.

> S.Ct. 62, 46 L.Ed.2d 54).  Nonetheless, the documents need not
> directly relate to the defendant's guilt or innocence.  Rather, they
> simply must "play an important role in uncovering admissible
> evidence, aiding witness preparation, corroborating testimony or
> assisting impeachment or rebuttal." <u>United States v. Felt</u>, 491
> F.Supp. 179, 186 (D.D.C. 1979).

<u>George</u>, 786 F.Supp. at 13 (emphasis added).  As this Court also observed in <u>George</u>: "At least

one of the rationales behind the materiality requirement (and limiting discovery by criminal

defendants generally) is to insure that the government not expend excessive time and effort

securing documents for the defendant."  <u>Id.</u> at 15.  In addition to the materiality requirement

found in Rule 16(a)(1)(E), the trial court also has some discretion in manage Rule 16 discovery

disputes as it deems appropriate.  In particular, Rule 16(d)(1) specifically provides in part that:

"At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or

grant other appropriate relief."  Fed. R. Crim. P. 16(d)(1).

The 11 Victim Vehicles

In their Motion, the defendants claim that Fed. R. Crim. Proc. 16(a)(1)(E) not only

entitles them to inspect the 11 Victim Vehicles, but demands that the government transport them

from Baghdad to the United States so that they may do so.  However, in light of the voluminous

discovery documenting the physical condition of the 11 Victim Vehicles already supplied to the

defense team and their inexplicable failure to travel to Iraq from late 2009 through February

2014 to inspect them in person, the defendants cannot seriously contend that an inspection of the

vehicles now will allow them "**significantly to alter the quantum of proof in [their] favor**."

<u>See</u> <u>Secord</u>, 726 F.Supp. at 846.  Moreover, although Rule 16(a)(1)(E), does permit the

defendants, upon their request, to inspect a tangible object if the item is within the government's

10

possession, custody or control and it is material to preparing the defense, the Rule does not require this Court to grant the "inspection location" relief they seek here.

As a threshold matter, under Rule 16(a)(1)(E), the defendants must establish that inspecting the 11 Victim Vehicles 6½ years after the shooting incident is "material to the preparation of their defense." See U.S. v. Thompson, 944 F.2d 1331, 1341 (7th Cir.1991), cert. denied, 502 U.S. 1097, 112 S.Ct. 1177 (1992) ("the defendant must make at least a prima facie showing that the requested items are material to his defense"). Here, the defense team has apparently done little to nothing to accomplish a physical inspection of the vehicles since at least October 2009. As set forth in greater detail above, in September 2009, the government supplied the defense team with important information to assist them in making an investigative trip to Iraq, including Department of State guidance and two lists of numerous private security companies that were capable of providing personal security services while in Iraq. In November 2009, in denying the defendants' demand for government-provided security measures, Judge Urbina explicitly recognized the feasibility of the defendants proposed travel to Baghdad to conduct investigative tasks. See ECF No. 163 at 9. Namely, he found that the government had not only identified capable and commensurate private security services providers in Iraq, but that these companies were capable of providing the defendants the security necessary for their investigation in Iraq. He further observed that "the defendants have acknowledged their ability to pay for such services." Id. Although imminently doable, the defendants chose to do nothing.

In an attempt to strengthen the basis for their request, the defendants also downplay the value of the substantial discovery concerning the 11 Victim Vehicles that they received in early 2009 and since. But, the importance of this Rule 16 discovery, which memorialized the physical

condition of the vehicles relatively shortly after the 2007 Nisur Square Shooting, cannot be overstated in light of the untimely relief they now seek. As indicated above, shortly after the shooting, the FBI acted expeditiously to acquire the 11 Victim Vehicles and then meticulously preserved the suspected evidence of bullet holes and gunfire damage through videotaped footage, thousands of photographs, and precision measurements. Several of the Iraqi victims also took photographs or videotaped their damaged vehicles shortly after the shooting and supplied those images to the FBI. Then, in March 2008 and June 2009, Mr. Murphy took detailed "bench notes" while inspecting and measuring the vehicles, as well as produced Reports of Examination and accompanying graphic diagrams depicting his trajectory analysis on the vehicles. The defendants have all of this information and have had it since at least 2009. In combination, the substantial Rule 16 discovery concerning the 11 Iraqi Vehicles already supplied to the defendants and their inaction since at least October 2009 belie their recent claims that effective preparation of their defense "can only be achieved if [they] are given access to these vehicles." Defs.' Mot. at 7.

