**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) ) | No. 1:08-cr-360-RCL |
| PAUL A. SLOUGH, EVAN S. LIBERTY, and DUSTIN L. HEARD, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO
<u>COMPEL PRODUCTION OF EVIDENCE</u>**

Paul Slough, Evan Liberty, and Dustin Heard ("Defendants"), through counsel, respectfully submit this reply memorandum in support of their motion to compel the government to make available all vehicles allegedly damaged during the Nisur Square firefight for inspection in the United States and to compel the production of the 3ds Max files, used to create the government's computer-generated animations.

Defendants seek a fair and reciprocal opportunity to have access to the exact same information to which the government—and its experts—had access. With respect to the Iraqi vehicles, Defendants' experts cannot conduct their analysis without inspecting the vehicles. The other information the government has provided is insufficient, and the defense should not be required to accept government experts' measurements without the opportunity for independent verification. Iraq, where the vehicles are currently located, is not a safe place for the defense to conduct its work. Indeed, independent security providers who were contacted by the defense informed the defense they could not provide security when they learned whom the defense represents. The security situation in Iraq has deteriorated, making it impossible for the defense and its experts to operate safely in Iraq. The Court should order the government to transfer the

vehicles to the United States or to another country in the Middle East that does not present the same security concerns.

As for the 3ds Max File, the defense expert requires the file to analyze the government's evidence and, if necessary, respond to it.  Courts that have analyzed the admissibility of computer-generated evidence have ordered the sponsoring party to make the underlying data and inputs available to the other party so that the evidence can be tested.  There is no reason not to produce the 3ds Max File.

## ARGUMENT

I. **The Government Should Be Ordered to Deliver the 11 Iraqi Vehicles to a Safe Location**

   A. **The Government's Photographs and Measurements of the Vehicles are Insufficient for the Defenses' Experts**

The government contends that there is no reason to produce the Iraqi vehicles to the defense because the government has produced other information about the vehicles, such as photos, videos, and measurements.  This other information, however, is insufficient for the Defendants' experts to conduct their analysis.

As a threshold matter, even if the information the government provided were sufficient for the defenses' experts' purposes (which it is not), the defense is entitled to test and examine the exact same items and materials that the government's experts examined.  *See Barnard v. Henderson*, 514 F.2d 744, 746 (5th Cir. 1975); *United States v. Willock*, 696 F. Supp. 2d 536, 570 (D. Md. 2010) (noting the need for a defendant's experts to be able to "perform their own independent study of the toolmark evidence itself").  Even more, the government presupposes that its experts' measurements are accurate.  Defendants should not be required to accept that supposition.

In addition, however, the defense is moving to compel because the information provided is fundamentally inadequate for the experts to perform their analysis:

> The photographs and videos the government has provided to date on the vehicles are not adequate to perform the required analysis and validation of the government's results. The photos and videos of the vehicles do not provide the important information necessary to perform a trajectory analysis. For instance, they do not reveal the angles or depth of the bullet holes, the scale of each impact, subsequent impact sites along the bullet path, and the details of the FBI's trajectory rod placements.

Liscio Decl. ¶ 9 (ECF No. 411-8). Based on fairness and reciprocity, there is no reason to deny the Defendants' experts equal access to the vehicles for their own inspection and analysis. "[T]he principle of reciprocity pervades *Rule 16* . . . . The trial process, while adversarial, is a search for the truth. . . . [T]he proper role of the expert is . . . to further the search for truth by assisting the defense in understanding otherwise complex evidence so that the defense can better prepare for trial." *United States v. Sayan*, Crim. Action No. 88-0148 (RCL), 1991 U.S. Dist. LEXIS 5454, at *14-15 (D.D.C. Apr. 23, 1991) (Lamberth, J.) (original emphasis).

    **B.**    **The Vehicles Are Material, But Iraq is Not a Safe Place for the Defense**

The government all but concedes that the inspection of the vehicles is material to the defense. Indeed, the government does not seriously dispute that the defense is entitled to inspect the vehicles. It simply refuses to make them available in the United States. The government's refusal to transport the vehicles outside of Iraq effectively precludes the defense from examining and inspecting them.

