**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v. ) <br> ) <br> PAUL A. SLOUGH, ) <br> EVAN S. LIBERTY, ) <br> DUSTIN L. HEARD, ) <br> ) <br> Defendants. ) | Crim. No. 1:08-CR-360 (RCL) <br> Judge Royce C. Lamberth |
| UNITED STATES OF AMERICA ) <br> ) <br> v. ) <br> ) <br> NICHOLAS A. SLATTEN, ) <br> ) <br> Defendant. ) | Crim. No. 1:14-CR-107 (RCL) <br> Judge Royce C. Lamberth |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION**
***IN LIMINE* TO EXCLUDE TESTIMONY REGARDING**
**RAVEN 23'S DEPARTURE FROM THE GREEN ZONE**

Paul Slough, Evan Liberty, Dustin Heard, in No 08-CR-360, and Nicholas Slatten, in No. 14-CR-107, through counsel, submit this reply in support of their motion *in limine* to exclude testimony regarding Raven 23's departure from the Green Zone.

**ARGUMENT**

The government does not dispute the central fact about the decision to depart the Green Zone on September 16, 2007: the decision was made by Raven 23's tactical commander, Jimmy Watson, alone. According to the government, the alleged direction for Raven 23 to remain at the checkpoint came (a) in a call to Watson's cell phone, to which none of the Defendants were privy, and (b) in an alleged radio communication from the Tactical Operations Center ("TOC")

*to Watson*, an order *Watson* allegedly acknowledged.[1]  Opp. at 2.  The government does not claim that any Defendant had any input into, or any responsibility for, Watson's decision.

Despite the lack of any input or responsibility by any Defendant into Watson's decision, the government nonetheless seeks to portray Raven 23's departure from the Green Zone as the wrongful action of *Raven 23 collectively*, to disobey an order and inject themselves into a location and situation where (according to the government) they did not belong.  *See* Gov't Notice of Intention to Introduce 404(b) Evid. at 2 ("Notice") (ECF No. 406) (stating intention to show that "Raven 23 left the Green Zone" "in disregard of an order from Blackwater's command").  Even if the evidence is restricted to showing that the decision was Watson's alone, the overwhelming purpose and effect of introducing such evidence, as the government's Notice expressly states, is to impute to Raven 23 collectively, including the Defendants, an improper purpose and improper action for which in fact they were not responsible.  The distortion of such a presentation, and the unfair prejudice of attributing an allegedly wrongful decision to Defendants who had no control over it, is manifest.

The government offers only two theories of relevance for this evidence: that it somehow impeaches the credibility of its own witness Watson regarding incoming fire, and that it undercuts the reasonableness of Defendants' belief that they were under attack.  Neither theory holds water.

The government's attempted use of this evidence against Watson is impermissible impeachment: the government cannot use purported "impeachment" of its own witness as a "mere subterfuge to get before the jury evidence not otherwise admissible," *United States v.*

---

[1] Gov. Opp. to Def. Mot. *in Limine* to Exclude Testimony Regarding Raven 23's Departure from Green Zone at 2 (ECF No. 479) ("Opp.").

2

*Johnson*, 802 F.2d 1459, 1466 (D.C. Cir. 1986), nor may it impeach the credibility of its own witness with extrinsic evidence of other conduct that does not go to the witness's truthfulness. *See* Fed. R. Evid. 608(b); *United States v. Whitmore*, 359 F.3d 609, 618-19 (D.C. Cir. 2004). More important, the evidence is wholly irrelevant: whether Watson's decision for Raven 23 to depart the Green Zone disregarded an order or not has no bearing whatsoever on whether Raven 23 encountered insurgent fire at Nisur Square. The government's claim that the likelihood of insurgent fire at Nisur Square is made more or less probable based on whether Raven 23 did or did not have permission to leave a Green Zone checkpoint is an utter *non sequitur*, between fanciful and downright absurd.

Even if the government could impeach its own witness's credibility with extrinsic evidence, its theory of impeachment credibility here is only slightly less absurd. Watson will testify that he fired approximately 60 rounds and two grenades in response to direct threats to the Raven 23 convoy, including perceived immediate VBIED threats and incoming small arms fire. His testimony will be corroborated by numerous members of Raven 23 who are government witnesses not charged with wrongdoing; by contemporaneous real-time radio reports of incoming fire; and by the physical evidence, including AK-47 shell casings, bullet marks on the command vehicle, and bullets or bullet fragments recovered from the turret of the command vehicle, in which Watson (and Defendants Slough, Slatten, and Liberty) rode. The notion that Watson's well-corroborated testimony about incoming fire was motivated by a desire to cover up Watson's disobedience of an order, rather than by the threats he and others reported in real time, does not pass the straight face test. In any event, it pales next to the unfair prejudice of attributing to Raven 23 generally, including the Defendants, alleged disobedience of an order that, if it happened, was Watson's alone.

