# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

        Government,                   CR No. 08-360

                                       Washington, DC
     vs.                             July 3, 2014
                                         10:08 a.m.
PAUL SLOUGH,
EVAN LIBERTY,
DUSTIN HEARD,
        Defendants.
_____

UNITED STATES OF AMERICA,

        Government,                   CR No. 14-107

                                         Washington, DC
     vs.                             July 3, 2014
                                         10:08 a.m.
NICHOLAS SLATTEN,
        Defendant.
_____/


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          Anthony Asuncion, Esquire
                              John Crabb, Jr., Esquire
                              T. Patrick Martin, Esquire
                              Christopher R. Kavanaugh, Esq.
                              David Joseph Mudd, Esquire
                              U.S. ATTORNEY'S OFFICE
                              Criminal Division
                              555 Fourth Street, NW
                              Washington, DC 20530
                              (202) 252-7786
                              anthony.asuncion@usdoj.gov

17

1   I'm not trying to re-bag a cat once it's worked out that way,

2   that's not the Court's role.

3          MR. HEBERLIG:  But we are trying to honor the

4   agreement.

5          THE DEPUTY CLERK:  All rise.  This Honorable Court

6   is in recess for 10 minutes.

7   BRIEF RECESS AT 11:50 A.M.

8                          AFTER RECESS

9   JURY ESCORTED INTO THE COURTROOM AT 12:05 P.M.

10          THE COURT:  All right, ladies and gentlemen, you

11   may be seated.

12   Thereupon,

13          AZALDEEN SAMI HAWAS AL-DULAIMI,

14   the witness, having been first duly sworn, was examined and

15   testified as follows:

16          MR. ASUNCION:  May I proceed, Your Honor?

17          THE COURT:  Yes.

18          MR. ASUNCION:  Thank you.

19                     DIRECT EXAMINATION

20   BY MR. ASUNCION:

21   Q.   Good afternoon, sir.

22   A.   Good afternoon.

23   Q.   Could you please introduce yourself to the ladies and

24   gentlemen of the jury by stating your full name?

25   A.   My name is Azaldeen Sami Hawas.

1    Q.    Okay.  And now moving on to Government's Exhibit 531T.

2  And is that just a picture of the same car with a rear view?

3    A.    Yes.

4    Q.    Where is it that you, you, your father and your

5  grandmother were going on September 16th of 2007?

6    A.    We were going to get medication for my grandmother and

7  then going back home.

8    Q.    And where was it exactly that you intended on heading,

9  if you know?

10   A.    Yes, we were going towards the hospital, and the road

11  was going through Nisur Square.

12   Q.    The hospital that you're referring to, do you remember

13  the full name?

14   A.    This is Yarmouk Hospital.

15   Q.    And to get to Yarmouk Hospital, is one of the routes to

16  Yarmouk through Nisur Circle?

17   A.    Yes.  Yes, this is one of the roads to get to that

18  hospital.

19   Q.    As you approached Nisur Square on your way to the

20  hospital, tell us what happened, tell us about what you

21  observed?

22   A.    When we were going to the hospital, on our way to the

23  hospital?

24   Q.    Yes, please.

25   A.    There were lots of traffic and there was intense

1   shooting.  Suddenly the road was clear so there were cars

2   coming the wrong side so we went -- we went to the right side,

3   so there were cars coming, so one of these cars started

4   shooting.  They shot the car that was in front of us and that

5   car stopped.  Later they shot at us.  ~~There was a person that~~

6   ~~was sitting on top of that car, it was the highest car.  Yes,~~

7   ~~he started shooting at us, and he was wearing glasses, and he~~

8   ~~had a beard.~~

9   Q.   Let me unpackage that a bit and step back for a moment.

10  You described, I think your phrase was intense shooting?

11  A.   Yes.

12  Q.   If you are able, do you have, at least a general sense

13  of where you heard that intense shooting coming from?

14  A.   It was south of that square.  And every time we

15  approach and then it will become more intense.

16  Q.   At the time you were hearing that intense gunfire, are

17  you facing, are you still heading towards the square or have

18  you turned in any way, do you remember?

19  A.   So we wanted to leave that area because there were cars

20  coming opposite traffic.  We veered to the right, however, we

21  were not able to leave.

22  Q.   At one point I think your phrase was the road cleared,

23  can you tell us exactly what you mean by that?

24  A.   Yes, when the road opened, yes, because it was cleared

25  on the right side because people were coming that were getting

1  away from the fires, they would come in opposite direction,

2  opposite the traffic.

3    Q.    Just so we're clear, did you see any armored vehicles?

4          THE INTERPRETER:  Could you repeat the question,

5  did I sit in a specific place?

