# Exhibit K



U.S. Department of Justice

Ronald C. Machen Jr.
United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

March 28, 2014

<u>*Via Federal Express*</u>

| | |
|---|---|
| Brian Matthew Heberlig | David Schertler |
| Bruce Charles Bishop | Danny C. Onorato |
| STEPTOE & JOHNSON LLP | SCHERTLER & ONORATO, L.L.P. |
| 1330 Connecticut Avenue NW | 575 7th Street, NW |
| Washington, DC 20036 | Suite 300 South |
| 202.429.8134 | Washington, DC 20004 |
| *Counsel for Defendant Paul Slough* | 202.628.4199 |
| | Counsel for Defendant Dustin Heard |
| Thomas Gerard Connolly | William Francis Coffield, IV |
| WILTSHIRE & GRANNIS, LLP | COFFIELD LAW GROUP, LLP |
| 1200 18th Street, NW | 1330 Connecticut Avenue, NW |
| Suite 1200 | Suite 220 |
| Washington, DC 20036 | Washington, DC 20036 |
| 202.730.1339 | 202.429.4799 |
| *Counsel for Defendant Nicholas Slatten* | *Counsel for Defendant Evan Liberty* |

    Re:   *United States v. Paul Slough, et al.*  (Case No. 08-360 (RCL))

Dear Counsel:

    Per the Court's March 7, 2014 Scheduling Order and Rule of Criminal Procedure 16(a)(1)(G), we are providing notice of the following expert witnesses that the government may call to testify in this matter:

    **1.**     **Suzanne Brown.** Ms. Brown is a Visual Information Specialist working in the FBI Laboratory's Operational Projects Unit. Her expert qualifications are described in her curriculum vitae, which is attached at Tab 1. Ms. Brown builds

digital, "approximate to scale" two- and three-dimensional exhibits, including animations (collectively, "digital exhibits"), for use at trial. Ms. Brown is in the process of building digital exhibits of Nisur Square that will include: landmarks, streets, and other points of reference in the area of Nisur Square on September 16, 2007; the relative locations of the Raven 23 vehicles during and around the time of the shooting incident on September 16, 2007; the relative locations of the certain Iraqi civilian vehicles during and around the time of the shooting incident on September 16, 2007; the relative locations of the certain Iraqi victims and witnesses during and around the time of the shooting incident on September 16, 2007; the relative location of some of the physical evidence during and around the time of the shooting incident on September 16, 2007; certain measurements taken by the FBI of relevant locations within Nisur Square after September 16, 2007; and overlays of certain trajectory analysis performed by Douglas Murphy in this case. The government may choose to introduce or otherwise use these diagram exhibits at trial. If it chooses to do so, the government will identify them as exhibits in its Exhibit List and supply copies of the digital exhibits at that time. As appropriate, Ms. Brown is expected to testify as to what aspects of the digital exhibits are "approximate to scale" and what may not be "approximate to scale" but nonetheless accurately represents what is being depicted. In order to construct the digital exhibits, Ms. Brown has examined and relied upon, among other things: satellite photographs of Nisur Square on September 16, 2007; Light Detection and Ranging ("LIDAR") data; video footage taken of Nisur Square on September 16, 2007, from Tower 8 shortly after the shooting; video footage of Nisur Square on September 16, 2007, taken by a U.S. military drone shortly after the shooting; video footage taken of Nisur Square on September 16, 2007, by individuals on the ground shortly after the shooting; hundreds of color photographs taken at Nisur Square on September 16, 2007, and subsequent dates; certain measurements taken by the FBI of relevant locations within Nisur Square after September 16, 2007; and the May 20, 2009 and August 28, 2009 expert reports of Douglas Murphy contained at Tab 4. Ms. Brown's creation of the digital exhibits will be based on her education, training, and experience in the construction of similar digital exhibits and models.

