**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal No. 08-360 (RCL)** |
| ) | |
| **DUSTIN LAURENT HEARD,** ) | **Sentencing:  April 13, 2015** |
| ) | |
| **Defendant** ) | |
| _____ ) | |

**DEFENDANT DUSTIN HEARD'S MEMORANDUM IN AID OF SENTENCING**

**I.      Introduction**

On April 13, 2015, defendant Dustin Laurent Heard will appear before this Court to be sentenced for the offenses of voluntary manslaughter, attempted voluntary manslaughter, and a violation of 18 U.S.C. § 924(c) for events that occurred in 2007 while Mr. Heard was a member of a Tactical Response Team (named "Raven 23") providing protective services to U.S. State Department personnel in Baghdad, Iraq.  Having presided over the lengthy trial, this Court knows the case well.  The Court is aware of the genesis of the events of September 16, 2007, in Nisur Square and their tragic outcome.  The Court is also aware of the volatile and dangerous conditions in which Mr. Heard and other U.S. personnel operated in post-invasion Iraq, especially in 2007, when the most prevalent threats to Americans emanated not from identifiable combatants but from insurgents who concealed themselves within the civilian population, in the everyday traffic of Baghdad, and on the police force.

It is self-evident, and was shown by the trial evidence, that these conditions created immeasurable stress and uncertainty for armed U.S. security contractors operating in Iraq.  Those contractors bore the weighty duty to protect United States diplomats and their team against mortal

threats through use of government-issued heavy weaponry.  Simultaneously, they had the weighty responsibility to decide, on the spot and often without full information, whether the use of those powerful weapons – the *only* weapons the contractors had at their disposal – was reasonable and necessary, despite the ever-present potential for unintended casualties in an urban war zone environment.  That inherently imperfect balancing process came to life through the trial testimony of Raven 23 member Adam Frost, who heard Mr. Heard announce over the radio from the rearmost turret in the convoy, as the convoy exited Nisur Square with its damaged command vehicle in tow, that the unit was "still taking fire from the rear."  7/15/14 AM Tr. 75.  When a team member responded to "shoot back," Mr. Heard's response, according to Mr. Frost's testimony, was ***"I can't shoot back because I can't see where it's coming from."***  *Id*. at 76.

This testimony exemplifies the nature and character of Dustin Heard.  On September 16, 2007, as during his four years of service in the United States Marine Corps, Mr. Heard tried to fulfill his duties and responsibilities honorably and conscientiously.  Mr. Heard would never, ***ever*** intentionally harm an innocent person.  He is a protector by nature and has devoted his adult life to defending innocents and his country.  He utilized his assigned weaponry in Nisur Square because he genuinely believed, based on the conditions and threats that he perceived at the time, that it was his duty to do so and that it was necessary for the protection of himself and his team.  We disagree with the jury's verdicts in this case against Mr. Heard and do not believe they are justified by the evidence.  Yet, we understand that as a result of those verdicts, Mr. Heard is scheduled to be sentenced by this Court.   Mr. Heard asks the Court, in fashioning its sentence, to recognize that his crimes of conviction involved no malice or ill will and that Mr. Heard presents no threat to society.  He is a law-abiding family man who implores the Court for a sentence that will allow him to return home with quality years left to share with his family and community.

2

## II.   The Court Should Sentence Mr. Heard Under 18 U.S.C. § 3553 and Impose a Below-Guidelines Sentence

As the Court is aware, Mr. Heard's conviction under 18 U.S.C. § 924(c), for using his government-issued weaponry during and in relation to the underlying manslaughter and attempted manslaughter offenses, carries a statutory sentence of not less than 30 years.   18 U.S.C. §924(c)(1)(B)(ii).   Such a sentence, in the context of a weapons offense for which Mr. Heard has no factual or moral culpability – because he had no choice but to carry the heavy weaponry the government issued to him as a security contractor for the State Department and no option but to use that particular weaponry if he perceived mortal threats to himself and his unit – is simply unconscionable.   The Court need not, and should not, impose it.   As briefed in the *Defendants' Motion to Forego Mandatory Minimum Sentencing Under 18 U.S.C. § 924(c) Based on As-Applied Eighth Amendment Challenge to 18 U.S.C. § 924(c)(1)(B)(ii)* (ECF No. 725), the 30-year mandatory minimum sentence of 18 U.S.C. § 924(c)(1)(B)(ii) is grossly disproportionate to the severity of the underlying crimes in the unique circumstances of this case, and the Eighth Amendment therefore protects Mr. Heard against its application.   A 30-year mandatory sentence of Mr. Heard in this case is nothing less than an unthinkable travesty of justice.