Finally, were the Court to grant the defendants the relief they seek, the government alone would bear a substantial cost. Practically speaking, because the defendants delayed in seeking to have the vehicles transported to the United States, they cannot be shipped here via surface and ocean carriers in time for the defendants to make effective use of them for trial. The only remaining option, which would be by air carrier and still take at least six weeks, would cost the government over $1.7 million. The government should not have to bear the exorbitant cost of the defendants' idleness.

In sum, because the defendants cannot make even a nominal showing that a 2014 inspection of the vehicles will allow them "significantly to alter the quantum of proof in [their] favor," the Court should not entertain their belated inspection demand.  Even if they meet the "materiality" standard, their unjustified delay in pursuing the inspection of the vehicles should not be rewarded by ordering the expedited production of the vehicles at a location of their choosing at great expense to the government.

The "3ds Max Files"

Pursuant to their motion, the defendants seek production of the 3ds Max working files used to create the 2009 Computer-Generated Evidence, including the 2009 Shooting Animation that the new trial team does not possess, and the 2014 Computer-Generated Evidence.  The defendants correctly recognize that the 3ds Max is a computer modeling and animation program (i.e., a tool) used in forensics for crime and accident scene reconstruction. See Defs.' Mot. Compel at 14.  Without citing any legal authority addressing the unique type of working computer files sought here in discovery, however, the defendants then simply proclaim that the 3ds Max files "fall squarely within the government's Rule 16 obligations." Id.  In doing so, they also conveniently ignore the fact that the 3ds Max working files used to create the final digital exhibits for use at trial constitute "work product," which is explicitly excluded from Rule 16 discovery.

As a preliminary matter, the defendants' demand for production of the 3ds Max working files used to create the 2009 Shooting Animation is warrantless.  As indicated above, for filter reasons, the new trial team does not possess the 2009 Shooting Animation, nor has it ever seen it. For the same filter reasons, the new trial team does not possess the 3ds Max working files used

13

to create the 2009 Shooting Animation.   When defense counsel initially demanded the production of the 2009 3ds Max working files, the new trial team reminded them of this.   When the new trial team asked whether the defendants would waive any Kastigar objections they may have to the 2009 Shooting Animation in connection with their discovery-related requests concerning it, defense counsel indicated the defendants will not.   Accordingly, because the new trial team is not in possession of the 2009 Shooting Animation and cannot therefore use it for any purpose, including as evidence at trial, there is absolutely no basis under Rule 16 or otherwise for producing the 2009 3ds Max working files.[3]

The defendants' demand for production of the 3ds Max working files that will be used to create any 2014 Shooting Animation deserves even less consideration.   The government will not seek to introduce any 2014 Shooting Animation into evidence at trial.   At most, after all the evidence is in and can be incorporated, as appropriate, into a summary demonstrative exhibit and animation, the government may seek to use such an exhibit during its closing argument.   If the defendants have objections as to the nature of any summary demonstrative exhibit and animation, they will have an opportunity to lodge those objections at that time.   They will not, however, be entitled to cross-examine the OPU Visual Information Specialist responsible for creating the summary demonstrative exhibit and animation because that person will not be

---

[3] Notably, the defendants assert that they need the 3ds Max files used to create the 2009 Shooting Animation and the 3ds Max files that will be used to create any 2014 Shooting Animation so they can compare and contrast the competing versions of the government's animation to identify any differences in the animations. Defs.' Mot. at 13. Such differences, they claim, would undermine the overall accuracy and trustworthiness of the computer-generated evidence's representation of the evidence. Id.  However, because the 2009 3ds Max files and 2014 3ds Max files are populated by different raw data due to the robust filter process employed by the government since the case was remanded, any differences are just as likely attributable to the difference in raw data inputs.  To allow the defendants to make "hay" out of any differences between the 2009 and any 2014 Computer-Generated Evidence would pervert the purpose for the filter process and unfairly prejudice the new trial team's presentation of its case.

required to testify for the government to make use of the summary demonstrative exhibit and animation in closing.  As such, there is no basis under Rule 16 or otherwise for producing the 2014 3ds Max working files.