Even back in 2009, a trip to Iraq was risky and expensive for the defense. Since 2009, security conditions have deteriorated and make a trip to Iraq by the defense or its agents and

experts now all but impracticable. In December 2011, the last U.S. troops left Iraq.[1] Without U.S. forces on the ground, the dangers posed to the defense are substantially greater than they were before. Even if the defense could hire personal security contractors to provide security, there would be no U.S. forces present to provide additional assistance if necessary. Moreover, the defense's resources are significantly more limited now than they were before—and even when the defense's resources were at their apex in 2009, the venture proved too burdensome.

Because of widespread antagonism towards Blackwater arising out of the firefight in Nisur Square, Iraq is particularly unsafe for the defense, including their experts. Indeed, security companies refused to provide services when defense counsel identified the nature of this case and the location of the inspection. *See* Coffield Aff. ¶ 4 (ECF No. 411-10). The risks are real and significant. No reason exists to place defense attorneys, experts, and investigators in harm's way, particularly where there are less dangerous options available to the parties, including examining the vehicles in a nearby Middle Eastern country that does not present the same security threats.

The government, however, contends that Defendants have not sufficiently pursued inspection of the Iraqi vehicles since 2009, and now the defense's request to inspect the vehicles comes too late. The government's account is inaccurate. In 2009, the defense took substantial steps in preparation to inspect the vehicles in Iraq; however, the effort ultimately proved to be too risky and expensive. While the defense continued to seek ways in which to visit Iraq in 2009, the case was dismissed, and there was no reason to travel to Iraq.

---

[1] *See* "Last Convoy of American Troops Leaves Iraq," N.Y. Times, Dec. 18, 2011, http://www.nytimes.com/2011/12/19/world/middleeast/last-convoy-of-american-troops-leaves-iraq.html?pagewanted=all.

Defendants also had no reason or obligation to continue to incur the time, resources, expense, and risk to their safety of an ongoing defense investigation in Iraq *when there was no indictment pending*. To be sure, it is difficult to fathom that the government would have entertained any Rule 16 discovery requests before the grand jury had returned an indictment.

Regardless, Defendants timely raised their request by letter at the end of February 2014. It took two meet-and-confers for the government to respond— nearly three weeks after the initial request—that they would not transport the vehicles. In short, the Defendants' request was timely.

      **C.**    **The Government Should Transport the Cars to a Safe Location, Either to the United States or Elsewhere in the Middle East**

Defendants filed this motion to compel to seek a fair and reciprocal opportunity to inspect the Iraqi vehicles. This motion seeks an order compelling production of the vehicles in the United States—a reasonable request, given that the vehicles are now owned and controlled by the government. The government contends that airlifting the vehicles to the United States is too burdensome and costly at $1.7 million. The defense respectfully disagrees. Given the amount of time and resources spent on this case and the centrality of the vehicle evidence to this prosecution, the cost cannot be considered too steep when it is weighed against the strong interest of all parties and the Court in assuring a fair trial.

The government has undertaken a prosecution for extraterritorial events, and added costs and burdens are inherent in that undertaking. The government has assumed such costs when they have served government interests by, for example, transporting and lodging Iraqi witnesses; paying for translators; and financing several trips to Iraq for the trial team, the taint team, and FBI investigators. The government has even paid to transport *other* evidence to the United States – when it considered it advantageous to the government to do so – and then paid for that

5

evidence to be analyzed.  The government should not be permitted to reject as "cost prohibitive" a reasonable defense request that it bring additional critical physical evidence back to the country in which trial will occur so that all parties have equal access to it when it already has expended, and will continue to expend, massive taxpayer funds to pursue this prosecution in the name of the United States.  As a matter of fairness, due process, and to satisfy the letter and spirit of Rule 16, the Court should compel the government to transport the Iraqi vehicles to the United States.

As an alternative, the Defendants asked the government, on April 28, 2014, to transport the cars to a safer location in the Middle East, such as Kuwait.  Adopting this "middle ground" approach still would require the defense to incur significant expense to access the evidence, but it would at least improve the current situation, which *effectively precludes* the defense from inspecting the evidence due to the security concerns surrounding travel to and within Iraq.  The government has represented that it will take time to explore this proposal as there are a number of variables and unknowns that must be investigated before it can fully access the feasibility, cost, and timing of executing the proposal.  The government has also advised that because it must investigate and coordinate some of the requisite logistics with the Iraqi government, which is in the middle of an election and has suspended communications with the U.S. Embassy during elections, it is unsure when it will obtain some of the logistical information needed to assess the proposal.  Until the government has completed its investigation, it advises that it cannot take a position as to the proposal.  Accordingly, to the extent the Court accepts the government's position that it should not be required to incur the costs associated with transporting the Iraqi vehicles to the United States, Defendants respectfully request an order compelling the government to transfer the Iraqi vehicles to another country in the Middle East that does not present the same security concerns as Iraq.