The government's theory about the effect of *Watson*'s decision on *Defendants'* state of mind makes no more sense. According to the government, the Defendants could have heard Watson's communication with the TOC on speakers within their vehicles, and this knowledge— if Defendants heard it—somehow made it less reasonable for the Defendants to believe that cars closely approaching the convoy might be VBIEDS, or people firing guns at the convoy might be attacking insurgents, or that it would be reasonable to protect themselves and the convoy by engaging such attackers with deadly force. The government's only reasoning is a series of rhetorical questions based on the unfounded supposition that Defendants intend to show an insurgent attack that was planned in advance *specifically to target Raven 23*, with (unexplained) knowledge of whether Raven 23 was or was not supposed to leave the Green Zone that afternoon. Opp. at 5. This absurd supposition is a creation of the government. While Defendants need not preview their evidence here, it is a matter of common sense that insurgent attacks in Baghdad were not directed at specific units of specific companies, but instead at American or coalition convoys generally, at locations and times of opportunity. A traffic square just outside the Green Zone, along the return route from the site of a minutes-ago car bomb attack, near a meeting attended by a U.S. diplomat, would be just such an opportunity.

The government's far-fetched suggestions of relevance are a smokescreen for its real and unfairly prejudicial purpose: to portray Raven 23 collectively, including the Defendants, as having disobeyed a direct order and having had no business in Nisur Square. Such evidence or argument is irrelevant under Rule 401 and plainly inadmissible under Rule 403. Even if the government claims it can show some tenuous grounds of relevance, it should not be permitted to open on this unfairly inflammatory theory until it has shown a foundation that this theory passes both Rule 401 and Rule 403.

### A.     Evidence Regarding the Departure from the Green Zone is Not Relevant

The government asserts that Watson's disobedience of an alleged order to remain in the Green Zone is relevant for two reasons—to impeach Mr. Watson's anticipated testimony that insurgents were firing at Blackwater, and to undermine the Defendants' claim that they were engaged by insurgents.  In other words, the government asserts that Mr. Watson had and continues to have a motive to lie about incoming fire because if he had violated an order and there had been no incoming fire, the consequences would have been far worse for Mr. Watson.  Under this theory, the government would argue to a jury that Watson fired approximately sixty rounds from his M-4 and two high-explosive grenades at phantom insurgents so he would not get in trouble for leaving the Green Zone against an order.  Further, according to the government, the Defendants decided in the heat of passion under incoming fire (or, in the case of Slatten, deliberately and with premeditation) to fire their weapons at Iraqi vehicles and individuals, in order to cover up the fact that *Watson* had disobeyed an order.  And, under the government's supposition, the Defendants supposedly feared an insurgent attack *specifically targeted at Raven 23*, and such a fear could not have been reasonable because insurgents could not have known Raven 23 would leave the Green Zone.  The government's explanations are nonsensical.

Even impeachment evidence, which is the government's primary basis for seeking to introduce evidence of Watson's disobedience, must be relevant—that is, it must make a fact more or less probable than it would be without the evidence.  *See* Fed. R. Evid. 401; *United States v. Hall*, 613 F.3d 249, 257 (D.C. Cir. 2010).  As a threshold matter, Watson's testimony about insurgent fire is corroborated by other witnesses' accounts and physical evidence.  For instance, investigators recovered from the scene AK-47 shell casings and bullets/bullet fragments, including from the turret of the vehicle in which Slough, Slatten, and Liberty rode.  Numerous witnesses, including Raven 23 members and others in the vicinity of Nisur Square,

5

recount hearing the distinctive sound of AK-47 fire and identified individuals engaging the convoy. Raven 23 members expected to be called by the government, who have not been charged with wrongdoing, have testified that the convoy took incoming fire and sustained bullet strikes to the Raven 23 Command vehicle. Witnesses identified and photographed those fresh bullet strikes. In light of the abundant corroborating evidence, including testimony of government witnesses and *physical* evidence, the government cannot credibly or in good faith suggest that its own witness is simply lying about such incoming fire. See *United States v. Sampol*, 636 F.2d 621, 658 (D.C.Cir.1980) ("[C]ounsel must have a reasonable basis for asking questions on cross-examination which tend to incriminate or degrade the witness and thereby create an unfounded bias which subsequent testimony cannot fully dispel."); *United States v. Fowler*, 465 F.2d 664, 666 (D.C. Cir. 1972) ("[T]he questioner must be in possession of some facts which support a genuine belief that the witness committed the offense or the degrading act to which the questioning relates."). Much less can the government do so solely to set up impeachment evidence regarding a supposed motive to lie.