6  BY MR. ASUNCION:

7    Q.    Well, you've referred to vehicles approaching you, and

8  I think you said once was, I think your phrase was taller or

9  something to that effect?

10   A.    Yes.

11   Q.    Can you describe that or can you tell us whether you've

12 seen similar vehicles like that before?

13   A.    Yeah, it is a high car and also it is armored car.

14   Q.    Had you seen those before?

15   A.    Yes, I saw similar cars because this is Iraq and Iraq

16 is full of military cars.

17   Q.    How many, all together, and we'll go through it, each

18 one, but all together, how many of those armored military type

19 vehicles did you see coming your way?

20   A.    Yes, I saw three passing by and then the fourth one

21 came later.

22   ~~Q.    Okay.   Which one of those vehicles, if you're able to~~

23 ~~say so, which one do you believe shot into your vehicle?~~

24   ~~A.    I believe one of the two, either the second car or the~~

25 ~~third car.~~

16

1    Q.   Now, can you tell us, can you describe for us either

2    the vehicle -- well, can you describe for us the vehicle in

3    which you saw the person shooting into your car, what kind of

4    vehicle was that, if you're able to say?

5    A.   The car that shot at us?

6    Q.   Yes.

7    A.   It was a high, very high, and it was a military armored

8    car.   It was a white and blue color, I believe.

9    Q.   Did you see anyone on top of that vehicle?

10   A.   Yes, I saw one person on top of the car, he was wearing

11   glasses, and also he had a beard.

12   Q.   Do you recall at the time you were shot, more or less,

13   whether there was a car in front of your car?

14   A.   There was a car that is the color red.

15            THE INTERPRETER:  Sorry, may I ask him to repeat

16   the second part?

17            THE WITNESS:  Yes, and we bumped into it because

18   the car in front of us stopped, and I saw it was hit also.

19   Yes, and as soon as it was hit I did pull my head down in the

20   car.

21   BY MR. ASUNCION:

22   Q.   So just so we're clear, which car got hit first, if

23   you're able to say, was it that red car or was it your car?

24   A.   No, in the beginning the car in front of us was hit

25   first.

1   Q. Okay. Which color car was that?

2   A. Red, red color.

3   ~~Q. Now, you say you put your head down, if you put your~~

4   ~~head down, how was it that you were able to see who shot into~~

5   ~~your car?~~

6   ~~A. Yes. Yes, when we hit the -- we bumped into the front,~~

7   ~~the car in front of us. I put my head down, and then I put my~~

8   ~~head back up and I looked, and I saw him shooting at us.~~

9   ~~Q. Could you tell whether those bullets impacted on your~~

10   ~~car, were you able to tell at the time it happened?~~

11   ~~A. Yes.~~

12   Q. Were you able to tell ~~at that point~~ whether your father

13   had been hit by any ~~of that~~ gunfire?

14   ~~A. Yes. Yes, and~~ I saw him when he was taken. I saw him

15   when he was taken by the police to the hospital.

16   Q. Did you, after this happened, did you take pictures of

17   the inside of the car?

18   A. Yes.

19   Q. And you yourself took those pictures?

20   A. Yes, I have these pictures on me.

21   Q. Okay. I'm going to show you two exhibits, Government

22   Exhibit first 531G.

23        MR. ASUNCION: And we're moving that into evidence,

24   Your Honor?

25        MR. HEBERLIG: No objection.

1    A.    I saw them coming towards us in that direction.

2    Q.    Why don't you mark on the map where it is that you

3    first saw them?

4    A.    So they came, coming towards us, not this.

5    Q.    Go ahead.

6    A.    They were coming in that direction.

7    Q.    So where you placed the arrows, is that the first point

8    at which you saw any of the armored vehicles?

9    A.    Yes, yes, it was going in that direction.

10    Q.    All right.

11             MR. HEBERLIG:  So let the record reflect that the

12    arrows were placed on this portion of the diagram on the

13    traffic island right after the wall or the guardrail on the

14    left.

15    BY MR. HEBERLIG:

16    Q.    When you first saw the vehicles, how many did you see?

17    A.    I saw three, the first one did not shoot, and later I

18    saw the fourth car.

19    Q.    So four total?

20    A.    Yes.

21    Q.    How close together were they?

22    A.    The distance was close, and they were driving.  It was

23    very close distance.

24    Q.    And in particular, I want to make sure that the record

25    is clear.  I'm talking about the distance in between the

1    armored vehicles, not the distance from them to you.  Do you

2    recall how spread apart those armored vehicles were?