2. **Jacob Cabelli.** Mr. Cabelli is a Visual Information Specialist working in the FBI Laboratory's Operational Projects Unit. His expert qualifications are described in his curriculum vitae, which is attached at Tab 2. Mr. Cabelli builds digital, "approximate to scale" two- and three-dimensional exhibits, including animations (collectively, "digital exhibits"), for use at trial. Mr. Cabelli is in the process of building digital exhibits of Nisur Square that will include: landmarks, streets, and other points of reference in the area of Nisur Square on September 16, 2007; the relative locations of the Raven 23 vehicles during and around the time of the shooting incident on September 16, 2007; the relative locations of the certain Iraqi civilian vehicles during and around the time of the shooting incident on September 16, 2007; the relative locations of the certain Iraqi victims and

witnesses during and around the time of the shooting incident on September 16, 2007; the relative location of some of the physical evidence during and around the time of the shooting incident on September 16, 2007; certain measurements taken by the FBI of relevant locations within Nisur Square after September 16, 2007; and overlays of certain trajectory analysis performed by Douglas Murphy in this case.  The government may choose to introduce or otherwise use these diagram exhibits at trial.  If it chooses to do so, the government will identify them as exhibits in its Exhibit List and supply copies of the digital exhibits at that time.  As appropriate, Mr. Cabelli is expected to testify as to what aspects of the digital exhibits are "approximate to scale" and what may not be "approximate to scale" but nonetheless accurately represents what is being depicted.  In order to construct the digital exhibits, Mr. Cabelli has examined and relied upon, among other things: satellite photographs of Nisur Square on September 16, 2007; Light Detection and Ranging ("LIDAR") data; video footage taken of Nisur Square on September 16, 2007, from Tower 8 shortly after the shooting; video footage of Nisur Square on September 16, 2007, taken by a U.S. military drone shortly after the shooting; video footage taken of Nisur Square on September 16, 2007, by individuals on the ground shortly after the shooting; hundreds of color photographs taken at Nisur Square on September 16, 2007, and subsequent dates; certain measurements taken by the FBI of relevant locations within Nisur Square after September 16, 2007; and the May 20, 2009 and August 28, 2009 expert reports of Douglas Murphy contained at Tab 4.  Mr. Cabelli's creation of the digital exhibits will be based on his education, training, and experience in the construction of similar digital exhibits and models.

3. **Brandon Giroux.**  Mr. Giroux is an expert in firearms and toolmark identification and comparison, formerly employed in the FBI Laboratory's Firearms/Toolmark Unit.  His expert qualifications are described in his curriculum vitae, a copy of which you previously received as Bates No. USAO_026003, et al.  He examined and analyzed some of the items of evidence in this case, including numerous times of ballistics-related evidence.  He is expected to testify about the science of firearms and toolmark identification and comparison, his particular disciplines within that area of expertise, and the particular work he performed in this case, consistent with his expert reports, copies of which are attached at Tab 3.  In addition, we expect him to testify to the following:

    Bullets
    - Q1 is a bullet consistent with those loaded into 7.62x51mm cartridges (specifically the M-993 cartridge). Q1 exhibits the general rifling characteristics consistent with the 7.62x51mm Fabrique National rifle, model M-240B.
    - Q3 is a bullet consistent with those loaded into 7.62x54R cartridges
    - Q42, Q51 through Q54 are bullets consistent with those loaded into 7.62x39mm cartridges.

3

- There were insufficient marks of value for comparison purposes to determine if any of these bullets were fired from any of the known M-240B barrels.