In light of the constitutional violation that would result from imposition of the 30-year minimum sentence prescribed by 18 U.S.C. § 924(c)(1)(B)(ii), the Court should forego application of that provision and sentence Mr. Heard pursuant to the principles of individualized federal sentencing set forth at 18 U.S.C. § 3553.   Under § 3553, the sentence imposed must be "sufficient, but not greater than necessary" to comply with the purposes of federal sentencing and it must take account of, among other things, the complete nature and circumstances of the defendant's offense(s) and the history and characteristics of the defendant.   *See* 18 U.S.C. § 3553(a).   In Mr. Heard's case, these factors and the objectives of federal sentencing overwhelmingly favor a modest

sentence of imprisonment that will permit Mr. Heard to return to free society and his young family with many productive years left to live.

A.   The Advisory Sentencing Guidelines Range

In the post-*Booker* era, the applicable range under the advisory Sentencing Guidelines is merely one factor that the Court must consider when imposing sentence, and the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Mr. Heard agrees that the combined offense level under the advisory Guidelines for his convictions for voluntary manslaughter (Counts 3-8) and attempted voluntary manslaughter (Counts 15-22 and 27-29) is, as the Presentence Investigation Report reflects, 34. PIR ¶ 181.[1]

Although the PIR reaches the correct combined offense level, its analysis overstates the number of "units" applicable to the attempted voluntary manslaughter offenses under U.S.S.G. § 3D1.4. In particular, the PIR erroneously applies a five-level firearm enhancement to each of the attempted voluntary manslaughter counts. PIR ¶¶ 89, 97, 105, 113, 121, 129, 137, 145, 153, 161, 169. The five-level enhancement under U.S.S.G. § 2A2.2(b)(2)(A) is inapplicable to any of the attempted voluntary manslaughter counts, because Mr. Heard already was convicted for using a firearm during these offenses under 18 U.S.C. § 924(c) (Count 33). *See* U.S.S.G. § 2K2.4 cmt. n.4; *United States v. Rhodes*, 106 F.3d 429, 432 n.3 (D.C. Cir. 1997) (noting that district court could not enhance either of two counts of possession of narcotics with intent to distribute because they both underlay a single § 924(c) count). Indeed, to double-count the use of a gun under both U.S.S.G. § 2K2.4 and 18 U.S.C. § 924(c) would impose multiple punishments for the same specific

---

[1] "PIR" refers to the Presentence Investigation Report dated March 13, 2015. Because Count 33 (the 18 U.S.C. § 924(c) count) carries a statutory minimum sentence, it is not reflected in the combined offense level computation. *See* U.S.S.G. § 2K2.4(b) (for convictions under 18 U.S.C. § 924(c), the guideline sentence is the minimum term of imprisonment required by statute).

offense characteristic, in violation of the Double Jeopardy Clause. *See United States v. Tolson*, 935 F. Supp. 17, 20 (D.D.C. 1996) ("When a defendant is charged and convicted of a violation of 18 U.S.C. § 924(c), a sentencing court is barred from applying the two-level enhancement under § 2D1.1(b)(1), because of the Double Jeopardy Clause.") (citing cases).  When the improper enhancements are removed from the adjusted offense levels for the attempted voluntary manslaughter convictions, the total number of "units" applied for grouping purposes is 7.5 (as opposed to 11.5).[2]

This correction also negates the PIR writer's suggestion that an upward Guidelines departure could be warranted under U.S.S.G. § 3D1.4.  PIR ¶ 256.  The commentary to § 3D1.4 approves such a departure only in the "unusual" case when the total units "significantly" exceed the "more than 5" units that trigger a five-level increase in offense level.  The correctly-calculated 7.5 units applicable to Mr. Heard do not "significantly" exceed this threshold.