In any event, the 3ds Max working files used to create the final digital exhibits constitute work product that is excluded from Rule 16 discovery.    In relevant part, Rule 16(a)(2) provides:

> Information Not Subject to Disclosure.  Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."

Fed. R. Crim. P. 16(a)(2).  Under the work product doctrine, a lawyer may not be required to disclose those memoranda or notes which would reveal counsel's "mental impressions" about a matter in litigation.  *Hickman v. Taylor*, 329 U.S. 495 (1947).  The doctrine applies to all relevant stages of criminal cases, and the Supreme Court has recognized that its utility "is even more vital" in criminal litigation.  United States v. Nobles, 422 U.S. 225, 238 (1975).

Like the attorney-client privilege, the work product doctrine recognizes that some work product will necessarily be created by nonlawyers, e.g., accountants, investigators, law clerks, etc.  In Nobles, 422 U.S. 225 (1975), for example, the Court extended the protections of the doctrine to notes made by a private investigator who, while acting at the direction of defense counsel, interviewed witnesses to a bank robbery.  The Court noted that the work product protections "necessarily must" extend to the agents of counsel.  Nobles, 422 U.S. at 239 n.13. The logic of this rule is apparent.  Before the agent can know what tasks to perform, the agent

must receive guidance from the lawyer, which guidance itself can reveal counsel's mental impressions.  See, e.g., Appeal of Hughes, 633 F.2d 282, 289-90 (3d Cir. 1980).

In this case, the new trial team has asked OPU to create new computer-generated exhibits for its potential use at trial.  These will include digital "approximate to scale" two- and three dimensional static diagrams of Nisur Square depicting the approximate locations of significant landmarks, the Raven 23 convoy vehicles, victim vehicles, victims, and other physical evidence discovered on the scene.  Although the FBI is utilizing various computer software programs, including the 3ds Max files, to create the "approximate to scale" two- and three dimensional diagrams, as well as any demonstrative exhibit and animation, these software programs are simply the tools used to create the final digital exhibits.  Significantly, all the raw source data upon which the final digital exhibits are or will be based has already been supplied to the defendants.  So that the Court will have some sense for the types of static digital exhibits OPU is creating and the government may seek to introduce at trial, the government has attached certain "DRAFT" examples of the potential digital exhibits at Attachment F.  While the government may seek to admit certain digital exhibits through OPU's Visual Information Specialists (e.g., the two-dimensional diagram of Nisur Square with approximate vehicle locations based on various raw data sources), the government will likely seek to admit the majority of the digital exhibits through fact witnesses involved in the Nisur Square Shooting or its aftermath.  In either case, contrary to the defendants' assertions, Rule 16 does not provide for the production of the 3ds Max working files used to create final trial exhibits.  Instead, Rule 16(a)(2) explicitly indicates that such work product files are not subject to disclosure.

**Conclusion**

Accordingly, the government respectfully asks the Court to deny the defendants' Motion to Compel Production of Evidence.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar Number 447889


By:   _____/s/_____
      T. Patrick Martin
      Assistant United States Attorney
      D.C. Bar Number 471965
      Thomas.Martin@usdoj.gov

      _____/s/_____
      Anthony Asuncion
      Assistant United States Attorney
      D.C. Bar Number 420822
      Anthnoy.Asuncion@usdoj.gov

      _____/s/_____
      Christopher Kavanaugh
      Assistant United States Attorney
      VA Bar Number 73093
      United States Attorney's Office
      555 4th Street, N.W.
      Washington, D.C. 20530
      Christopher.Kavanaugh@usdoj.gov

17