## II. The Government Should Be Ordered to Produce the Data File for Its Computer-Generated Evidence

### A. The 3ds Max File for the 2014 Computer Generated Evidence Should be Produced

The government asserts that it has no obligation to provide the defense with the 3ds Max working files underlying its new CGE simulation and that it will not submit the experts who created this animation to cross examination, because it "would only seek to use any 2014 Shooting Animation as a summary demonstrative exhibit and animation during its closing argument." Opp'n ¶ 14, ECF No. 427.[2]  Regardless of how the government intends to use the demonstrative evidence, including reserving it for use in closing (a critical phase of trial in which the dangers of misleading the jury through unsupported or inaccurate statements of counsel are acute), Defendants are entitled to the inputs and underlying equations of the computer file so that they can test and challenge them.[3]  Additionally, the government noticed expert witnesses for the purpose of addressing its CGE imagery; thus, the 2014 CGE is the product of expert analysis and opinion and is subject to Rule 16's provisions governing experts.  *See* Letter from T. Pat Martin to Defense Counsel (Mar. 28, 2014) (disclosing two separate experts related to computer generated evidence) (attached to Motion as Exhibit G, ECF No. 411-7).

---

[2] The government refers to the 2014 CGE as an "animation." This is inaccurate. An animation reflects only the testimony of percipient witnesses, whereas a "simulation adds information beyond the testimony of percipient witnesses, both in terms of the data inputs into the computer and the programming which analyzes and then graphically portrays the outputs." Kenneth S. Broun *et al*., 2 *McCormick on Evidence* § 218 (7th ed. 2013).  Such additional information can include the "size and shape of an object, time, altitude, and velocity." *Id.*  Here, the government undoubtedly bases its CGE on various measurements and expert analysis, in addition to the testimony of its preferred percipient witnesses.  The 3ds Max program then processes that information in accordance with its programming and the creating expert's discretionary choices.

[3] Since the filing of this motion, the parties have agreed that the government will produce the underlying raw data used to create the 2014 animation.

Courts that have analyzed admitting a computer animation as demonstrative evidence have made clear that, among other requirements, the opposing party should be provided access to the inputs and underlying data so that the opposing party can assess the accuracy of the animation and challenge it:

> At a minimum, the [animation's] proponent must show the computer simulation fairly and accurately depicts what it represents, whether through the computer expert who prepared it or some other witness who is qualified to so testify, and the opposing party must be afforded an opportunity for cross-examination. In some instances, the proponent may also be required to show that: (1) the computer is functioning properly; (2) *the input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party, so that they may challenge them)*; and (3) the program is generally accepted by the appropriate community of scientists.

*Bledsoe v. Salt River Valley Water Users' Assoc.*, 880 P.2d 689, 692 (Ariz. Ct. App. 1994) (citing *Commercial Union Ins. Co. v. Boston Edison Co.*, 591 N.E.2d 165, 168 (Mass. 1992)) (emphasis added). *See also State v. Clark*, 655 N.E.2d 795, 812 (Ohio Ct. App. 1995); *Kudlacek v. Fiat S.p.A.*, 509 N.W.2d 603, 617 (Neb. 1994).[4]

To test the accuracy of the government's expert-produced CGE, the defense must have access to the 3ds Max files on which it is built so that they may assess the correctness of the data entry and the software's underlying equations and, later, cross examine the government's noticed experts regarding the demonstrative evidence they created:

> Without access to the 3ds Max files, however, there is no way of verifying whether the CGE is based on the correct data, such as trajectory measurements, vehicle location measurements, or

---

[4] Providing the other side with the underlying data is consistent with the policy objectives of the only federal rule of evidence to address demonstratives and summaries, Rule 1006. Rule 1006 of the Federal Rules of Evidence provides that in order to admit a summary "[t]he proponent must make the original or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. The purpose of this motion is to have available to it all of the underlying data—in the form it is entered in the government's computer program—in order to test the accuracy of the animation.