Moreover, testimony that *Watson* disobeyed an order does not make the existence of insurgents and incoming fire, or the reasonableness of believing that such fire constitutes an insurgent attack, more or less probable. Insurgents do not choose whom to attack based on whether their target obeyed or disobeyed an order to enter the Red Zone. Nor do insurgents track and target particular convoys such as Raven 23 for attack. Straining to fashion a relevancy argument, the government attempts to impute to Defendants an argument that they believed Raven 23 was specifically targeted by insurgents who were lying in wait just for them, and since Raven 23 was ordered to remain inside the Green Zone, the group of Raven 23-assigned insurgents could not have possibly known to be at Nisur Square. *See* Gov't Opp'n at 5 ("If

6

Raven 23 was ordered to stay in the Green Zone, then how did the planned insurgent ambush realize that Raven 23 ignored the order?"). This fanciful, straw-man reasoning is the government's own creation. Insurgents do not track and attack specific units, nor do they (to our knowledge) have access to American radio or cell phone communications to track those units' individual command decisions. Insurgents do, however, attack targets of opportunity— American or coalition convoys—at locations known to be used by security forces, such as Nisur Square.

      **B.    Watson's Disobedience is Not Proper Impeachment Evidence**

Because the evidence of *Watson*'s decision to leave the Green Zone is not relevant to the existence of incoming fire or to *Defendants*' state of mind, the government resorts to admitting it to impeach Watson's credibility. But this use of the evidence is not proper impeachment under Rule 608 of the Federal Rules of Evidence. Commentators and courts have cautioned against the abuse of the power of impeachment to present to the jury evidence that the sponsor hopes will be improperly used by the jury for substantive purposes against the Defendants rather than for the limited purpose of assessing the credibility of a particular witness. *See United States v. Johnson*, 802 F.2d 1459, 1466 (D.C. Cir. 1986) ("[i]mpreachment evidence is to be used solely for the purpose of impeachment, and it may not be 'employed as mere subterfuge to get before the jury evidence not otherwise admissible.'") (quoting *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975)); *United States v. Buffalo*, 358 F.3d 519, 522-23 (8th Cir. 2004) ("The danger … is that a party will call a witness, knowing him or her to be adverse, merely to make an end-run around the rule against hearsay by impeaching the witness with a prior inconsistent statement that the jury would not otherwise have been allowed to hear . . . We are concerned under these circumstances that, despite any limiting instruction, the jury will misuse the inconsistent statement as substantive evidence, rather than consider it only on the issue of a witness's

credibility."); *United States v. Logan,* 121 F.3d 1172, 1174 (8th Cir. 1997); 27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6093 (1990).[2]

Rule 608(b) governs the use of specific instances of conduct to attack a witness's character for truthfulness. Here, this rule precludes the government's use of Watson's alleged disobedience of an order for three reasons. First, the use of prior conduct to impeach a witness may only be inquired into on *cross examination. Id.* The government notes in its opposition that it anticipates calling Watson as a witness during its case-in-chief. Gov't Opp'n at 2. The rule by its plain text prohibits the use of prior bad conduct during *direct* examination to attack the witness's credibility.

Second, the prior bad conduct must go to the "witness's character for truthfulness." Fed. R. Evid. 608; *Whitmore*, 359 F.3d at 618. Whether Watson disobeyed an order is not relevant to whether or not he is a truthful person. Indeed, courts have concluded that failure to comply with orders such as the terms of probation or conditions of release do not involve dishonesty and do not bear on a witness's truthfulness, and therefore fall outside Rule 608(b)'s permitted uses. *See, e.g.*, *United States v. Morrow*, No. Crim. 04-355, 2005 WL 3163801, at *4 (D.D.C. June 2, 2005). What is more, the fact that Watson's conduct was, as the government states in its opposition, "in complete disregard of a direct order," Gov't Opp'n at 1, demonstrates the lack of untruthfulness required by the rule. *See United States v. Vasquez*, 840 F. Supp. 2d 564, 575 (E.D.N.Y. 2011) (finding that "the fact that such conduct is 'blatant' implies that it does not

---

[2] *See also United States v. Peterman*, 841 F.2d 1474, 1479 (10th Cir.1988); *United States v. Frappier*, 807 F.2d 257, 259 (1st Cir. 1986); *United States v. Sebetich*, 776 F.2d 412, 429 (3d Cir. 1985); *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984); *United States v. Crouch*, 731 F.2d 621, 624 (9th Cir. 1984); *United States v. Fay*, 668 F.2d 375, 379 (8th Cir. 1981); *United States v. Miller*, 664 F.2d 94, 97 (5th Cir. 1981); *United States v. DeLillo*, 620 F.2d 939, 946 (2d Cir. 1980); *Whitehurst v. Wright*, 592 F.2d 834, 839 (5th Cir. 1979).

involve some element of deceit, untruthfulness, or falsification in the nature of *crimen falsi* such as perjury, false statement, fraud, embezzlement, or smuggling").