3      A.    They were close distance; however, the fourth car was

4    far.

5      Q.    So the fourth car was farther away than the first

6    three; is that correct?

7      A.    Yes, approximately, yes.

8      Q.    Did you see whether one of the vehicles was towing

9    another one of the vehicles?

10     A.    No, I did not see that.  Could you please repeat the

11   question, do you mean the military cars, your military cars?

12     Q.    My question was did you see whether one of the military

13   trucks was towing another of the military trucks?

14     A.    No.

15     Q.    I'm sorry?

16     A.    No.

17     Q.    How many trucks did you see shooting?

18     A.    One, I saw it shooting at us, at our car.

19     Q.    You saw only one or more than one?  I wasn't clear on

20   your testimony.

21     A.    Yes, the car that shot at us was only one car that shot

22   at us.  However, I don't know, I'm not aware of the other

23   cars.

24     Q.    And am I correct that on direct examination you

25   testified that you weren't sure whether it was the second or

1    ~~third car in the line of traffic that shot at you?~~

2    ~~A.    Yes.~~

3    Q.    Now, when the shots were fired, am I correct that your

4    vehicle, the front of your vehicle was facing in the direction

5    of Nisur Square?

6    A.    Yes.

7    Q.    And you described a white vehicle in front of yours; is

8    that correct?

9    A.    (No response.)

10    Q.    You described a white vehicle -- I'm sorry, a red

11    vehicle in front of yours; is that correct?

12    A.    Yes, in front of us, there was a red car.

13    Q.    And that vehicle was also facing forward in the

14    direction of Nisur Square; correct?

15    A.    Yes.

16    Q.    And the armored vehicles that you saw past on the left

17    side or driver's side of your vehicle; correct?

18    A.    Yes, opposite traffic.

19    Q.    And then at some point -- well, let me step back a

20    second.

21          While the vehicles were coming in your direction, did

22    you see shots fired at a man near a white car who was standing

23    outside of his vehicle?

24               THE INTERPRETER:  Could you repeat that?

25

1  within one or two car lengths of your vehicle right in the

2  general area where I just placed the arrow (indicating).

3    A.    What are you indicating here?

4    Q.    Well, I was attempting to indicate where your vehicle

5  was located, and as I understand it, your vehicle was

6  somewhere around that arrow.

7          And my question to you, sir, is did you see a

8  different -- did you see a different white car located right

9  in front of your car where a man got shot?

10   A.    No, I did not see that.

11   Q.    Okay.  Now, were the first shots that you saw directed

12  at the red car in front of you?

13   A.    Yes, those shots were towards the red car in front of

14  us.

15   Q.    And just so we're clear, those were the very first

16  shots you saw fired by these trucks; correct?

17   A.    Yes, I heard shooting coming from the square; however,

18  I saw that he started shooting at the car in front of us, then

19  started shooting at us.

20   Q.    And just so my question is clear, I'm talking about now

21  the very first shots that you saw with your own eyes, not what

22  you heard.  Am I right that those were the shots fired at the

23  red car?

24   A.    Yes, ~~it is the same person that shot at us, he shot~~ at

25  the red car in front of us.

1    ~~Q.    And those were the first shots you saw fired; correct?~~

2    ~~A.    I did not see the shots themselves; however, I saw him~~

3    ~~shooting.~~

4    ~~Q.    And what is the distinction you're drawing there?~~

5    ~~A.    Yes, you said the shots.   However, you cannot really be~~

6    ~~specific and see the shots.~~

7    ~~Q.    Okay.   Well, how about the first person you saw~~

8    ~~shooting, the first time with your own eyes you could perceive~~

9    ~~that shots were being fired, not with your ears, but with your~~

10   ~~eyes, those were the shots directed at the red car?~~

11   ~~A.    Yes, he was wearing glasses.~~

12   Q.    Now, when you saw that red car hit, am I correct that

13   you got out of your car?

14   A.    We left our car, no, we were not able to leave our car

15   because he was shooting and our car was hit.

16   Q.    So that -- my question, sir, is after you saw the shots

17   hit the red car, did you exit your car out of the passenger

18   side and lay on the ground?

19   A.    Yes, after the shooting stopped at us, this is when I

20   came out of the car.

21   Q.    Okay.   I want to be precise.   I'm talking about after

22   you saw the shots hit the red car, but before any shots were

23   directed at the car you were in, isn't that the time you got

24   out of your vehicle and laid down in the road?

25   A.    No.

1    Q.   That's incorrect?

2    A.   Yes, incorrect.

3    Q.   Do you remember being interviewed by the FBI during the

4    investigation in this case?