Bullet Fragments and Bullet Jacket Fragments
- Q2, Q8, Q90, Q124, and Q126 are consistent with steel penetrator tips found in Q231 through Q250 (i.e., 5.56mm cartridges).
- Q4 is a bullet fragment consistent with bullets loaded into 7.62x39mm cartridges.
- Q5, Q6, Q27, Q36, Q37, Q38, Q39, Q117, Q122, Q123, Q125, Q133, Q156, Q157, Q166, Q170, Q173, Q174, Q177, Q178, Q254 are bullet fragments or bullet jacket fragments.
- Q7, Q13 through Q15, Q29, Q32, Q40, Q41, Q112, Q120, Q121, Q127 through Q131, Q134 through Q137, Q148 through Q155 are consistent with bullet fragments or bullet jacket fragments.
- Based on class characteristics, some of the bullet fragments and bullet jacket fragments could be excluded as having been fired from the known M-4 and SR-25 barrels and known 9mm pistols. For this same reason, others could be excluded as having been fired from the known M-240B barrels. However, no bullet fragment or bullet jacket fragment was excluded as having been fired from all of the known barrels and known pistols. Further, there were insufficient marks of value for comparison purposes to determine if any of the bullet fragments or bullet jacket fragments were fired from any of the known barrels and known pistols.

Metal fragments
- Q9, Q16 through Q26, Q28, Q30, Q31, Q34, Q113 through Q116, Q118, Q119, Q132, Q138 through Q147, Q158 through Q169, Q171, Q172, Q176, and Q255 through Q258 appear to be metal fragments.

Cartridge cases
- Q10 through Q12, Q65 through Q69, Q76, Q79 through Q82, and Q85 are 7.62x39mm cartridge cases with a variety of headstamps (i.e., Chinese, Serbian, unknown, obliterated, or none). Q10 through Q12, Q65 through Q69, Q82, and Q86 exhibit damage consistent with having been discharged from a firearm. Q76, Q79 through Q81, and Q85 exhibit damage that exceeds that which is expected from having been discharged in a firearm. Q86 is a 7.62x39mm cartridge case with an unknown headstamp and a 7.62mm bullet inserted into the mouth of the cartridge case. Q86 had no powder in the cartridge case and the bullet inserted inside it had no rifling marks.
- Q43, Q74, Q75, and Q99 through Q103 are 7.62x51mm cartridge cases. Q43 and Q99 through Q103 have unknown headstamps and were fired from K40 (i.e., an M-240B machine gun).

- Q74 and Q75 have Swedish headstamps and were fired from K28 (i.e., an M-240B machine gun).
- Q44 through Q49, Q70 through Q73, and Q94 through Q98 are 5.56mm cartridge cases with Lake City Ordnance headstamps. Q44 was fired from K11 (i.e., an M-4 rifle with grenade launcher). Q45 and Q47 through Q49 were fired from K12 (i.e., an M-4 rifle with grenade launcher). Q94, Q96, and Q97 were fired from K22 (i.e., an M-4 rifle). Q98 was fired from K6 (i.e., an M-4 rifle with grenade launcher). There were insufficient marks of value for comparison purposes to determine if Q46, Q70 through Q73, and Q95 were fired in any of the known M-4 rifles.
- Q56 through Q64 are 9mm Luger cartridge cases. There were insufficient marks of value for comparison purposes to determine if Q56, Q57, Q59, and Q62 through Q64 were fired in any of the known 9mm pistols. The class characteristics of Q56, Q57, Q59, and Q62 through Q64 are consistent with Glock and Smith & Wesson pistols. Q58, Q60, and Q61 were excluded as having been fired in any of the known 9mm pistols.
- Q77, Q78, Q83, and Q84 are 7.62x54R cartridge cases with unknown headstamps.

Smoke canisters, grenades, and grenade casings
- Q104 and Q105 are grenade casings that exhibit damage consistent with having been discharged from a firearm. Q104 was fired from K6 (i.e., an M-4 rifle with grenade launcher). There were insufficient marks of value for comparison purposes to determine if Q105 was fired from any of the known M-4 rifles with grenade launchers.

Tires
- Q91 and Q92 are damaged tires. No residues consistent with a bullet impact were found on the tires. Metal objects removed from Q91 and Q92 were not consistent with bullets or bullet fragments.

Mr. Giroux's expert opinions will be based on his education, training, and experience in the science of firearms and toolmark identification and comparison.