Mr. Heard's absence of any criminal history places him in criminal history category I.  The resulting advisory Guidelines range for his manslaughter and attempted manslaughter convictions (*i.e.*, not including the firearms conviction under § 924(c)) is 151 to 180 months.

B.    The Other § 3553 Factors

As noted, the advisory Guidelines range is merely one of several factors that the Court must consider when imposing sentence.  Section 3553 requires district courts also to consider the following factors in imposing sentence:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to

---

[2]   The corrected adjusted offense level computations result in zero units being assigned to Count Groups 8-9, 11-14, and 16-17.  Because the PIR erroneously assigned .5 unit to each of these Groups (PIR ¶ 175), the total number of units reflected in the PIR (11.5 units) is overstated by four units.

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).  The end result of the analysis must be a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing, i.e., the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  For the reasons that follow, a modest sentence of imprisonment that permits Mr. Heard to return to society with productive years of his life still ahead of him is "sufficient but not greater than necessary" to serve the purposes of federal sentencing in the circumstances of this case.

### 1.    *The Nature and Circumstances of Mr. Heard's Offenses*

Mr. Heard already has touched upon the nature and circumstances of his offenses of conviction in his introductory discussion, and the Court is aware of the evidence that was presented at trial.  Mr. Heard has been convicted of multiple felony offenses based on the jury's finding that he and other members of Raven 23 acted unreasonably as they carried out their duties on September 16, 2007, and that innocent people were killed or injured as a result.  Mr. Heard has been a law-abiding citizen his entire life.  As the many letters that have been written on his behalf illustrate (*see* Exhibit A), violence is not in his nature.  Mr. Heard discovered his professional calling in the Marines and subsequently with Blackwater, because he has an inherent instinct to protect others and to keep innocent people safe.  The tragic outcome of the events in Nisur Square

is the opposite of what Mr. Heard tried to accomplish that day.  He, like all of us, deeply regrets any civilian deaths and injuries that took place.

As the Court weighs the level of punishment that is "sufficient, but not greater than necessary" to serve the purposes of sentencing, however, Mr. Heard asks the Court to consider that his intent in Nisur Square was to fulfill his duties to the State Department honorably and responsibly.  In a trial that spanned more than two months, not a single witness testified that Mr. Heard had ever conducted himself dishonorably or disrespectfully, had ever discharged a weapon irresponsibly, or had ever expressed animosity or insensitivity toward Iraqis or any other group. Nor was any evidence presented that Mr. Heard fired a weapon in Nisur Square for any reason other than to protect himself and his team members from threats that he reasonably perceived. Indeed, as already noted, the trial evidence included testimony that Mr. Heard ***explicitly refused*** to fire his weapon as the convoy exited the Square, due to the absence of an identifiable *bona fide* target.  That is the conduct of an individual trying to make the right judgments in a difficult and fluid situation.

Mr. Heard's honorable intentions in Nisur Square are reinforced by letters that have been written to the Court by other members of Raven 23.  Dean Wagler, a Raven 23 teammate of Mr. Heard who was present in Nisur Square writes

> Dustin and I were assigned to the same vehicle so we did spend a considerable amount of time together.  I will say that Dustin understood our scope of work and responsibilities that lie within more than most of the other men on our team.  He clearly understood that there were ramifications for all our actions, or in some cases our lack of action.  He took our job along with all the responsibilities very serious[ly].  I can attest to the fact that if Dustin discharged his weapon while in the line of duty there was an absolute reason for it.  There was a threat, period.  Exhibit A, letter A-43.

Edward Randall, another Raven 23 teammate who was in Mr. Heard's truck during the events in Nisur Square, similarly writes:

7

Dustin always showed nothing but professionalism when it came to his duties and how he treated his counterparts as well as the local Iraqi people.  He has always had a pure heart with no malice to be found for anyone.  Without a doubt Dustin is the kind of guy that would have risked his life for me or anyone in danger regardless of who they were.  He really is that kind of person and a personal hero to me. Exhibit A, letter A-28.