> witness testimony. There is also no way of assessing whether the data underlying the CGE was correctly inputted. The 3ds Max file is also necessary to determine the extent to which the CGE deviates from the underlying data or is based on assumptions.

Liscio Decl. ¶ 7. Principles of reciprocity and fairness dictate that the experts should have access to the same materials so that they can both analyze the evidence and reach their own conclusion. The defense expert says he needs this file for his analysis. There is no basis to withhold it.

> B. **The Old Trial Team's 3ds Max File from Its 2009 Computer-Generated Evidence Must be Produced Pursuant to *Brady***
>
> 1. **The Differences in the 2009 and 2014 Computer-Generated Models are *Brady* and Must Be Disclosed Regardless of the Trial Team's Access**

The 2009 computer-generated model must be produced under *Brady* if it is different from the 2014 computer-generated model. The Fifth Amendment requires the government to disclose to the defense all evidence in its possession, custody, or control that is favorable to the accused. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (requiring disclosure of exculpatory evidence "material either to guilt or to punishment"). *Brady* imposes on the government an affirmative duty to disclose favorable information to the defense, even if the defense never specifically requests it. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). "[C]ourts in this jurisdiction look with disfavor on narrow readings by prosecutors of the government's obligations under *Brady*." *United States v. Singhal*, 876 F. Supp. 2d 82, 104 (D.D.C. 2012) (alteration in original) (quoting *United States v. Edwards*, 191 F. Supp. 2d 88, 89-90 (D.D.C. 2002)).

The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable. The only question before (and even during trial) is whether the evidence at issue may be "favorable to the accused." If so, it must be disclosed. *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005). *Safavian* is the accepted

9

rule in this District. "Information is favorable to the accused if it 'relates to guilt or punishment' and '***tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses***.'" *Singhal*, 876 F. Supp. 2d at 104 (quoting *Safavian*, 233 F.R.D. at 16) (emphasis added). "Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure." *Safavian I*, 233 F.R.D. at 17 (citing *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).[5]

While *Brady* is often said to be a self-executing disclosure obligation, courts may exercise their broad discretion to compel pre-trial production of *Brady* material. *See Singhal*, 876 F. Supp. 2d at 104 (ordering production of certain witness statements); *United States v. Naegele*, 468 F. Supp. 2d 150, 153, 155 (D.D.C. 2007); *see also* Mot. Hr'g Tr. at 8:21-9:2 *United States v. Stevens*, No. 1:08-cr-231-EGS (D.D.C. Apr. 7, 2009), ECF No. 374 (Judge Walton urging judicial colleagues to enter *Brady* orders requiring timely disclosure of exculpatory evidence in useable format).[6]

As a threshold matter, the trial team appears to suggest that because the trial team is not in possession of specific materials it has no obligation to turn them over. *Brady* is not so narrow.

---

[5] *Accord Cone v. Bell*, 556 U.S. 449, 470 n.15 (2009); *Kyles v. Whitley*, 514 U.S. 419, 439 (1995); *United States v. Moore*, 651 F.3d 30, 99 (D.C. Cir. 2011) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)); *see also United States Attorneys' Manual* § 9-5.001 (June 2010) ("The law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or punishment. . . . [P]rosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeachment evidence." (citations omitted)).

[6] *Accord United States v. Coppa*, 267 F.3d 132, 147 (2d Cir. 2001); *United States v. Runyan*, 290 F.3d 223, 245 (5th Cir. 2001); *United States v. Campagnuolo*, 592 F.2d 852, 857 n.2 (5th Cir. 1979) (noting that the trial court acts within its "sound discretion" to order pre-trial disclosure of Brady material and rejecting as "without merit" the government's argument that it did not have to comply with that order); *United States v. Starusko*, 729 F.2d 256, 261 (3d Cir. 1984) ("The district court may dictate by court order when *Brady* material must be disclosed, and absent an abuse of discretion, the government must abide by that order.").