Third, and finally, Rule 608 states that the witness's truthfulness cannot be attacked through "extrinsic evidence." *See* Fed. R. Evid. 608(b); *Whitmore*, 359 F.3d at 618-19.  In other words, if a witness denies what the government accuses him of doing, for instance, disobeying an order not to leave the Green Zone, the government cannot then introduce evidence to show the witness in fact did what he denied doing.  *See United States v. Bynum*, 3 F.3d 769, 772 (4th Cir. 1993) (noting that under Rule 608, a "cross-examiner may inquire into specific incidents of conduct, but does so at the peril of not being able to rebut the witness's denials" and that "[t]he purpose of this rule is to prohibit things from getting too far afield-to prevent the proverbial trial within a trial").  Here, Watson vehemently denied before the grand jury that he disobeyed any order.  He believed that as the tactical commander of Raven 23, whether and where to deploy outside the Green Zone was up to him.  Defs.' Mot., Attach. A at 82-83.  This is an instance where the Court and the parties have the benefit of knowing in advance what the witness will say in response to the government's charge—he will deny it.  And because the government cannot go beyond that denial, no purpose would be served by even an initial inquiry, even if one were otherwise permissible.  Accordingly, this evidence should not be admitted for the purposes of impeachment.

### C.     The Evidence is Highly Prejudicial

Evidence of Watson's disobedience is not only irrelevant and improper for impeachment, its introduction would be highly prejudicial.  As discussed in Defendants' opening motion, the chief purpose and effect of the government's proposed evidence is to show that *Raven 23 collectively* disobeyed an order, and had no business being at Nisur Square.  That is a distortion of the evidence, and will confuse and inflame the jury, unfairly prejudicing them against the

9

Defendants.  Even if the evidence is limited to Watson, however (who is not charged with wrongdoing), there is a danger—especially pronounced in light of the government's announced intention to impeach Watson's testimony that is favorable to the defense—that the jury will conclude Watson disobeyed an order, put Raven 23 where it should not have been, and that the Defendants (three of whom rode in Watson's truck) are in some way "guilty by association."  Even the government concedes such use would be inappropriate.  Gov't Opp'n at 6.  The dispute to be tried is about what actually happened at Nisur Square, and whether the Defendants' conduct was reasonable.  It should be limited to that inquiry.  The Defendants did not act improperly in departing the Green Zone, or have any control over that decision.  The Defendants, along with every other member of Raven 23 on September 16, 2007, proceeded out of the Green Zone and took up position at Nisur Square under the order of their commander.  To permit the government to introduce evidence that would allow the jury to conclude otherwise would be highly prejudicial.

## CONCLUSION

For the reasons stated herein and in the Defendant's memorandum, all evidence related to Watson's decision to disregard an order and leave the Green Zone immediately prior to the Nisur Square incident should be excluded.

Dated: May 27, 2014                                                     Respectfully submitted,

  /s/ Thomas G. Connolly                                       /s/ Brian M. Heberlig
Thomas G. Connolly (No. 420416)                   Brian M. Heberlig (No. 455381)
Steven A. Fredley (No. 484794)                        Michael J. Baratz (No. 480607)
Jared P. Marx (No. 1008934)                            Bruce C. Bishop (No. 437225)
Anne K. Langer (No. 501389)                           Linda C. Bailey (No. 985081)
HARRIS, WILTSHIRE & GRANNIS LLP               Scott P. Armstrong (No. 993851)
1200 Eighteenth St., N.W., Suite 1200              Steptoe & Johnson, LLP
Washington, D.C. 20036                                   1330 Connecticut Avenue, N.W.

Telephone: (202) 730-1300  
Facsimile:  (202) 730-1301

*Counsel for Nicholas A. Slatten*

Washington, D.C.  20036-1795  
Telephone:  (202) 429-3000

*Counsel for Defendant Paul A. Slough*

 /s/ David Schertler  
David Schertler (No. 367203)  
Janet Foster (*pro hac vice*)  
Schertler & Onorato, L.L.P.  
575 – 7th Street, N.W., Suite 300 South  
Washington, D.C.  20004  
Telephone:  (202) 628-4199

*Counsel for Defendant Dustin L. Heard*

/s/ William Coffield  
William Coffield (No. 431126)  
Coffield Law Group LLP  
1330 Connecticut Avenue, N.W., Suite 220  
Washington, DC  20036  
Telephone:  (202) 429-4799

*Counsel for Defendant Evan S. Liberty*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of May 2014, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record.

/s Steven Fredley