5    A.   You mean they asked me this question?

6    Q.   Do you remember for the first time, the first time that

7    you were interviewed about what was happened in Nisur Square

8    was by the FBI in Baghdad in 2012?

9    A.   So what you said, it's something that I said?

10   Q.   My first question is, do you remember being interviewed

11   by them in Baghdad in 2012, specifically July 2012?

12   A.   Yes, yes, I do remember.

13   Q.   All right.  And so my first question is whether you

14   remember telling them during that first interview in July

15   of 2012 that you got out of the car when the red car was hit

16   and laid down?

17   A.   No, after our car was hit, this is when I came out of

18   the car.

19   Q.   Let me see if I can refresh your recollection.

20        MR. HEBERLIG:  Can we take down this exhibit?  And

21   this should be for the witness only.

22        MR. ASUNCION:  There's no evidence that we need to

23   refresh his recollection on this point, Your Honor.

24        THE COURT:  Overruled.

25        MR. HEBERLIG:  All right.  Can we display just for

1    the witness only, please, Defense Exhibit 2890, page 3, one

2    more.  And if we could highlight the first three lines,

3    magnify them.

4            All right.  I'd ask the interpreter to please read

5    that to you and let me know when you finish reading it and

6    I'll have a question for you.

7            (Interpreter reading in Arabic.)

8            THE INTERPRETER:  Sorry, I can't read the word

9    before "down."

10           MR. HEBERLIG:  Can I approach, Your Honor?

11           THE COURT:  Laid.

12           MR. HEBERLIG:  Laid.

13           THE INTERPRETER:  Laid down.  Okay.

14           (Interpreter continues reading in

15        Arabic.)

16           MR. HEBERLIG:  And have you finished reading now?

17           THE INTERPRETER:  Yes?

18   BY MR. HEBERLIG:

19    Q.   And so my question to you, sir, is do you recall during

20   your first interview with the FBI in July of 2012 telling them

21   that you got out of the car when the red car was hit and you

22   laid down you, you were on the passenger side?

23    A.   Yes, I do remember I told them; however, I told them

24   that I got out after our car was hit.

25    Q.   So not after the red car was hit, but after your car

1   was hit?

2   A.   Yes, I believe that's what I said.

3   Q.   And at what point did you get out of the car?

4   A.   When they started the shooting.

5   Q.   So at the beginning of the shooting you out of the car

6   and laid down on the road?

7   A.   When we were hit.

8   Q.   At the beginning, when the shots hit your car, you got

9   out and you laid down in the road?

10   A.   Yes.

11   Q.   Now --

12   A.   Yes, all these shooting took seconds, it's not a long

13   time.

14   Q.   Okay.  Now, you testified on direct examination, ~~you~~

15   ~~gave some information about the person who shot your father;~~

16   ~~isn't that correct?~~

17   ~~A.   Yes, I gave the information.~~

18   Q.   Okay.  But isn't it true, sir, that during your first

19   interview with the FBI back in July of 2012, you told them

20   that you didn't see who shot your father?

21   A.   My dad, he didn't want me to be involved in this issue

22   and because I was a student.

23   Q.   Let me see if I have this straight.  Is it accurate

24   then during your first interview with the FBI you told them

25   that you didn't see who shot your father?

1   out of this.  Is that your testimony?

2           MR. ASUNCION:  Mischaracterizing the testimony,

3   we're objecting Your Honor.

4           THE COURT:  Sustained.

5   BY MR. HEBERLIG:

6   Q.   Sir, you gave some other information today about a

7   physical description of the man who did the shooting; correct?

8   A.   Yes.

9   Q.   And am I correct that in this July of 2012 interview,

10  the first interview you gave with the FBI, you told them

11  nothing about any sort of physical description of the man who

12  did the shooting?

13  A.   Yes.

14  Q.   So if one were to read a summary of the interview that

15  you gave to the FBI in July of 2012, there would be no

16  information in there about the man who shot you having a beard

17  or sunglasses or anything else?

18  A.   I just told you the reason, yes.

19  Q.   Okay.  And I'm correct, then, that nowhere in the

20  summary of your interview from 2012 did you ever say that a

21  person who was shooting at you or your family had a beard or

22  sunglasses or anything else?

23  A.   Are you talking about the second or the first interview

24  with them?