**4.     Douglas Murphy.** Douglas Murphy is an expert in firearms and toolmark identification and comparison, trajectory analysis, and shooting incident reconstruction working in the FBI Laboratory's Firearms/Toolmark Unit. His expert qualifications are described in his curriculum vitae, which is attached at Tab 4. He examined and analyzed some of the items of evidence in this case, including numerous civilian vehicles purportedly struck by gunfire in the shooting incident in Nisur Square on September 16, 2007. He is expected to testify about the science of firearms and toolmark identification and comparison and trajectory analysis, his particular disciplines within those areas of expertise, and the particular work he performed in this case, consistent with his expert reports,

copies of which are attached at Tab 4. Mr. Murphy's expert opinions will be based on his education, training, and experience in the science of firearms and toolmark identification and comparison, trajectory analysis, and shooting incident reconstruction.

5. **Susan Marvin (formerly Kazanjian), PhD.** Dr. Marvin is an expert in Forensic Examination and Metallurgy working in the FBI Laboratory's Chemistry Unit Unit. Her expert qualifications are described in her curriculum vitae, which is attached at Tab 5. She examined and analyzed some of the items of evidence in this case, including three metal fragments removed from tires from the Raven 23 "Command Vehicle" used on September 16, 2007. She is expected to testify about the science of forensic metallurgy, her particular disciplines within that area of expertise, and the particular work she performed in this case, consistent with her expert report, a copy of which is attached at Tab 5. Dr. Marvin's expert opinions will be based on her education, training, and experience in the science of forensic examination and metallurgy.

6. **Michael A. Smith, PhD.** Dr. Smith is a forensic metallurgist working in the FBI Laboratory's Chemistry Unit. His expert qualifications are described in his curriculum vitae, which is attached at Tab 6. He examined and analyzed some of the items of evidence in this case, including numerous ballistics evidence. He is expected to testify about the science of forensic metallurgy, his particular disciplines within this area of expertise, and the particular work he performed in this case, consistent with his expert reports, copies of which are attached at Tab 6. In addition, we expect him to testify to the following:

    M-993 cartridges (Tungsten)
    - Q1 has a Tungsten core consistent with those found in M-993 cartridges (i.e., 7.62x51mm cartridges).
    - Q15 and Q113 are Tungsten fragments consistent with the Tungsten core found in M-993 cartridges.
    - Q14 through Q18 are Tungsten fragments consistent with the Tungsten found in M-993 cartridges.
    - Q114 and Q115 are aluminum fragments consistent with a component of M-993 cartridges (i.e., the "sleeve" or covering over the Tungsten core).

    Steel penetrator tips
    - Q2, Q8, Q90, Q124, and Q126 are consistent with the steel penetrator tips found in Q231 through Q250 (i.e., 5.56mm cartridges).

    Dr. Smith's expert opinions will be based on his education, training, and experience in the science of forensic metallurgy.

7. **Maureen Bradley, PhD.** Dr. Bradley is an expert in analytical chemistry and

paint transfer analysis working in the FBI Laboratory's Chemistry Unit. Her expert qualifications are described in her curriculum vitae, which is attached at Tab 7. She examined and analyzed some of the items of evidence in this case. Specifically, she conducted a paint transfer analysis of the front bumper of the burned Kia sedan and the rear bumper of the white VW Caddy box truck. She is expected to testify about the science of analytical chemistry, her particular disciplines within that area of expertise, and the particular work she performed in this case, consistent with her expert reports, copies of which are attached at Tab 7. In addition, she is expected to testify that the apparent transfer of paint from the front bumper of the burned Kia sedan to the rear of the white VW Caddy box truck is consistent with the two bumpers having come into contact with each other with a sufficient amount of frictional force to cause the paint transfer. Dr. Bradley's expert opinions will be based on her education, training, and experience in the science of analytical chemistry and paint transfer analysis.