Mr. Heard asks the Court to consider, as a significant mitigating circumstance of his offenses, that the evidence at trial showed him to be a conscientious and respected team member whose judgment was universally regarded as sound and reasonable.  Mr. Heard exercised his judgment to the best of his ability in Nisur Square under conditions that many members of Raven 23 – both charged and uncharged – deemed dangerous and threatening.  Mr. Heard did not intend to harm innocent people.  He tried to do his job.  His punishment should fairly reflect those facts.

2.    *The History and Characteristics of Mr. Heard*

The history and characteristics of Mr. Heard also weigh heavily in favor of sentencing leniency.  As detailed below, Mr. Heard has no prior criminal history and honorably served this country for four years in the United States Marine Corps.  He has been married to his wife Kelli for eleven years, and they have two young children, a daughter, who is nine-years old, and a son, who is three-years old.[3]  Across the board, those who know Mr. Heard from his childhood, from his neighborhood, from the military, and from Blackwater regard him as a principled man who values family and country above all else and who would, and always does, extend himself in any situation to assist others who are in need or peril.  Mr. Heard is an asset to society, and his sentence should permit him to return to his family and community with life still ahead of him.

Mr. Heard was born in 1981 in the small rural community of Olney, Texas.  Mr. Heard's parents divorced when he was only three years old, an early personal challenge that resulted in Mr.

---

[3] A photograph of Mr. Heard and his family is attached as Exhibit B.

Heard spending most of his childhood under the care of his grandparents.  Mr. Heard's cousin, Jeffrey Tatum, also lived in the grandparents' home due to his own parents' divorce.  In his letter to the Court, Mr. Tatum explains that he and Mr. Heard were raised "like brothers" and that Mr. Heard's moral compass and sound judgment emerged early in his life.  Exhibit A, letter A-42. According to Mr. Tatum, Mr. Heard was always "the 'voice of reason'" and "always made sure he was doing the right thing" so as not to disappoint his grandparents.  *Id*.

Kara Gaertner, another cousin of Mr. Heard's from Olney, similarly writes about how the early disruption of Mr. Heard's family life made him determined to build a stable and productive life for himself:

> My cousin, Dustin Heard, could have used the life he was dealt as an excuse to give in to the "system," deal/use drugs, and give up any dream of living beyond our hometown.  Believe me, we both have several classmates that have gone down that path.  There was no doubt in Dustin's mind that he wanted more and would work endlessly to make the best decisions to serve his country and himself.  Exhibit A, letter A-12.

Ms. Gaertner identified the key character traits that she saw emerge in Dustin during his childhood and that continue to define him today:  Generosity ("he was always giving to his friends and siblings to make sure they had what they needed"), Loyalty ("I never heard a negative word come from [Dustin] pertaining to [his parents]" despite the lack of support he had from them), and Responsibility ("From as early as I can remember, Dustin had to keep his own life in order.").  *Id*. Mr. Heard's childhood friend, Shane Pendleton, adds three additional early traits to that list: Integrity, Honesty, and Kindness.  Exhibit A, letter A-23.  As Mr. Pendleton writes:  "Dustin's reputation has always been of kindness, for only the sake of being kind."  *Id*.

Shannon Campbell, another cousin of Mr. Heard who grew up in Olney, describes spending every Sunday at church with Mr. Heard, followed by hours of farm work with their grandparents. Exhibit A, letter A-4.  Ms. Campbell recognized in those early years Mr. Heard's work ethic as

well as his strong instincts to protect others and to value family.  She writes:

> By virtue Dustin is a protector, not only of me, his family, but of people in general. He has a huge heart, and would give the shirt off his back to whoever was in need of it.  Growing up we did not have the best of everything but we made do with what we had.  He taught me what the meaning of family really was, he taught me about loyalty, and many other things.  *Id.*