The Assistant United States Attorneys acting as filter attorneys are part of the government's prosecution team and are bound by the government's *Brady* obligations. *See, e.g.*, *Kyles*, 514 U.S. at 437-39 (prosecution has duty to learn of and disclose "any favorable evidence known to the others acting on the government's behalf in the case"). That the taint team may have decided to screen the 2009 materials from the trial team in no way diminishes their obligation to review the 2009 materials for *Brady* information and to disclose in accordance with their *Brady* obligations. *See id.*

In a footnote in its opposition, the government admits that there will be differences in the 2009 and 2014 animations "because the 2009 3ds Max files and 2014 3ds Max files are populated by different raw data due to the robust filter process employed by the government since the case was remanded, any differences are just as likely attributable to difference in raw data inputs." Opp'n 14 n.3. The government goes on to say that the Defendants should not be allowed to make "hay" out of the differences. The government entirely misconceives the idea of *Brady*. The entire purpose of *Brady* is to guarantee the defense has access to any information that "tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses." *Singhal*, 876 F. Supp. 2d at 104 (quoting *Safavian*, 223 F.R.D. at 16). *Brady* evidence is not limited to challenges to witness testimony; it also includes evidence that may be used to challenge the reliability of the government's investigation. *Kyles*, 514 U.S. at 445-46, 450. Discrepancies between the government's 2009 and 2014 CGE models, which are presumably based on objective evidence and the attempted application of consistent scientific principles to that evidence, could expose flaws in the government's theory or cast serious doubt about the reliability of the government's evidence. The defense is entitled to make full use of

those discrepancies in challenging the reliability of the government's CGE, whether it is offered as evidence or a demonstrative exhibit.

The presence in this case of *Kastigar* issues does not allow the government to restrict the *Brady* information made available to the defense, as the government would have it. The jury is entitled to receive, and the defense is entitled to use, evidence based on the physical reality of what happened at Nisur Square—not just a subset of that evidence that the government has selected to make available to its trial team. The fact that the government's filter team has had to screen evidence from its trial team, even in an abundance of caution for Fifth Amendment reasons, does not permit the government to withhold evidence from defense counsel that is material to preparing the defense case. If the government possesses evidence that would be favorable to the preparation of the defense, it must disclose that information under *Brady*, and its *Kastigar* obligations are not a pass from satisfying that obligation.

This does not mean, as the government protests, that the government's trial team is at risk of unfair surprise. The parties have in place an understanding through which they are attempting to resolve cooperatively any issues about what may be disclosed to the trial team so as to prevent unfair surprise based on what the defense intends to use at trial.[7] Under that understanding, the government's filter team is free to identify any evidence that it seeks to pass through to the trial team, and ask the defense for consent to such a pass-through, or for the defense to identify any portions of such evidence to which the defense objects to disclosure on *Kastigar* grounds, so that the filter team may seek relief with respect to that concrete evidence.[8] The defense also has agreed to give notice to the filter team of any evidence that it knows it intends to use at trial, and

---

[7] *See* April 10, 2014 Ltr. from B. Bishop to G. Maisel, filed by the government under seal on April 11, 2014, in support of ECF No. 418.

[8] *See id.* at 2, § 3 ("Procedure for Future Review").

which it knows has been filtered from the trial team, to allow the parties to reach agreement as to disclosure of such evidence to the trial team, or to permit the filter team to seek relief from this Court if necessary, based on a narrowed dispute as to the disclosability of such discrete pieces of evidence.[9]

For that process to work, however, the defense must know what evidence is at issue, so that it may evaluate (a) whether disclosure of such evidence would violate *Kastigar* under the principles enunciated by the Supreme Court and the D.C. Circuit; and (b) whether the defense intends to use such evidence at trial. Those evaluations cannot be made in the abstract; they depend on the particular detailed evidence, evaluated in the context of the government's disclosed evidence and theory of the case. Here, with respect to the 2009 CGE evidence, the government has refused to disclose *any* of it to the defense unless the defense first gives a blanket *Kastigar* waiver in advance. The defense cannot give, and cannot be required to give, such a waiver of its constitutional protections in advance, for an entire category of evidence, sight unseen. The government cannot condition its performance of its *Brady* obligations on the defense's waiver of its constitutional rights, nor can it excuse itself from its *Brady* obligations based on such a demand. *See, e.g., Simmons v. United States*, 390 U.S. 377, 394 (1968) (finding it "intolerable that one constitutional right should have to be surrendered in order to assert another").[10]

### C. The 3ds Max Files are Not Work Product

Finally, the government erroneously submits that 3ds Max files are protected from disclosure under the work-product doctrine. While the government relies on Rule 16(a)(2) to

---

[9] *See id.* at 3, § 3 (second paragraph).