25  Q.   The first time you were interviewed by federal agents

1   from the United States, you never told them anything about ~~a~~

2   ~~man shooting at you with a beard or sunglasses or anything~~

3   ~~else; isn't that correct?~~

4     A.    Yes, I did not tell them.

5             MR. HEBERLIG:  Can we approach briefly, Your Honor?

6             THE COURT:  All right.

7   SIDEBAR DISCUSSION ON THE RECORD AS FOLLOWS:

8             MR. HEBERLIG:  Your Honor, I have an objection.  We

9   have not been provided any notice before this witness

10  testified that he recanted and changed the initial information

11  he gave to the FBI.  We have a 302 where he says:  I didn't

12  see who did the shooting.  He obviously lied to the FBI and he

13  admitted it.

14            There's been no notice of that to us.  I believe

15  that's a *Brady* and *Giglio* violation, that's a material

16  inconsistent statement that obviously the prosecutor figured

17  out before this witness took the stand, and I think the remedy

18  should be to strike his testimony.

19            MR. ASUNCION:  Well, we obviously don't see it that

20  way, Your Honor.  Again, just so the record is clear, we

21  learned of the description provided by this witness during

22  trial preparation here in the United States.  It's never come

23  up before, and we weren't aware of it, obviously.  The defense

24  has crossed extensively on this issue, and they can continue

25  to do so.

```
 1              MR. HEBERLIG:  Would you like to look at it?

 2              THE COURT:  (Nodded affirmatively.)

 3              MR. HEBERLIG:  It's one piece of substantive

 4    information.  I think the substance starts at the bottom of

 5    page 1.

 6              THE COURT:  What was the --

 7              (Pause.)

 8              MR. HEBERLIG:  These are just the notes, but the

 9    portion I was using are -- there are two parts.  In the 302

10    itself it says:  Hawas did not see who shot his father.  The

11    notes say:  He got out of car when red car hit and laid down.

12    He was on passenger side.  It's clear from the context he

13    got -- red car was shot first, he got out and laid down,

14    didn't see anything happen.

15              I mean, this is key testimony against only my

16    client.  It's an identification that's highly, highly suspect,

17    and it's the product of a *Brady* violation.

18              THE COURT:  In a *Brady* violation, though, I mean,

19    I'm not clear that you can strike all the testimony or just

20    the ID testimony.

21              MR. KAVANAUGH:  Your Honor, if I may.

22              MR. HEBERLIG:  I can live with the ID testimony.  I

23    think that's the only thing of substance he said.

24              MR. KAVANAUGH:  Your Honor, if I may.

25              THE COURT:  Yes.
```

1           MR. KAVANAUGH:  This is all we had as far as the

2    *Jencks* for this witness.  Your Honor, as far as to the extent

3    that there was anything inconsistent with his testimony here

4    today, the defense had that, it's all memorialized here.  To

5    the -- if there's something inconsistent with his testimony

6    today, he's made great and sufficient use of it.  The

7    Government has satisfied its burden as far as being able to

8    provide with that prior inconsistent statement for his

9    testimony.

10          But, Your Honor, this witness --

11          THE COURT:  I will find a *Brady* violation and I

12   will strike his ID testimony -- anything regarding the

13   identification.

14          MR. HEBERLIG:  And there is an issue, but I think

15   we can take it up after he testifies, if the Government plans

16   to call his father.

17          THE COURT:  All right.

18   SIDEBAR DISCUSSION CONCLUDED

19          THE COURT:  The witness may step down.

20          (Witness excused.)

21          THE COURT:  Ladies and gentlemen, I'm going to give

22   you a final instruction on this at the time of final

23   instructions, but I don't want you to go away today without

24   knowing what the result is going to be.

25          I'm going to grant the defendant's motion to strike

1    all of the testimony of this witness regarding the

2    identification of the shooter.  I'm going to find that there's

3    no basis for the jury to consider that testimony and weigh

4    that testimony.  Just strike and leave out of your minds

5    totally whatever he said about the identification of the

6    shooter.

7                His original statements to the FBI had never been

8    contradicted.  The defendants could not prepare for trial not

9    knowing that he was now going to claim that his father told

10   him what to say.  Just leave it all out of your mind, don't

11   worry about any of it.  Just don't consider that he made any

12   identification today or at any other time about the shooter.

13   He's going to be stuck with what he originally said.

14               We'll go ahead and let you all get an early start

15   on those of you who are going out of town, try to beat the

16   traffic, we'll let you go now.  We'll come back at 10:00

17   o'clock on Monday.

18               Don't talk about the case with anyone, don't let

19   anyone talk to you about the case.  Don't discuss this

20   incident.  I will give you final instructions at the

21   conclusion, but I'm just going to say, strike from your minds

22   any testimony about his identification of the shooter.

23               Have a nice weekend.  Don't Twitter or Tweet.  I'll

24   see you all Monday.

25   JURY ESCORTED FROM THE COURTROOM AT 1:40 P.M.