8.  **Chief Warrant Officer ("Gunner") Shelby Lasater.** Gunner Lasater is a Chief Warrant Officer in the United States Marine Corps ("U.S.M.C.") and has served in the U.S.M.C. since 1991. He is an expert in infantry weapon systems employment, weapons systems effects, and training in individual weapon systems for use by individual servicemembers and military units. His expert qualifications in these disciplines are described in his curriculum vitae, which is attached at Tab 8. He currently serves as the "Gunner" for the U.S.M.C.'s Infantry Officer Course, the comprehensive course of instruction for all U.S.M.C. Infantry Officers. As the Gunner for this course, which is part of the premier Infantry school in the U.S.M.C., Gunner Lasater also contributes and comments on the development of U.S.M.C. policies on weapon systems and tactical implementation. Gunner Lasater is expected to testify about the characteristics, capabilities, and features of the some of the weapon systems used by Raven 23 on September 16, 2007, including the M-4 rifle, M-240 heavy machine gun, and the M-203 grenade launcher. As to each of the these weapon systems, he is expected to testify to the caliber and characteristics of the weapon system's munitions, and the weapon system's mechanical features, firing characteristics, sustained rate of fire, maximum effective rates of fire, maximum effective range, maximum range, and fire selector options, etc., consistent with U.S.M.C. Technical Manuals 05538/10012-OR and other relevant technical manuals, his experience, and his training. Gunner Lasater is also an expert on how the U.S.M.C. trains its infantryman and the training received by each infantryman with the above-referenced weapon systems, including training concerning personal identification of a target before firing at a target. He is also familiar with the standard weapons qualifications testing of U.S.M.C. members of the infantry on the above-referenced weapon systems, interpreting qualification scores, and interpreting the relative proficiency of a shooter given that person's qualification scores. Finally, based on Gunner Lasater's familiarity with the training supplied by the U.S.M.C. to its infantrymen and his review of the training records of defendants Heard and

      Liberty, Gunner Lasater is expected to testify as to the type of training defendants Heard and Liberty received on infantry weapon systems like those used by Raven 23 on September 16, 2007, while defendants Heard and Liberty were in the U.S.M.C.

9. **W. Mark Whitworth.** Mr. Whitworth is an explosives and hazardous materials examiner and expert working in the FBI Laboratory's Explosives Unit. His expert qualifications are described in his curriculum vitae, which is attached at Tab 9. He examined and analyzed various items of evidence in this case, including color photographic images of the burned white Kia and the white VW Caddy box truck taken after the shooting in Nisur Square on September 16, 2007, as well as the tires from the Raven 23 "Command Vehicle" used on September 16, 2007 and three metal fragments removed from those tires. He also conducted a series of explosives tests to obtain reference material that could be compared to the damage observed in the above-referenced photographs of the burned white Kia and the white Caddy VW box truck, as well as the fragments referenced above. He is expected to testify about explosives and hazardous materials, including the M433 HE DP projectile fired by the M203 grenade launcher and M79 grenade launcher. He is also expected to testify to the findings and conclusions contained in his expert reports, copies of which are attached at Tab 9. In addition, he is expected to testify to the following:

   Smoke canisters, grenades, and grenade casings
   - Q50, Q106, and Q107 are smoke canisters
   - Q87 is a smoke grenade.
   - Q88 and Q108 are smoke grenade spoons; Q109 is a grenade pin

10. **Scott Patterson.** Mr. Patterson is a firearms and ballistics testing examiner and expert working in the FBI Laboratory's Ballistic Research Facility. His expert qualifications are described in his curriculum vitae, which is attached at Tab 10. He examined certain items of evidence in this case, including the SR-25 sniper rifle used by defendant Slatten on September 16, 2007. He also performed various forms of demonstrative firearms testing. He obtained and examined exemplar M-4 and SR-25 rifle scopes similar to those issued to and carried by the defendants on September 16, 2007, in Nisur Square and took demonstrative photographs through those scopes of silhouette and mannequin targets at distances of between 25 and 500 feet to demonstrate how scope magnification of targets enhances the viewer's ability to observe targets well beyond the abilities of the naked eye. He also conducted a series of live-fire tests and demonstrations, using various weapons systems (i.e., semiautomatic rifles, the M-240 heavy machine gun, and the AK-47 assault rifle) with their corresponding munition rounds (i.e., 5.56 mm rounds and 7.62 mm rounds) to capture the effects fired rounds from those weapons would have on sheet metal, 5mm plated armor, and ballistic gelatin blocks at various distances. Some of this testing was captured by high-speed