After Mr. Heard graduated from high school in 1999, his "protector" instincts led him to enlist with the United States Marine Corps at age 19.  Those who knew Mr. Heard at this time recognized the perfect fit between his personality and the military as well as the enormous pride that Mr. Heard took in serving his country.  Kaci McClatchy Creel became close friends with Mr. Heard in high school and has written to the Court about the day that Mr. Heard "came back from basic training and knocked on my door."  Exhibit A, letter A-6.  As Ms. Creel describes it, "The pride [Mr. Heard] displayed for his accomplishments and the honor he shared for serving his country were obvious."  *Id.*  Mr. Heard's step-aunt, Aurlie Strealy, noticed palpable changes in Mr. Heard's demeanor and self-confidence when he joined the military:  "There was quite a difference in Dustin after he became a Marine.  He held himself with more assurance.  He was proud of his physical endurance.  He was more confident."  Exhibit A, letter A-40.

The compatibility between Mr. Heard's personality and the Marine Corps resulted in a distinguished four-year military career at a time when this country was in great need of service. Mr. Heard completed basic training in San Diego and ultimately deployed to both Iraq (Operation Iraqi Freedom) and Afghanistan (Operation Enduring Freedom).  He received numerous commendations and medals before being honorably discharged in October 2004 at the rank of Corporal (E-4).[4]  Several of Mr. Heard's military colleagues have written letters to the Court to

---

[4]  Mr. Heard's certificate of honorable discharge is attached as Exhibit C and reflects the following commendations and awards:  Navy and Marine Corps Expeditionary Medal, Global War on Terrorism Expeditionary Medal, Sea Service Deployment Ribbon (3d Awd), Armed Forces

describe the bravery, professionalism, and compassion that they witnessed in Mr. Heard during his military service.

As former Marine Scott Lambin has written, Mr. Heard "was a vital part of an elite anti-terrorism unit known as FAST (Fleet Anti Terrorism Security Team) during his time in the Corp." Exhibit A, letter A-21.  FAST members were selected for their "restraint, sound judgment, and great attention to detail while carrying out duties pertaining to the safety, security and quick reaction of the entire Naval 5th Fleet."  *Id.*  Mr. Lambin recounts an occasion when Mr. Heard, "amidst hostile enemy fire during the initial operations in 2003 outside Kirkuk, Iraq," worked to recover the remains of a downed Navy pilot so that the pilot's "Gold Star family received the closure that they deserved."  *Id.*  Mr. Lambin also notes that, in all his experiences with Mr. Heard, he has "never heard or witnessed [Mr. Heard] say or act disparaging in any way, shape or form towards anyone."  *Id.*

John Hall, another FAST member who was in Mr. Heard's platoon in the early days of Operation Iraqi Freedom, recounts their unit's participation in the capture of Al Basrah Oil Terminal and the detention of Iraqi military personnel at the site.  Exhibit A, letter A-15.  Mr. Hall explains that the "night was extremely cold" and that the detainees had inadequate clothing and shelter for the conditions.  By morning, one of the detainees showed signs of hypothermia.  Mr. Heard and another Marine "buddy warmed" the Iraqi detainee until he regained movement and strength.  As Mr. Hall writes:

> Dustin had just been relieved from his post and was heading to rest with the group of Marines that had come off post. We had been on the platform for at least 8 hours. None of us had rested for the previous 14-16 hours leading up to the operation. All were exhausted. Dustin, along with another Marine, was tasked with "buddy

Expeditionary Medal (2d Awd), National Defense Service Medal, Navy Unit Commendation, Meritorious Unit Commendation, Rifle Qualification Badge (Marksman), Pistol Qualification Badge (Sharpshooter).

warming" the individual.  Buddy warming is a technique used to warm a person by sharing body heat.  No blankets or other material were available other than an oil soaked rug or mat.  Dustin stood, holding the man upright, hugging him and trying to warm him.  He did this without complaint for over 20 minutes.  The man finally regained some movement and strength.  *Id*.