[10] *Accord United States v. Salvucci*, 448 U.S. 83, 89 (1980); *Lefkowitz v. Cunningham*, 431 U.S. 801, 807-08 (1977); *see also Garrity v. New Jersey*, 385 U.S. 493, 501 (1967) ("There are rights of constitutional stature whose exercise [the government] may not condition by the exaction of a price.").

13

assert work-product protection over the 3ds Max files, that Rule's clear text compels the opposite result.  Rule 16(a)(2) expressly exempts from any work-product protection Rule 16(a)(1)(G), which governs expert witnesses.  The government chose to notice as experts the OPU Visual Information Specialist in its Rule 16(a)(1)(G) disclosure.  Based on that disclosure, the government cannot claim work-product protection.  Indeed, anything of which the government informed the expert witnesses that forms the basis of their opinions is discoverable.  *See, e.g., United States v. Fort*, 472 F.3d 1106, 1121 (9th Cir. 2007) ("The government concedes that materials on which a proposed expert witness relies must be produced to Defendants in discovery, and we agree."); Robert M. Cary, Craig D. Singer & Simon A. Latcovich, *Federal Criminal Discovery* 137 (2011) ("It appears to be common ground that material on which a government expert relies is not covered by the work-product rule.  Accordingly, the government 'waives' work product by showing materials to an expert." (footnote omitted)).

While the government is now trying to recast their disclosed experts as non-testifying consultants, the government already opted to disclose them under Rule 16(a)(1)(G).  Thus, pursuant to the clear text of Rule 16(a)(2), there is no work-product protection.[11]

Even if there were any work-product protection for the 3ds Max files, the government would waive such protection by putting the CGE before the jury at trial (whether as evidence or, as the government now asserts, as closing argument demonstratives).  It is bedrock law that a party cannot put evidence before the jury while using a claim of work-product protection to shield underlying evidence that might undercut the reliability of what is put before the jury.  *See, e.g.*, *United States v. Nobles*, 422 U.S. 225, 231-32, 239-40 (1975).  The government has no legal

---

[11] Even if the Court were to view the OPU Visual Information Specialists as non-experts (despite the disclosure), as explained above, Defendants are entitled to the underlying inputs and data so that the defense can analyze the computer-generated evidence.

authority to put the CGE before the jury while, at the same time, insulating the CGE from challenge by withholding from the defense the underlying files.

## CONCLUSION

For the foregoing reasons, the Court should order: (1) that the government transport the Iraqi vehicles to the United States (or, alternatively, to another county in the Middle East that does not pose the same security risks as Iraq); (2) that the government produce the 3ds Max file and the underlying data for the 2014 animation as soon as it is ready regardless of what purpose it is intended for at trial; and (3) the immediate production of the 3ds Max file for the 2009 animation directed by the former trial team. If Defendants intend to make use in any way of the 2009 animation at trial, they will adhere to the letter agreement between the parties to provide notice of such use and full disclosure to the trial team.

Dated: May 5, 2014

Respectfully submitted,

/s/ William Coffield
William Coffield (No. 431126)
Coffield Law Group LLP
1330 Connecticut Avenue, N.W., Suite 220
Washington, DC  20036
Telephone:  (202) 429-4799

*Counsel for Defendant Evan S. Liberty*

/s/ Brian M. Heberlig
Brian M. Heberlig (No. 455381)
Michael J. Baratz (No. 480607)
Bruce C. Bishop (No. 437225)
Linda C. Bailey (No. 985081)
Scott P. Armstrong (No. 993851)
Steptoe & Johnson, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
Telephone:  (202) 429-3000

*Counsel for Defendant Paul A. Slough*

/s/ David Schertler
David Schertler (No. 367203)
Danny Onorato (No. 380043)
Lisa Schertler (No. 430754)
Schertler & Onorato, L.L.P.
575 – 7th Street, N.W., Suite 300 South
Washington, D.C.  20004
Telephone:  (202) 628-4199

*Counsel for Defendant Dustin L. Heard*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of May 2014, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

Anthony Asuncion
T. Patrick Martin
Christopher Kavanaugh
John Crabb, Jr.
David Mudd
United States Attorney's Office
for the District of Columbia
555 Fourth Street, NW
Washington, DC 20530

/s/ Michael J. Baratz