cameras. Mr. Patterson is also expected to conduct similar live-fire tests and demonstration with the SR-25 sniper rifle. If the government chooses to present Mr. Patterson's testimony, it may choose to augment that testimony through the use of visual aids and exhibits, such as video footage, still photographs, and the actual physical targets that were fired upon. Should it seek to use any such exhibits at trial, the government will identify those exhibits in its Exhibit List and either supply a copy of the exhibits at that time or offer the defendants an opportunity to examine the exhibits (e.g., the physical targets that were fired upon).

11. **Brian Chase.** Mr. Chase is an expert in the field of motor vehicle/crash causation analysis, traffic accident investigation, and traffic accident reconstruction. His qualifications are described in his curriculum vitae, which is attached at Tab 11. He examined and analyzed some of the items of evidence in this case, including the front bumper system of the burned Kia sedan and the rear bumper system of the white VW Caddy box truck. He has also examined, among other things: satellite photographs of Nisur Square on September 16, 2007; video footage taken of Nisur Square on September 16, 2007, from Tower 8 shortly after the shooting; video footage of Nisur Square on September 16, 2007, taken by a U.S. military drone shortly after the shooting; video footage taken of Nisur Square on September 16, 2007, by individuals on the ground shortly after the shooting; video footage of the burned Kia sedan and the white VW Caddy box truck taken after the shooting in Nisur Square on September 16, 2007; color photographs of the burned Kia sedan and the white VW Caddy box truck taken after the shooting in Nisur Square on September 16, 2007; and close-up photographs taken of the front bumper system of the burned Kia sedan and the rear bumper system of the white VW Caddy box truck. He is expected to testify that based on all the evidence he has reviewed and analyzed, including the limited damage he observed to the front bumper system of the burned Kia sedan and the rear bumper system of the white VW Caddy box truck, no apparent structural damage, and no evidence of energy absorption, the vehicles were involved in a very low-speed impact. He is also expected to testify that the bumper covers of both bumper systems exhibit directional scratching and paint transfer consistent with frictional force present when two surfaces slide across one another. If the government chooses to present Mr. Chase's testimony, it may choose to augment that testimony through the use of visual aids and exhibits. Should it seek to use any such exhibits at trial, the government will identify those exhibits in its Exhibit List and either supply a copy of the exhibits at that time or offer the defendants an opportunity to examine the exhibits.

12. **Eric Benn.** Mr. Benn is an expert in the field of imagery analysis working for the Department of Defense's National Geospatial Agency. His qualifications are described in his curriculum vitae, which is attached at Tab 12. Mr. Benn will authenticate and characterize satellite images of West Central Baghdad, Iraq

9

captured on September 16, 2007 at 12:06 and 34 seconds p.m. (local time) by the commercial satellite QuickBird, owned and operated by DigitalGlobe. You have been provided that imagery previously, and snapshots with annotations were previously produced and identified by Bates nos. USAO_026601 - USAO_026609. Mr. Benn is expected to testify that DigitalGlobe provides unclassified satellite imagery to the US Government on a contractual basis. Mr. Benn is expected to testify as to the probable identification of four armored vehicles, of the type commonly used by Blackwater, USA in Baghdad, Iraq, entering Nisur Square at 12:06 pm, and another convoy of armored vehicles traveling in the vicinity of the Izdihar Compound located to the north and west of Nisur Square. Mr. Benn will also identify the location of an explosion near the Izdihar Compound, from which a plume of black smoke can be seen on the imagery.