Mr. Hall concludes by observing that Mr. Heard "is one of the most professional and dedicated people I have served with or known" and "has shown compassion, demonstrated sound judgment, and restraint in chaotic stressful situations." *Id*.  Former Marine Nick Stucker, who served on a FAST platoon and fire team with Mr. Heard, offers a similar assessment of Mr. Heard's character:

> With Dustin Heard, there was never a question of whether or not he was a team player!  Dustin was a very hard worker that never showed any signs of giving up no matter how difficult the task may be.  Dustin constantly showed acts of un-selfishness, loyalty, honor, courage and commitment.  Dustin knew no stranger and would give his shirt off his back if was asked.  You could not ask for a better teammate that would lend a helping hand without hesitation.
>
> Our platoon was a part of the Iraqi invasion in March of 2003 to include other combat operations as well.  Myself, along with other teammates were very happy to have Dustin Heard on our team while traveling into harms way.
> Ex. A, letter A-41.

In 2003, before his honorable discharge from the Marines, Mr. Heard married his wife Kelli, who is now a school teacher.  Through this relationship, Mr. Heard discovered another central calling in his life – to be a faithful family man committed to providing his children the parental stability and support that Mr. Heard did not receive.  As Mrs. Heard writes in her letter to the Court, "Dustin Heard is a thoughtful man whose greatest wish is to spend his life supporting me, our children, contributing to his community, and leading the simple life that has been our dream since we first met over ten years ago."  Exhibit A, letter A-1.  The Heards have built their life together in Maryville, Tennessee, and own the house where Mrs. Heard was raised.  They have a nine-year old daughter and a three-year old son.  Mr. Heard's children are the joy of his life, and

he has instilled in them compassion and strong moral values.   As close family friend Danielle

Gordley writes:

> [Mr. Heard] takes the time to play with his children and finds ways to incorporate
> life skills and lessons throughout the day.  I have watched with pride and gratitude
> as he took the time to play with and educate my two children, alongside his own,
> with lessons on safety, friendship, and the importance of selflessness and
> consideration for others.  His children believe in him and his daughter is brave and
> confident because her father taught her to trust in herself and in his guidance.  Ex.
> A, letter A-14.

Mr. Heard's daughter similarly describes her father's loving and compassionate nature:

> My dad is a very good man. He taught me how to fish. In my lifetime he has been
> a hero. He loves me, and how I know is almost everywhere he goes he lets me
> come, and every night he comes and gives me hugs a[nd] kisses and he does the
> same with my brother. He would play with me everyday when I got home. I really
> care for him and he cares for me. When I was very little he would take me to my
> school while mommy was working. Once when we were driving I accidentally
> dropped something, and he stopped the car and got out and he found what [I] had
> dropped and gave it back and it put a huge smile on my face. Ex. A, letter A-2.

Mr. Heard's commitment to supporting his family was a central factor that led him to accept

employment with Blackwater in 2004.  As Mrs. Heard explains, the couple weighed the decision

"for quite some time" but ultimately decided that the financial stability the position would offer

them as they expected their first child and as Mrs. Heard completed her bachelor's degree, as well

as Mr. Heard's "sense of duty to do what he could to help in the way for which he was uniquely

trained," made the opportunity worthwhile despite the physical separation it would require.

Exhibit A, letter A-1.

In Maryville, Mr. Heard's integrity is recognized throughout the community.  Numerous

friends and neighbors have submitted letters to the Court describing Mr. Heard's honorable

character, generosity, and compassion.  Next-door neighbor Ashley White describes Mr. Heard's

successful petition to install traffic calming devices in their neighborhood to protect the children

from distracted and reckless drivers.  Exhibit A, letter A-45.  Mrs. Heard's coworker, Brad White,

writes of Mr. Heard's volunteer efforts with the school. Exhibit A, letter A-46. Close friend James Dixon writes of the "numerous times [Mr. Heard] has stopped to help someone stranded on the side of the road" and how "Dustin has always put the well-being of others before himself." Exhibit A, letter A-9. Those who know Mr. Heard all believe that, as Lesia Criswell writes, "he would never do anything less than honorable in any mission that he was assigned." Exhibit A, letter A-7.

### 3.    *The Purposes of Federal Sentencing*

As noted earlier, Congress has identified four purposes of federal sentencing that must guide district courts in selecting a sentence. The sentence must be "sufficient, but not greater than necessary" to serve those purposes. All the purposes of federal sentencing would be fully served in this case by a sentence of incarceration that is substantially less than either the advisory Guidelines range for the manslaughter and attempted manslaughter offenses or the draconian 30-year statutory penalty prescribed under 18 U.S.C. § 924(c)(1)(B)(ii).