Mr. Benn will also authenticate the video and photographs of Nisur Square captured on September 16, 2007 by the United States Army Unarmed Aerial Vehicle ("UAV") or "drone." Still photos from this drone can be found on the previously produced DVD labeled "Discovery Production No. 17" at Bates Nos. USAO_027532 - USAO_027544, and the video is on a separate previously produced compact disc identified by Bates No. USAO_028233. Mr. Benn will also identify water mark stains on the pavement that are visible on the UAV imagery, and has concluded the following:

- There is a dark stain on the traffic pavement on the inside curb of the traffic circle in the South-Southwest portion of the circle (the "stain).
- The stain was not present on the DigitalGlobe commercial imagery (acquired at 12:06:34).
- The stain is also present on the UAV imagery acquired from (at least) 12:34:03 and the subsequent 3 (or more) minutes.
- The stain is almost certainly a result of wet pavement caused by water or another liquid that was spilled or sprayed and ran onto the pavement.
- The shape of the stain is not precisely geometric, implying it was not a result of a wet object (e.g., a tarp, blanket, etc.) being placed onto the pavement; rather, it appears to have been the result of a spray or spill, potentially off a vehicle-sized object.

13. **Robert Martin.** Mr. Martin is a gunsmith (a.k.a. "armorer") currently working in the FBI's Defensive Systems Unit. He is an expert in various weapons systems, including the SR-25 sniper rifle. He is also an expert in various rifle scopes, including the Leopold Mark 4 3.5-10x40mm variable power rifle scope. His expert qualifications are described in his curriculum vitae, which is attached at Tab 13. Mr. Martin is expected to testify about the characteristics, capabilities, and features of the SR-25 and Leopold Mark 4 riflescope used by defendant Slatten on September 16, 2007. As to the SR-25 in particular, he is also expected

to testify to the caliber and characteristics of the weapon's munitions, and the weapon's mechanical features, firing characteristics, maximum effective range, maximum range, consistent with his education, training, and experience, as well as the Knight's Armament manufacturer's manual for the SR-25 sniper rifle, technical manuals, and other reliable references for the SR-25. Mr. Martin also physically examined the SR-25 used by defendant Slatten on September 16, 2007, and subsequently seized by the FBI as evidence in this case. He is expected to testify that upon examining the SR-25, he observed several things of interest. First, the trigger mechanism for the rifle appeared to have been manipulated or altered, which resulted in a single-stage trigger pull as opposed to a two-stage trigger pull. Mr. Martin is expected to testify that a two-stage trigger pull generally consists of an initial trigger pull with a noticeable take-up of the slack in the trigger (i.e., stage one), followed by a distinct increase in the force required to pull the trigger to fire the weapon (i.e., stage two). In contrast, a single stage trigger pull has no discernible movement or increase in force required to fire the weapon (i.e., a single pull). Mr. Martin is expected to testify that the SR-25 sniper rifle is manufactured to have a two-stage trigger pull system, and qualified armorers working with the SR-25 generally configure it, as manufactured, to utilize a two-stage trigger pull system. Based on his examination of the SR-25 used by defendant Slatten on September 16, 2007, as well as his education, experience, and training in the field, it appeared to Mr. Martin that someone had manipulated or altered the trigger mechanism in the SR-25 intentionally. Second, in examining the SR-25 used by defendant Slatten on September 16, 2007, Mr. Martin also observed noticeable wear near the end of the barrel of the rifle that, in his experience, is caused by and consistent with a rifle suppressor being attached, removed, and reattached to the end of the rifle numerous times.

If you have any questions, please do not hesitate to contact us.

                                                                 Sincerely,

                                        _____/s/_____
                                        T. Patrick Martin
                                        Anthony Asuncion
                                        Christopher Kavanaugh
                                        Assistant United States Attorneys

Enclosures