The first purpose of federal sentencing is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." As discussed above, the offenses in this case arose in a war zone setting that required Mr. Heard and other members of Raven 23 to make spontaneous, on-the-spot judgments about whether and how to respond to perceived mortal threats through use of their government-issued weapons. There is no evidence in the record that Mr. Heard acted out of malice, ill will, or any bad intent that would justify incarcerating him for any extended period of time, let alone a sentence of decades in prison. Sentences of that magnitude are properly reserved for defendants who have exhibited egregious criminal states of mind that reflect an inability or unwillingness to live within a civilized society. Mr. Heard presents the opposite profile. He has been an upstanding citizen for his entire life, he

14

has served his country honorably, and his crimes occurred under circumstances in which *no person* can be expected to make pristine judgments.

The second purpose of federal sentencing is "to afford adequate deterrence to criminal conduct." This purpose has virtually no application to this case, because there is no evidence that Mr. Heard intended to commit any crime in Nisur Square. The evidence instead showed that his intent was to carry out his professional duty to protect himself and his team from perceived mortal threats within a war zone. Incarcerating Mr. Heard for decades will serve no "deterrent" purpose to others who may find themselves in an equivalent situation, because those individuals, just like Mr. Heard, will have no option but to interpret a fluid situation as best they can under inherently dangerous circumstances and respond as they have been trained. If anything, imposing a lengthy term of incarceration on Mr. Heard will merely deter service-minded citizens from ever "stepping up" to serve their country in dangerous environments because of the potential that a split-second judgment call made under the pressures and uncertainties of a war zone will result in criminal charges and a draconian prison sentence.

The third purpose of federal sentencing is "to protect the public from further crimes of the defendant." Mr. Heard is a decorated former soldier who is being sentenced for the first time in his life. His crimes of conviction arose in a setting that will never repeat itself for him. His entire personal history attests to his peaceful nature, his productivity as a citizen, and his strong moral character. He presents utterly no danger of recidivism.

In sum, this Court should reject application of the 30-year statutory minimum sentence under 18 U.S.C. § 924(c) as violative of the Eighth Amendment in the circumstances of Mr. Heard's case. Based on the principles of federal sentencing set forth at 18 U.S.C. § 3553, and in light of the mitigating circumstances of Mr. Heard's offenses and his upstanding personal history

and characteristics, the Court should apply a downward variance to the advisory Sentencing Guidelines range for the manslaughter and attempted manslaughter offenses and sentence Mr. Heard to a modicum term of imprisonment that will allow him to return to society and his family with many years left to live.

**III.**    **If the Court Imposes the Statutory Minimum Sentence Under 18 U.S.C. § 924(c), It Should Sentence Mr. Heard to a Cumulative Term of 30 Years and One Day of Imprisonment and Recommend His Placement in a Minimum or Low Security Facility Near Maryville, Tennessee**

We cannot emphasize too strongly the fact that the application of a 30-year mandatory minimum sentence in this case is unconstitutional and unconscionable. If the Court nonetheless applies the 30-year minimum sentence prescribed by 18 U.S.C. § 924(c)(1)(B)(ii) to Mr. Heard despite its gross disproportionality to the nature of the underlying weapons offense (as discussed in ECF No. 725) we ask the Court to impose an overall sentence of 30 years and one day of imprisonment. Although a sentence of that draconian length cannot fairly be characterized as "sufficient, but not greater than necessary" to accomplish the purposes of federal sentencing in the circumstances of this case, it is the "least unjust" sentence that can be constructed within the restriction of a 30-year minimum term.

As the Court of Appeals in this Circuit has recognized, "Sentences which include § 924(c) counts are particularly well suited to be treated as a package." *United States v. Townsend*, 178 F.3d 558, 567 (D.C. Cir. 1999). A § 924(c) conviction, which must be premised on a conviction for one or more underlying crimes of violence, creates intrinsic interdependence between counts. Thus, "the fact that § 924(c) carries a mandatory sentence may influence the sentence imposed on other counts." *Id.* at 567-68. *See United States v. Smith*, 756 F.3d 1179, 1181 (10th Cir. 2014) ("[T]he relevant statutes permit a sentencing court to consider a defendant's § 924(c) conviction and sentence just as they permit a sentencing court to consider most any other salient fact about a

defendant.").  The requirement under § 924(c) that the mandatory minimum gun sentence not run

concurrently with "any other term of imprisonment imposed on the" defendant does not alter

federal courts' well-established ability to consider all counts of conviction together in calculating

an overall fair sentence.  *Id*. at 1184.  As *Smith* explains:

> [Section 924(c)] does not say that in calculating the length of a (consecutive) crime
> of violence sentence a district court must ignore the length of the mandatory
> minimum gun sentence.  It does not limit the factors the court may and must
> consider when setting a sentence for the crime of violence.  It does not increase the
> penalties for the underlying crime of violence.  In fact, it does not say *anything*
> about how the underlying crime of violence must be punished, about what the
> "other term of imprisonment" must be.  The statute leaves that task to the usual
> sources of sentencing law outside § 924(c), including § 3661 and § 3553.  Section
> 924(c)(1)(D)(ii) says simply that § 924(c)'s mandatory minimums must run
> consecutively to "any other term of imprisonment."  And that means *any* other term
> of imprisonment.

*Id*. (emphases in original).

As explained above, the 30-year statutory sentence under § 924(c)(1)(B)(ii) is double even

the high end of the advisory Guidelines range for the underlying manslaughter and attempted

manslaughter charges.  In addition to that disparity, and as discussed in detail in the Defendants'

Eighth Amendment motion, the 30-year sentence hinges only on the power of the weapons that

Mr. Heard employed in Nisur Square, a factor that was entirely outside Mr. Heard's control

because his weapons were *issued to him by the government* and he was required to use *those*

*weapons alone* in the event of a threat.  In these circumstances, the Court should, and indeed must,

take into account the mandatory minimum sentence under § 924(c) (if it is imposed) when

determining how the balance of Mr. Heard's sentence should be structured in order to best serve

(or least offend) the purposes of federal sentencing set forth in § 3553.  For all the reasons that Mr.

Heard has offered for imposing a below-Guidelines sentence, a 30-year sentence is drastically out

of proportion to the nature of his offenses, given the mitigating offense factors and Mr. Heard's

background and personal characteristics.  If the Court imposes that sentence, it should mitigate the disproportionality by imposing a cumulative sentence of 30 years and one day.

Mr. Heard also asks the Court to recommend that the Bureau of Prisons waive any applicable security restrictions and permit Mr. Heard to be incarcerated at a minimum security prison as close as possible to his hometown of Maryville, Tennessee.  As explained above, Mr. Heard is a devoted husband and father of two young children.  His immediate family will suffer immeasurably from any lengthy period of incarceration that is imposed, and Mrs. Heard does not have the resources to engage in regular travel with the children or to relocate.  Mr. Heard's placement at a distant and/or high security facility would threaten the continuity of these family relationships and is entirely unnecessary and inhumane given Mr. Heard's lack of any prior criminal history and the unusual circumstances of this case.  Mr. Heard also has a community of extended family, friends, and neighbors in Tennessee who have supported him throughout this difficult time of his life; he will continue to depend heavily on that support for his physical and mental well-being while he serves any sentence.

Respectfully submitted,


/s/ David Schertler
DAVID SCHERTLER
Schertler & Onorato, LLP
575 7th Street, NW
Suite 300 South
Washington, D.C. 20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
Email: dschertler@schertlerlaw.com

*Counsel for Defendant Dustin Heard*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 7th day of April 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to the registered participants as identified on the Notice of Electronic Filing (NEF).


    /s/ David Schertler          
David Schertler
Schertler & Onorato, LLP
575 7th Street, NW
Suite 300 South
Washington, D.C. 20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
Email: dschertler@schertlerlaw.com

*Counsel for Defendant Dustin Heard*