## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No. 08-360 (RCL)**[1] |
| | : | |
| **v.** | : | |
| | : | |
| **PAUL ALVIN SLOUGH,** | : | |
| **EVAN SHAWN LIBERTY, and** | : | |
| **DUSTIN LAURENT HEARD,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No. 14-107 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **NICHOLAS SLATTEN,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR A NEW TRIAL

The government hereby opposes the defendants' motions for a new trial [Dkts. # 765 (defendants Slough, Liberty and Heard) and # 659 (defendant Slatten)].

**I.      There was no perjured testimony, so the defendants are not entitled to a new trial.**

Contrary to the defendants' central claim, the testimony of Iraqi police officer Sarhan Deab Abdull Monem[2] was truthful; in fact, as set forth below, his account of the Nisur Square massacre has been remarkably consistent over the years, and has been amply corroborated by

---

[1]      On May 12, 2014, the Court granted the government's motion to join this case with *United States v. Nicholas Abram Slatten*, Crim. No, 14-107 (RCL) [Dkt #434].  This memorandum is intended to be filed in the two joined cases, and the government is filing a notice to that effect in Crim. No. 14-107.

[2]      This is the English spelling of the witness's name as adopted by the witness.  Trial T. 6/19/14 p.m. at 46.

others.  Even if Monem's Victim Impact Statement ("VIS") were deemed to contradict his trial testimony, he has since reaffirmed the truth of his testimony.  At most, then, the "new evidence" before the Court is essentially a repudiated recantation, which is an insufficient basis for granting a new trial.  As one commentator has explained, a motion for a new trial based on a repudiated recantation has "little or no chance of success.  With the repudiation of the recantation, it becomes merely impeaching and could be used at a new trial only for the purpose of cross-examining the witness, and not as substantive evidence."  26 James William Moore, *et al.*, *Federal Practice* § 633.05[2] at 633-37 (3d ed. 2014).  Defendants also cannot show, as they must, that even with Monem's "new evidence" in hand, they would probably be acquitted at a new trial.

Faced with this reality, the defendants have tried to convert what is arguably a repudiated recantation into a *Brady*[3] violation.  It is axiomatic, however, that the government could not have suppressed evidence that did not exist at the time of trial, such as Monem's VIS.  Undaunted by this straightforward logic, as well as the settled case law on this point, the defendants argue that the government should have known that Monem's testimony at trial was false.  Their arguments in support of this claim consist of smears, distortions, misrepresentations, and *non sequiturs*. Accordingly, the defendants' arguments should be rejected.

## II.   Monem's VIS, his trial testimony, and his prior consistent statements.

Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(4) (a victim has the right to be heard at sentencing), the government solicited statements from the Nisur Square victims and submitted them to the Court for its consideration at sentencing.  The government reached out

---

[3]      *Brady v. Maryland*, 373 U.S. 83 (1963).

not only to Iraqi victims who were named in the indictment, but to others who were present during the shooting, within the zone of danger, who also may have been harmed.

The government received Monem's typed VIS on April 2, 2015 (in Arabic), and an English translation on April 4, 2015.  It provided his VIS both to the Court and the defense, along with several other Victim Impact Statements, on April 8, 2015, in connection with the government's sentencing memorandum.   During an interview on April 10, 2015, Monem explained that he wrote his VIS (in Arabic) by hand.  (FBI 302 dated April 15, 2015, attached as Ex. P.)  He then asked a colleague, who had internet access, to type the VIS (in Arabic) and email it to the government.  *Id.*  The government has subsequently received a copy of Monem's handwritten statement.  (That statement and its translation are attached as Ex. A.)  Notably, in his statement, Monem wrote, "The mother wept and hugged her son *as if to say* to him no, don't go, we will be killed.  Ex. A (emphasis added).

In his VIS, Monem writes that he heard the driver of the Kia talking to his mother after the shooting began.  At trial, Monem testified that the driver was killed in the initial volley of shots fired by the Blackwater convoy.[4]   Since submitting his VIS, Monem has explained that he did not understand the VIS to be an "investigative document," and that instead of recounting what he actually saw in the Square, he was attempting to express his feelings and emotions about

---

[4]     The defendants devote a significant amount of discussion to their claim that Monem's VIS contradicts his trial testimony in a second respect – *i.e.,* that he approached the Kia.  [Dkt. # 765 at 8, 11, 12, 36 and # 659 at 2, 8, 9, 10, 19, 21, 22, 24].  The VIS, however, does not address that point.  In the VIS, Monem describes cowering at the police kiosk while the defendants destroyed the Kia, but he said the same at trial.  *See, e.g.,* Trial T. 6/23/14 a.m. at 24 ("Q. What did you [Monem] do when the second set of gunfire hit the vehicle [white Kia]? A. Ali and I move [sic] away.  Q. Where did you go? A. I went to the right to the other sidewalk.");  *Id.* at 25 ("Q. What did you [Monem] do next? A. I went back to my kiosk, and I hid behind it because there was so much gunfire.").  Monem did not say in his VIS that he never approached the Kia before it was incinerated.  Thus, the only possible inconsistency between his VIS and his trial testimony involves the condition of the Kia's driver.

the shooting – and imagining what it may have been like to be shot and killed that day.  Ex. P. Monem also unequivocally affirmed that when he approached the passenger's side of the Kia on September 16, he saw that the driver had been killed by a gunshot wound to his head, and that he never heard him speak.  Ex. P.

Monem's most recent statement about the driver of the Kia being dead when Monem first approached the Kia is entirely consistent with the accounts he has given at least nine times before:

**Monem's Prior Consistent Statements:**

(1)   **Monem Statement to Iraqi National Police (INP), September 18, 2007**: "The American soldier opened fire at a white Credos car which was driven by a man with a woman next to him, *leading to the death of the man who was driving it*. Myself and officer Ali [Ghalaf] went to the car trying to save this person and, at that time, the same soldier started opening fire again at the same vehicle which killed the woman and burned the car.") (Attached as Ex. A (emphasis added)).

(2)   **Monem Statement to U.S. Army, September 18, 2007:**  "The third vehicle [Slatten's vehicle] shot the white Kia (the third vehicle in the line of traffic) and *the young man driving the white Kia was shot in the head and killed. . . . The driver of the white Kia was shot and killed before it moved toward the circle*.") (Attached as Ex. B (emphasis added)).

(3)   **Monem Statement to the FBI, October 16, 2007:**  "*Moneim could see that the driver of the Kia was shot in the forehead*. . . . Moneim turned back around and went to the passenger side of the Kia to help Ali Khalif.  Moneim was trying to get the door open to get the lady out who was inside . . . Moneim saw the lady holding on to her son.  (Attached as Ex. C (emphasis added)).

(4)   **Monem Grand Jury Testimony, May 27, 2008:**  "I went towards that car, and *I saw the driver with a bullet in his head*.  His head was split. . . . [The passenger] was still alive, but she was hugging her son and screaming, asking for help and yelling, 'My son.  My son. (p. 11)'" (Attached as Ex. D (emphasis added)).

(5)   **Monem Statement to the FBI, June 21, 2009:**  Monem reviewed his

grand jury testimony and, while making several minor corrections, confirmed its accuracy.  (Attached as Ex. E).

(6)  **Monem Statement to the FBI, July 26, 2012**:  Monem reviewed his prior statements regarding the shooting and did not contradict them in any material way.  (Attached as Ex. F).

(7)  **Monem Kastigar Hearing Testimony, December 4, 2013**:  "I approached [the white car], because from distance, *I saw that somebody was shot at his face*, and I was trying to help.  The person who got shot was the driver, was shot in the face, and next to him was a lady, which later on I discovered was his mother (p. 33). (Attached as Ex. G (emphasis added)).

(8)  **Monem Statement to the FBI, April 16, 2014**:  "[Monem] said when he approached the car he saw the driver had been shot.  *There was a single bullet hole in the center of the driver's forehead and the driver's head was leaning backwards*.  There was blood on the driver's face and body.  He did not see blood anywhere else in the vehicle at that time.  He saw a single bullet hole in the front windshield."  (Attached as Ex. H (emphasis added)).

(9)  **Monem Trial Testimony, June 23, 2014 a.m.**:  "Q. When you heard the scream and identified it as coming from the Kia Credos, what did you do? A. I approached it to find out the source of the scream. (p. 14).  Q. Could you see where the male driver had been shot?  A. *In the middle of his head – or his face*, sorry. (p. 15).  Can you describe that driver's body position?  A. In the beginning when I saw him, he was laying or leaning to the side that's close to him.  After that, the lady that was screaming pulled him and moved him to her shoulder. (p. 18)."  (Attached as Ex. I (emphasis added)).

Notably, three of Monem's prior statements were under oath, and two were subject to cross examination by the defendants.[5]

## III.    The defendants cannot satisfy the criteria for a new trial.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.

For a defendant to obtain a new trial because of newly discovered evidence, he

---

[5]    Additionally, not only are his prior statements to the Court, the grand jury, and law enforcement consistent with his trial testimony, with one exception, media accounts of Monem's statements also comport with his testimony.  *See* Ex. K.

must satisfy each of five requirements:   (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) [it must be] of such nature that in a new trial it would probably produce an acquittal.

*United States v. Johnson*, 519 F.3d 478, 487 (D.C. Cir. 2008), (citing *Thompson v. United States*, 188 F.2d 652, 653 (D.C. Cir. 1951)).   The defendants bear the burden of establishing each of these criteria.   *See, e.g.*, *United States v. Garcia-Pastrana*, 584 F.3d 351, 390 (1st Cir. 2009) (when seeking a new trial based on newly discovered evidence, defendant "bears a weighty burden.").

Since the "newly discovered evidence" cited by the defendants involves an alleged recantation of trial testimony, the Court must first determine whether the trial testimony was, in fact, false.   *United States v. Kearney*, 682 F.2d 214, 220 (D.C. Cir. 1982) ("In considering a motion for new trial based on the contention that an affidavit by a recanting witness constitutes newly discovered evidence the first test to be applied by the judge is whether the court is reasonably well satisfied that the prior testimony was false."); *United States v. Mangieri*, 694 F.2d 1270, 1287 (D.C. Cir. 1982) (affirming denial of new trial motion based on alleged perjured testimony where court was "not 'reasonably well satisfied' that [] testimony [was] false.").   It is the defendants, who must establish that the trial testimony was false.   *United States v. Henry*, 821 F. Supp. 2d 249, 258 (D.D.C. 2011) ("The burden rests with [defendant], as the proponent of postconviction relief, to adduce 'credible evidence' that would allow the Court to [determine that the trial testimony was false].."); *United States v. Dipaolo*, 835 F.2d 46, 49 (2nd Cir. 1987) (same).

The Court cannot "be reasonably well satisfied that [Monem's] trial testimony was false." The only inconsistency between Monem's trial testimony and his VIS involves whether Monem heard the Kia's driver speak. *See* fn. 3, *supra*. Monem has stated repeatedly – both before and after trial – that the driver was killed instantly, and he has also affirmed that he did not hear the driver speak. As Monem has explained, the reference in his VIS to a conversation between the driver and the passenger of the Kia was the product of his imagination. In an attempt to express the horror of the defendants' actions, Monem tried to place himself in the shoes of two victims killed by the defendants. *See, e.g, United States v. Bradshaw*, 787 F.2d 1385, 1391 (10th Cir. 1986) (denying motion for new trial based on allegation that a witness recanted, where government "submitted a counteraffidavit, stating that he had spoken with [the witness] and that he denied having recanted his trial testimony.").

In fact, from his position in the police kiosk, Monem could not have heard a conversation between the driver of the Kia and his mother. The police shack was approximately 50 feet from the white Kia.[6] Additionally, there were loud gunshots and explosions occurring at the time of the imagined conversation. (Trial T. 6/23/14 a.m. at 24, 25). *See, e.g.*, *United States v. Provost,* 969 F.2d 617, 620 (8th Cir. 1992) (denying motion for new trial, where "district court concluded that [the witness's] recantation was not credible."); *United States v. Leibowitz*, 919 F.2d 482, 483 (7th Cir. 1990) (recantation not worthy of belief because it "contain[ed] fantastic assertions"); *United States v. Carbone*, 880 F.2d 1500, 1502 (1st Cir. 1989) (denying motion for a new trial where there is "substantial cause to disbelieve [witness's] alleged recantation); *United States v.*

---

[6]   *See* Government's Exhibit 8007. On that exhibit's scale, one inch is equivalent to 25 feet, and the exhibit shows that Monem's police kiosk was approximately two inches (or 50 feet) from the burn mark that the Kia left on the street after it was incinerated by the defendants.

*Johnson*, 487 F.2d 1278, 1280 (4th Cir. 1973) (endorsing "the court's conclusion that the revised stories of [the witnesses] were unbelievable and that [the witness's] testimony at the trial was truthful as to appellant's involvement in the robbery").   In sum, it is implausible that Monem could have heard a conversation occurring in a car 50 feet away – especially with a cacophony of gunfire and explosions in the background.

Additionally, there would have been no reason for Monem to lie about the driver's death. Monem was not privy to the government's theory of the case; he did not even know which defendant was charged with which crime; and he had no knowledge of the applicable law or elements of the crimes charged.[7]   Accordingly, even if he were inclined to lie in a misguided attempt to help the government's case, Monem would have had no reason to lie about the timing of the driver's death.

In sharp contrast to the imagined "facts" set forth in the VIS, there is ample reason to credit Monem's trial testimony.   First, he testified under oath three times that the driver of the Kia was killed at the beginning of the shooting.   *See* § II, *supra*.   On two of those occasions, Monem was subject to vigorous cross examination, and he never wavered on this point.   In his previous sworn testimony, unlike in his VIS, Monem presented a detailed, complete account of what he did and what he witnessed in Nisur Square on September 16, 2007.   *See, e.g., Dipaolo*, 835 F.2d at 50 (denying motion for a new trial where, [i]n contrast to the alleged recantation, [the witness's] testimony before Magistrate Larimer and before Judge Platt was detailed, consistent, and under oath.").   Additionally, the Court had the opportunity to observe Monem testify twice

---

[7]      Additionally, Monem would have to be a soothsayer to have known in September 2007, when he first reported that the driver of the Kia was killed at the beginning of the incident, that this fact would be significance to the government's case.

and assess his demeanor and credibility.  *See, e.g.*, *United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir. 2000) (affirming denial of motion for new trial where, after having had several opportunities to observe witness testify, the trial judge determined that recanting witness's trial testimony, as opposed to recantation, was true); *United States v. MMR Corp.*, 954 F.2d 1040, 1046 (5th Cir. 1992) (affirming denial of new trial motion based on recantation, where "the court had already had ample opportunity to evaluate [the witness's] credibility during his more than four days of trial testimony, including at least two days of cross-examination, and concluded that the recantations in the January 15th statement were not credible"); *Dipaolo*, 835 F.2d at 51 ("In passing on the credibility of her recantation, [the judge] 'utilize[d] the knowledge he gained from presiding at the trial as well as the showing made on the motion.'").

Second, Monem's trial testimony that the driver was killed by the first volley fired by the Blackwater convoy is corroborated by other witnesses.  Both Ali Ghalaf and Majed Al-Gharbawi testified that the driver of the Kia was killed by a gunshot wound to his head at the beginning of the incident.  *See* § III.B.1, *infra*.  In sum, the Court cannot "be reasonably well satisfied that the prior testimony was false."  *Kearney*, 682 F.2d at 220.  In fact, the Court should conclude that Monem's trial testimony was true.

After concluding that Monem's trial testimony was not false, the Court is presented with – at most – a situation where a trial witness has repudiated his apparent recantation (*i.e.*, the imagined facts set forth in his VIS).  When assessing a motion for a new trial based on newly discovered evidence, the Court should "start [its] appraisal of the record from the premise that recantations by witnesses for the prosecution are viewed with suspicion."  *United States v. Mackin*, 561 F.2d 958, 961 (D.C. Cir. 1977); *see also Kearney*, 682 F.2d at 219 ("Recanting

affidavits and witnesses are looked upon with "the utmost suspicion" by the courts." (collecting cases)).  Furthermore, Monem's repudiated recantation does not constitute "newly discovered evidence" entitling the defendants to a new trial because it does not satisfy at least two of the criteria of the aforementioned test.  Namely, the repudiated recantation (1) would be merely impeaching and (2) would not probably produce an acquittal.  *See Johnson*, 519 F.3d at 487.

## A.  The "newly discovered evidence" would be merely impeaching.

Even assuming that the "newly discovered evidence," namely Monem's VIS, constitutes a recantation of his trial testimony, Monem has subsequently reaffirmed that his trial testimony was true.  *See* § II, *supra*.  Accordingly, the most the defendants have here is a repudiated recantation and that is an insufficient basis for granting a new trial based on newly discovered evidence.  *See, e.g*, *Awon v. United States*, 308 F.3d 133, 141 (1st Cir. 2002) ("A repudiated recantation is not substantive evidence, and can be used at a new trial only to cross-examine the witness."); *United States v. Lespier*, 266 F. App'x 5, 7 (2d Cir. 2008) ("a district court should give little evidentiary weight to a recantation affidavit that has since been repudiated"); *United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 1999) (affirming denial of a new trial where witness's recantation would constitute only impeaching evidence); *Lindsey v. United States*, 368 F.2d 633, 636 (9th Cir. 1966) ("But where the recantation has itself been repudiated, as is the case here, the recantation becomes merely impeaching and could be used at a new trial only for the purpose of cross examining the witness, and not as substantive evidence.").

*United States v. Glantz*, 884 F.2d 1483 (1st Cir. 1989), is instructive.  In *Glantz*, the defendants were convicted of extortion.  *Id.* at 1485.  "The key issue in the case was whether the payments made by [the victim] were kickbacks or legal fees.  The government's key witness on

this issue was [the victim] himself."  *Id.*  After trial, the victim filed a petition in tax court in which he characterized the payments as deductible "legal fees," but he later reaffirmed his trial testimony that the payments were "kickbacks."  *Id.* at 1485-86.  The defendants claimed that the tax court petition constituted a recantation of the victim's trial testimony and moved for a new trial on that basis.  *Id.*  In affirming the denial of a new trial, the First Circuit noted that

> [the witness] had "consistently [and] uncompromisingly" contended that the payments were kickbacks. . . .  [Accordingly] the Tax Court petition was at best impeachment evidence.  Even if we were to assume that the petition was a recantation, it was subsequently repudiated by [the witness] in an affidavit.  A repudiated recantation is not substantive evidence, and can be used at a new trial only to cross-examine the witness.

*Id.* at 1486; *see also United States v. Johnson*, 114 F.3d 808, 817 n.4 (8th Cir. 1997) (denying motion for new trial based on newly discovered evidence consisting of a discrepancy between a witness's trial testimony and his VIS).

The defendants may belittle Monem's explanation for writing his VIS the way he did (Dkt. # 765 at 16-18), but the fact remains:  regardless of what they may think of his explanation, Monem has repudiated the "facts" in his VIS and reasserted the veracity of his trial testimony. That renders the VIS at most impeaching material.  *See, e.g.*, *Glantz*, 884 F.2d at 1486, n.2 ("The defendants argue that the repudiation should be entirely discounted.  This argument adds nothing, because regardless of the repudiation's credibility, a repudiated recantation is still impeachment evidence.").[8]

---

[8]     There is no merit to defendants' argument that Monem's repudiation of the imagined "facts" set forth in his VIS is anything other than mere impeaching material.  *See* Defendant Slatten [Dkt. # 659 at 10-14]; *cf.* Defendants Slough, Liberty and Heard [Dkt. #765 at 11, 33].  The cases that they rely upon do not support their argument.  First, defendant Slatten cites *United States v. Delossantos*, 468 F. App's 789, 790 (9th Cir. 2012), and *United States v. McLaughlin*, 89 F.Supp. 2d 617, 628 (E.D. Pa. 2000), but those cases involve the discovery of exculpatory evidence that actually supports the defendant's defense.  Here, however, Monem's VIS is at most an unsworn prior

## B.    The "newly discovered evidence" would not probably produce an acquittal.

The defendants have greatly exaggerated the significance of Monem's testimony.[9]   Other

witnesses and other evidence showed (1) that defendant Slatten shot and killed the driver of the

Kia and (2) that the Kia rolled toward the Raven 23 convoy in a slow non-threatening manner

and that defendants Slough, Liberty, and Heard continued to fire at it after it had stopped.  *See,*

*e.g.*, *United States v. Sensi*, 879 F.2d 888, 900-01 (D.C. Cir. 1989) (newly discovered evidence

---

inconsistent statement, so it could only be used to impeach him; it could not be admitted as substantive evidence. *See* Fed. R. Evid. 801(c) & (d)(1)(A).  Second, defendant Slatten relies on cases where, unlike here, false testimony was actually presented at trial.  *See, e.g.*, *United States v. King*, 232 F. Supp. 2d 636, 648 (E.D. Va. 2002) aff'd, 71 F. App'x 192 (4th Cir. 2003) ("the Court is reasonably well satisfied that [the witness] gave false testimony at trial"); *United States v. Browne*, 130 F. Supp. 2d 552, 554 (S.D.N.Y. 2001) ("Approximately 17 months after the trial, the U.S. Attorney's office for the Southern District of New York charged [the witness] with securities fraud, perjury, making false statements, and obstruction of justice.").  Third, defendant Slatten relies on *Alvarez v. United States*, 808 F. Supp. 1066, 1093 (S.D.N.Y. 1992), but that case applies a standard enunciated by the Second Circuit in *United States v. Stofsky*, 527 F.2d 237, 246 (2nd Cir. 1975), which has been explicitly rejected by our circuit.  *See United States v. Williams*, 233 F.3d 592 (D.C. Cir. 2000) ("we reject *Stofsky* [537 F.2d 237 (2nd Cir. 1975)]").  Fourth, the defendants rely on *United States v. Gordon,* 246 F. Supp. 522 (D.D.C 1965), where the court granted a new trial when it was discovered after trial that the victim (and sole witness) had been previously convicted of committing the same crime for which the defendant was convicted.  *Id.* at 525.  The government did not appeal the district court's grant of a new trial in *Gordon*, but when the defendant was again convicted upon retrial and then appealed his conviction, the D.C. Circuit noted, even though it was not an issue on appeal, the unusualness of the district court's new trial ruling.  "Such a discovery would not normally constitute newly discovered evidence, but the circumstances in this case were unusual.  Newly discovered evidence which is only of impeaching value does not ordinarily warrant a new trial, [citations omitted], but the District Judge granted a new trial to ensure that the jury had before it the same type of available impeachment evidence about the complaining witness as it had about Appellant so that it could make a fair evaluation of credibility." *Gordon v. United States*, 383 F.2d 936, 938 (D.C. Cir. 1967).  The defendants cite no case decided after the *Gordon* ruling 50 years ago in which a court granted a new trial motion based merely on impeaching material.  Fifth, as opposed to a repudiated recantation, *United States v. Carmichael*, 269 F. Supp. 2d 588, 596 (D.N.J. 2003), involved a grand jury witness, who, post-trial, confessed to the crime of conviction; and in *United States v. Blackwell*, No. 5:12-CR-201-1F, 2013 WL 6504731, at *4 (E.D.N.C. Dec. 11, 2013), the newly discovered evidence involved an individual, whom the government's sole witness had claimed was present for each charged drug transaction, denying that any of the drug transactions had occurred.  Last, in *United States v. Arroyo*, 301 F. Supp. 2d 217, 225 (D. Conn. 2004), it was discovered post-trial that a tape presented at trial as a real-time recording of the incidence was, in fact, not a real-time depiction of the incident; thus, the case involved demonstrably false testimony by a key government witness.

[9]         For example, the defendants trumpet Monem's place in the government's order of call as a sign of his significance as a witness.  [Dkt. # 765 at 7; Dkt. # 659 at 7].  Monem's place in the order of call, however, was not determined by the significance of his testimony.  Instead it was determined by the fact that, at the time of trial, his wife was experiencing a difficult pregnancy.  Therefore, Monem testified early in the trial, so he could return home to his wife as soon as possible.

unlikely to produce an acquittal in light of strength of government's evidence); *United States v. Williams*, 233 F.3d 592, 595 (D.C. Cir. 2000) (same re:  newly discovered evidence of witness perjury); *United States v. Douglas*, 862 F. Supp. 521, 531 (D.D.C. 1994) (denying motion for a new trial based on newly discovered evidence, since, even if the questionably obtained (newly discovered) evidence had been excluded, acquittal unlikely), *aff'd mem.* 70 F.3d 638 (D.C. Cir. 1995).[10]

1.     **Without Monem's testimony, there is still strong evidence establishing that Slatten shot and killed the Kia's driver.**

Even without Monem's testimony, the government presented a strong case establishing that defendant Slatten shot and killed Ahmed Al-Rubia'y, the driver of the Kia.  First, Al-Gharbawi, who was a passenger in a car stopped in the first row of traffic facing the Raven 23 convoy, testified to hearing a single gunshot come from one of the two convoy vehicles in front of his vehicle. Trial T. 6/24/14 a.m. at 48.  Al-Gharbawi then felt the white Kia gently bump into the rear of his vehicle, at which time he looked back and saw a single hole in the front windshield of the white Kia and the driver's bloodied head.  Moments later, he heard the driver's mother, who was seated next to the driver's now lifeless and slumping body, screaming.  *Id.* at 48-49.  Officer Ghalaf testified that he heard "a woman screaming, 'My son, my son.'"  Trial T. 7/2/14 a.m. at 91.  He then approached the Kia's driver's side, and he "saw the man, he was

---

[10]     Defendants Slough, Liberty, and Heard's reference to the length of deliberations is unavailing. [Dkt. 765 at 33-36.]  The defendants cite one case from our circuit that notes the length of deliberations in determining whether the jury's exposure during deliberations to unadmitted evidence was harmless.  *Dallago v. United States*, 427 F.2d 546, 559 (D.C. Cir. 1969).  In *United States v. Williams*, 212 F.3d, 1313 (D.C. Cir. 2000), the dissent cited *Dallago*, analogizing to the significance to be attributed to a hung jury.  The cases from outside this circuit cited by the defendants involved other factors not found here, in addition to the length of deliberations.  *Avarez v. United States*, 808 F.Supp 1066, 1095 (S.D.N.Y. 1992) (involving a read-back of all relevant testimony and "numerous" clarifications to the jury); *United v. Varoudakis*, 233 F.3d 113, 126 (1st Cir. 2000) (the jury had indicated that it was hung).  Here, the fact that, after a lengthy, complicated trial, the jury found the defendants guilty of 71 counts (and did not find them not guilty of any counts) is a much better barometer of the strength of the government's case.

bloodied and the woman hanging to her car, holding her son and screaming, 'My son, my son.'" Trial T. 7/2/14 a.m. at 91.   Officer Ghalaf testified that the blood, "was coming from the [driver's] head, and his whole face was full of blood." Trial T. 7/2/14 a.m. at 92.

Jimmy Watson, who was inside defendant Slatten's vehicle, testified that while their vehicle was stopped in the southern portion of the traffic circle, defendant Slatten had his sniper rifle pointed out the left side of the vehicle, aiming to the south of the circle.   Watson identified defendant Slatten as the Raven 23 team member who fired first that day and, crucially, Watson stated that "[c]oincidentally, where [Slatten] was, the direction that he was firing is where the car was.   It was on that left side exactly where he was." Trial T. 7/29/14 a.m. at 29.   According to Watson, after defendant Slatten fired the initial two shots, Slatten yelled, "white car, white car coming in." *Id.* at 49.   Additionally, Ridgeway testified that shortly after the incident, defendant Slatten bragged that he had shot a man in the head ("popped his grape") and defendant Slatten described how the man had slumped over after being shot.   Trial T. 7/31/14 a.m. at 49.

Additionally, the evidence established defendant Slatten's motive for the shooting:   he held a deep-seated animus toward Iraqis, blaming them for the 9/11 attacks.   Trial T. 6/30/14 p.m. at 61-63; Trial T. 7/15/14 p.m. at 53-54, 56-58, 60; Trial T. 7/30/14 a.m. at 53, 54, 59. Moreover, defendant Slatten had a history of shooting at Iraqis in order to instigate a fight, as he did on September 16, 2007.   Trial T. 6/30/14 p.m. at 100-02; Trial T. 7/30/14 a.m. at 70, 72.

**2.     Without Monem's testimony, there is still strong evidence establishing that the Kia presented no threat when defendants Slough, Liberty, and Heard riddled it with gunfire and incinerated it with grenades.**

Even without Monem's testimony, there was a wealth of evidence that established the Kia presented no threat when defendants Slough, Liberty, and Heard fired upon it.   First, Officer

Ghalaf testified that the traffic approaching Nisur Square from the south (the Kia's approach route) stopped upon the Blackwater convoy's arrival in Nisur Square.  Trial T. 7/2/14 a.m. at 89-90 ("I turned and I saw that there was no car moving").  Officer Ghalaf also testified that the Kia rolled slowly forward and bumped Al-Gharbawi's vehicle, after the driver was shot:  "[T]he car started moving slowly because the young man was killed, and he did not have control of the car."  Trial T. 7/2/14 a.m. at 93, at 96 (Ghalaf walked slowly alongside the Kia as it rolled toward Nisur Square).  Ghalaf's testimony was corroborated by Brian Chase, an automobile crash expert.  Chase testified that based on his expert analysis of the bumpers from the Kia and from Al-Gharbawi's vehicle, the Kia was rolling at less than five miles per hour at the point of impact.  Trial T. 6/24/14 p.m. at 18-19.

At the point of the collision between the Kia and Al-Gharbawi's vehicle, Ghalaf signaled to Raven 23 to stop shooting.  Trial T. 7/2/14 a.m. at 94.  Nevertheless, even after the Kia rolled to a stop, defendants Slough, Liberty, and Heard continued to fire upon it.  Among other witnesses, former Blackwater helicopter pilot Michael Gosiewski established that, while the Kia was being fired upon, it had stopped and presented no threat to the Blackwater convoy.  Trial T. 8/18/14 p.m. at 66 (while Kia was being "peppered with gunfire" "[i]t was not moving.").[11]

---

[11]    *See also* (1) Murphy, Trial T. 6/30/14 p.m. at 124 ("I saw this small white car *kind of rolling* . . .) (emphasis added), *id.* at 127 (Kia was moving "five miles an hour, seven, 10, something like that"), *id.* at 131 (when the Kia was being shot, "[i]t's coming to a stop. It's rolling to a stop."), *id.* (defendant Slough fired two grenades into the Kia after it stopped); (2) Mealy, Trial T. 7/15/14 p.m. at 99 (when initially fired upon, Kia was moving at "[m]aybe a couple of miles an hour"); and (3) Ridgeway, Trial T. 7/31/14 89-90 (Kia "was moving, so I would say maybe, yeah, two to five would be – I'd be comfortable saying that it was that."), *id.* at 91 (the Kia "was far enough away at the time that I fired on it where I could have paused, made a judgment, and observed that that vehicle was slowing down or stopping even."), *id.* at 98 (Kia "was already stopping at the time that I fired").

While Monem's testimony was arguably more significant vis-à-vis defendant Slatten,[12] the argument that Monem's testimony played a significant role in the convictions of defendants Slough, Heard, and Liberty is unfounded.  As set forth above, Gosiewski and others established that the Kia was stationary when defendants Slough, Liberty, and Heard fired upon it. Accordingly, Monem's testimony about the initial shots and the death of the driver were not relevant to those defendants' convictions for killing the passenger (Count 2).  Also, the defendants' claim that Momein's testimony was critical to establishing their guilt regarding the shooting of victims south of Nisur Square is frivolous.  Regardless of the appropriateness of killing the occupants of the Kia, defendants Slough, Liberty, and Heard had no justification for shooting and killing unarmed civilians south of Nisur Square.  Their claim that there is little evidence that they fired south of the circle is belied by the carnage they wrought.

Notably, none of the foregoing evidence is based on Monem's testimony.  If, however, this case were retried, contrary to defendant Slatten's conjecture [Dkt. # 659 at 18], the government would not hesitate to call him as a witness.  Accordingly, the newly discovered evidence (*i.e.*, the imagined "facts" set forth in Monem's VIS, which he has repudiated) would

---

[12]     Monem's testimony was far from being crucial to establishing defendant Slatten's guilt.  To the contrary, it could be argued – indeed, counsel for defendant Slatten did argue to the jury – that Monem presented exculpatory evidence vis-à-vis defendant Slatten, inasmuch as Monem suggested that the shot that killed the Kia's driver was fired by a turret gunner – not Slatten.  *See* Slatten's Closing Argument, Trial T. 8/28/14 p.m. at 15 ("Mr. Moniem came here and testified under oath to you that he was three to four meters away when the first shots hit the white Kia and those first shots came not from the holes on the side of the vehicle, but from a turret gunner.").  *See also* Trial T. 6/23/14 a.m. at 12 (Monem's testimony:  "In the beginning when I mentioned that there was firing, I meant it was coming from the turrets and not from the holes or the windows that are in the vehicles.").  In fact, counsel for defendant Slatten chose not to cross examine Monem at all and then pointed out to the jury in closing argument that he had made that choice, explaining that the government had elicited what he viewed as key exculpatory evidence in direct examination – namely, that Monem perceived that a turret gunner fired the first shots at the driver of the Kia, Trial T. 8/28/14 p.m. at 15-16.  Moreover, in his closing argument, counsel for defendant Slatten did not ask the jury to discredit a single aspect of Monem's testimony.  *See id.* at 13-16.  These facts are strong indicators that counsel for defendant Slatten did not perceive Monem's testimony as particularly harmful to his defense.

not probably produce an acquittal.[13]

## IV. The defendants' attempt to transform Monem's VIS into a *Brady* violation is misplaced.

The defendants' attempt to transform the repudiated (and imagined) "facts" set forth in Monem's VIS into a *Brady* violation amounts to no more than alchemy. As set forth above, Monem's trial testimony was not false. *See* § III, *supra*. In any event, Monem's VIS cannot constitute a *Brady* violation; since the allegedly exculpatory material did not exist until after trial, by definition, it could not have been suppressed by the government. To constitute a *Brady* violation, (1) the material must be exculpatory, (2) there must be a reasonable probability that the material would have produced a different verdict, and (3) the material must have been suppressed by the government. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 280-02 (1999) ("In *Brady*, this Court held 'that *the suppression by the prosecution* of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt . . . .'" (emphasis added)); *United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010) ("[the] evidence must have been suppressed by the State . . ."). The government cannot suppress evidence that did not exist at the time of trial. *See, e.g.*, *United States v. Borda*, 941 F.Supp.2d 16, (D.D.C. 2013) (Denying post-trial motions alleging a series of *Brady* violations including failure to disclose a June 2011 letter from [Manjarres] which the Defendants claim shows that Juan Montoya, a government witness, asked Manjarres to lie about Borda threatening [a person]: "[T]he June 2011 letter from Manjarres is not *Brady* material because it did not even exist at the

---

[13]     The foregoing evidence also demonstrates that even under the inapplicable *Brady* standard relied upon by the defendants [Dkt. #765 at 26-37], namely a reasonable probability that the suppressed evidence would have produced a different verdict, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), there would still be no basis to grant the defendants' motion for a new trial.

time of trial."); *Browning v. Trammell*, 717 F.3d 1092, 1104 (10th Cir. 2013) ("In the *Brady* context, however, it is inappropriate to consider evidence developed post-verdict. To do otherwise would contradict Supreme Court cases applying *Brady* by analyzing how withheld evidence might have affected the jury in light of all other evidence it heard."); *Whitlock v. Brueggemann*, 682 F.3d 567, 587–88 (7th Cir. 2012) ("*Brady* continues to apply [in a post-trial action] to an assertion that one did not receive a fair trial because of *the concealment of exculpatory evidence known and in existence at the time of that trial*." (emphasis added)); *Burgess v. Terry*, 478 Fed. App'x 597 (11th Cir. 2012) (rejecting claim that government violated *Brady* by failing to disclose a statement that did not exist at operative time:  "As to the [statement], however, we do not assume suppression because it is clear that *there can be no suppression of evidence that does not exist at the time of trial* or sentencing." (emphasis added)); *United States v. Michtavi*, 390 Fed. App'x 852 (11th Cir. 2010) (Rejecting *Brady* claim, where "the government could not have produced either the translations or statements that [witness #2] made at his later Rule 35 hearing because they did not exist at the time of Michtavi's trial."); *United States v. Smith*, 749 F.3d 465, 489 (6th Cir. 2014) (no *Brady* violation in failing to produce a report generated post-trial); *United States v. Shepard*, 462 F.3d 847, 871 (8th Cir. 2006) (government's obligation to make disclosure assessed in light of what was known at time, not post trial); *United States v. Sanchez*, 251 F.3d 598, 603 (7th Cir. 2001) ("[B]ecause the government cannot suppress evidence that does not exist at the time of the trial, there is no *Brady* violation as claimed by Sanchez.").

The defendants' allusions to a "*Napue* violation" are likewise misplaced.  [Dkt. # 765 at 9, 11, 26, 30; Dkt. # 659 at 11].  In *Napue v. Illinois*, 360 U.S. 264 (1959), the prosecutor

knowingly elicited false testimony.  The witness testified that he had not received any promises in exchange for his testimony, when, in fact, the prosecutor had made such promises to the witness.  *Id.* at 265.  Under those circumstances, the Supreme Court reversed the conviction, holding that a prosecutor's failure to correct testimony that he knew to be false violated the defendant's right to due process.  *Id.* at 269.

Our Circuit explained the distinction between newly discovered evidence of false testimony and a *Brady* violation in *United Stated v. Williams*, 233 F.3d 592 (D.C. Cir. 2000) (affirming denial of a new trial motion, where drug expert regularly used by the government had offered perjurious testimony regarding his background and credentials).[14]  The *Williams* court noted that the *Brady* line of cases requires reversing a conviction "based on the government's knowing use of perjured testimony if there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Id.* at 594.  Alternatively, the court held that when evidence of false testimony arises after trial, the familiar standard for granting new trial motions as enunciated in *Thompson*, 188 F.2d at 653, must be applied:

> Because we can see no good reason to treat newly discovered evidence of perjury differently than other types of newly discovered evidence, we reject *Stofsky* [537 F.2d 237 (2nd Cir. 1975)] and adhere to our original formulation under *Thompson*.
>
> *          *          *
>
> This would mean that, when perjury by a prosecution witness is discovered after trial and when the prosecution did not know of the perjury until then, a defendant would be entitled to a new trial only if he can establish that he would probably be

---

[14]     The factual scenario in *Williams*, where the D.C. Circuit upheld the denial of a motion for a new trial based on newly discovered evidence of perjury, is exactly the same scenario (*e.g.*, perjured testimony from the government's drug expert, Johnny St. Valentine Brown, regarding his credentials) that was presented in a case relied upon by the defendants, *United States v. Jones*, 84 F. Supp. 2d 124 (D.D.C. 1999).

acquitted on retrial.

*Williams*, 233 F.3d at 594-95.

The defendants' attempts to morph Monem's VIS into a *Brady* violation by claiming that the government should have known that Monem's trial testimony was false also fails.  As a threshold matter, the government cannot be faulted for failing to detect false testimony, when, as here, there was no false testimony.  *See* § III, *supra*.  Even if, *arguendo*, Monem's trial testimony had been false, as set forth below, none of the indicia of unreliability that the defendants claim the government overlooked, has any merit.[15]

## A.      Statements to the INP

The defendants claim that the similarity between Monem's and Ghalaf's statements to the Iraqi National Police should have signaled to the government that Monem lied about the Nisur Square massacre.  [Dkt. # 765 at 13-14].  This claim is baseless.

It is not surprising that two police officers who witnessed the same incident from almost the same perspective noted many of the same things.  However, none of the similarities cited by the defendants demonstrates that Monem lied about the condition of the driver of the Kia (or whether he approached the Kia).  In another context, the Court has already dismissed claims of wrongdoing based on the similarity among statements taken by the Iraqi police.  Memorandum

---

[15]      Accordingly, the cases relied upon by the defendants involving suppression of exculpatory evidence by the government are inapposite.  *See, e.g.*, *United States v. Iverson*, 637 F.2d 799, 803(D.C. Cir. 1981) (reversing conviction where prosecutor "knew or should have known" that a witness testified falsely); *Singh v. Prunty*, 142 F.3d 1157, 1161 (9th Cir. 1998) (involving "undisclosed evidence of an agreement to provide benefits to [a witness] in exchange for his testimony"); *United States v. Freeman*, 650 F.3d 673, 677 (7th Cir. 2011) (government told before trial that defendant was incarcerated at time a witness claimed he was at crime scene); *United States v. Wallach*, 935 F.2d 445, 455 (2d Cir. 1991) (court found that government should have known of witness's perjury in a case where the government subsequently indicted the witness for perjury).

Opinion, dated March 26, 2014, at 28-29 ("The defendants also argue that the similarity of some Iraqi statements to the Iraqi National Police show that Col. Faris influenced testimony, [citation omitted], but again this is mere speculation.").

While the similarity among certain statements initially taken from witnesses is meaningless, the government's method of investigation and handling of the witnesses speaks volumes. The government did not blithely rely on Monem's initial statement to the Iraqi police. Instead, we interviewed him at least nine times regarding the shooting. Additionally, Monem's initial statement to the Iraqi police and all of his other prior statements were provided to the defense, who cross examined him vigorously on this issue. At bottom, it is specious to suggest that any similarity between Monem's initial statement and that of another police officer should be construed as evidence that the government should have known Monem testified falsely.

**B.      Monem's statements as reported in the media were consistent with his trial testimony.**

The defendants claim that Monem gave a number of statements to the media that "differ[ed] considerably from [his] trial testimony . . . ." [Dkt #765 at 15]. Even if true, the Court has made its view of such claims clear. *See Kastigar* Hearing T. 12/4/13 p.m. at 53 (noting that the Court does not "consider newspaper articles as evidence of anything"). In any event, with the exception of an article in the German publication *Der Spiegel*, the media coverage of Monem's account of the shooting is remarkably consistent with his trial testimony.[16]

---

[16]      The defendants also make the peculiar complaint that "there is no indication that the government reviewed Mr. Monem's statements in the media at all." [Dkt. # 765 at 15]. As the defendants well know, due to the *Kastigar* issue in this case, the trial team was precluded from reviewing media accounts of the massacre. *See, e.g.*, Government's Status Report and Memorandum Regarding *Kastigar* Issues [Dkt. # 259] at 19 ("Furthermore, the trial team and its supervisory chain have been instructed to avoid any media coverage (including news broadcasts,

Far from contradicting Monem's testimony, the press accounts commend its truth, as demonstrated by a comparison of media reports regarding Monem and his trial testimony. *See* Appendix K. Significantly, in not one of the stories is Monem quoted as saying anything about a conversation between the driver and the passenger of the Kia after the shooting started. In fact, most of the stories report that Monem said that the driver was killed at the beginning of the incident. *See, e.g.*, CNN.COM ("one of the rounds struck a car and killed a young man"); NEW YORK TIMES ("a man and his mother who were among those first shot"); CBS NEWS ("'I saw the left side of his [driver of the Kia] head was destroyed").

The only media account cited by the defendants that appears to be inconsistent with Monem's trial testimony was published in the German publication *Der Spiegel*. [Dkt. #765 at 15]. According to that publication, Monem indicated that "'the driver of a white car was anxious to drive off[.] I signaled to him to drive, since the distance to the convoy was around 60 meters, far enough to get traffic rolling again.'" *Id.* The undisputed evidence in the record, however, is that Monem never made such an assertion and never even spoke to a reporter for *Der Speigel*.[17]

---

books, Internet reporting, etc.) of this matter."). Even so, as we explain, had the team reviewed Monem's statements as reported in the press, it would have seen that his various accounts over the years were substantially consistent.

[17]     At the *Kastigar* hearing, Monem testified as follows on cross examination:

> Q.     Okay. Well, let me see if I could ask you some questions that may refresh your memory. First of all, do you recall telling a reporter for a magazine called Spiegel, that after the Blackwater convoy pulled into Nisur Square, you signaled the driver of the white Kia to pull forward, and that's when the shots were fired?

> A.     I don't remember that. There's no such thing.

> Q.     Well, let me direct your attention to Defense Exhibit 15, please, in your binder. All right. This is an article from a publication called Spiegel Online. It's dated September 24, 2007, and the title is "Blackwater's Hail of Gunfire."

> A.     I did not meet with these people.

Whatever may have been said (or not said), this report is an aberration:  according to the other accounts, Monem consistently said the driver was killed at the beginning of the incident by a gunshot wound to his head.

**C.      Monem's account was not contradicted by other witnesses.**

Next, the defendants argue that Monem never approached the white Kia and claim that the government overlooked "red flags" on this issue, asserting that there were no witnesses who saw more than one officer approach the Kia.  [Dkt. #765 at 13, 16].  This too is untrue.  First, and most importantly, the first time that the FBI interviewed Ali Ghalaf, the police officer who approached the driver's side of white Kia, Ghalaf stated that Monem approached the Kia's

---

*Kastigar* Hearing T. 12/4/13 p.m. at 51-52.

At trial Monem testified as follows on cross examination:

> Q.      Sure.  After the traffic stopped, the driver of that white sedan signaled to you that he wanted to turn his car around, correct?
>
> A.      No, that's not correct.
>
> Q.      Didn't you wave the white sedan forward to turn around?
>
> A.      No, I didn't do that.
>
> Q.      Didn't the white car pull forward out of traffic before the shots were fired?
>
> A.      No.
>
> Q.      You told the journalist that's what happened, didn't you?
>
> A.      I didn't speak to a journalist.
>
> Q.      All right. I want to be very precise with my question.  Did you tell a reporter, "The driver of the white car was anxious to drive off.  I signaled to him to drive since the distance to the convoy was around 60 meters, far enough to get rolling again?"
>
> A.      I did not speak to a reporter.

Trial T. 6/23/14 p.m. at 28.

passenger side:  "His police partner [Monem] tried to save the woman, and when the woman was shot, he ran with [Ali Ghalaf] to behind the police post."  FBI 302, dated 10/23/07 (Attached as Ex. L).

Second, when defendant Slough spoke to Matthew Twigg, he too reported that more than one police officer approached the Kia.  Twigg G.J. Transcript, dated 1/24/08 at 27 (Attached as Ex. M) ("[Slough] said at that point, *individuals* dressed in Iraqi police uniform ran to the vehicle, appeared that it was pushing the car.  [Slough] fired again and those *individuals* ran." (emphasis added)).[18]

The government is not aware of any witness who has stated that only one police officer approached the Kia.  To be sure, the witnesses cited by the defendants [Dkt. #765 at 16] described seeing one officer.  But they did not state that no other officer approached the car.  The fact that some witnesses may have only seen one officer – or only testified about one officer – does not mean that Monem was not there.  Instead, it is simply the product of different peoples' perspectives and memories.

**D.    Jason Roane's testimony was neither impeached nor contradicted by any competent evidence.**

The defendants' claim that the government knowingly sponsored false testimony from former Blackwater guard Jason Roane [Dkt. # 765 at 18] is footless.  Without contradiction, Roane testified that during an incident on January 23, 2007, he saw defendant Liberty fire excessively (Trial T. 8/13/14 p.m. at 70, 82-84) and that, after the shooting, Liberty told him, among other things, that his vehicle fired over 1,000 rounds that day.  *Id.* at 86.  The defendants

---

[18]    Twigg's testimony helps to establish that the government did not make an argument it knew to be untrue to the jury, even though his testimony was not presented at trial.

unsuccessfully tried to admit into evidence a document prepared by Blackwater, which did not include Liberty among those who participated in the incident on January 23, 2007.[19]  On redirect examination, however, Roane confirmed his testimony:  "Q. And is there any doubt in your mind that you were present at one point in which you heard Mr. Liberty saying what you testified he said?  A. Absolutely not."  Trial T. 8/13/14 p.m. at 93.  The defense made no other attempt to get the document admitted, or to otherwise establish that Liberty did not take part in the January 23 shooting.

The government was not obliged to credit an unauthenticated, hearsay document that was created by a third party.  This is especially true here, in light of the document's source.  The document at issue was created by Blackwater, and it was established at trial that on another occasion Blackwater had doctored one of its documents.  Trial T. 7/17/14 a.m. at 50-51 (Juan Mendoza testified that he was instructed by Blackwater management to alter the TOC log).  Accordingly, the government had no reason to doubt Roane's uncontradicted, sworn testimony.  In sum, the government's use of Roane's testimony was completely appropriate.

---

[19]

| | |
|---|---|
| Q. | And does that [Blackwater document] comport with your recollection that that's about how long it was? |
| A. | That sounds about right. |
| MR. COFFIELD: | Okay. Your Honor, I'd introduce this. |
| MR. ASUNCION: | That portion, Your Honor? |
| MR. COFFIELD: | No, the after actions report that he reviewed. |
| MR. ASUNCION: | Objection, hearsay. |
| THE COURT: | Sustained. |

Trial T. 8/13/14 p.m. at 90.

**E.     The government's rebuttal argument regarding defendant Slough having killed Ali Razzaq was proper and fully supported by the evidence.**

The defendants claim that, in its rebuttal argument, the government misled the jury regarding the fact that defendant Slough killed Ali Razzaq. [Dkt. # 765 at 20-22]. The rebuttal argument, however, was proper and fully supported by the evidence. The defendants' claim to the contrary is simply wrong.

Ali Razzaq was the nine-year-old son of Mohammed Kinani. On September 16, 2007, he was riding in the driver's side backseat of Kinani's car. Trial t. 6/18/14 p.m. at 42. The car was stopped south of Nisur Square, when defendant Slough shot Ali in the head, killing him. As the government explained, the forensic evidence combined with defendant Slough's firing position established that it was defendant Slough who killed Ali. First, a fragment of a 7.62mm projectile was found in the car seat, where Ali had been sitting. Gov. Ex. 9055. This is consistent with the projectile fired from an M-240 machine gun. Next, the trajectory analysis demonstrated that defendant Slough was the only member of Raven 23 firing an M-240 machine gun who was in a position to fire the shot that killed Ali.

In their attempt to undermine this evidence, the defendants present a faulty syllogism: (1) the projectile fragment recovered from the backseat where Ali was sitting was from an armor piercing (black tip) round; (2) other bullet fragments recovered from the scene and traced to defendant Slough's M-240 machine gun were not armor piercing rounds; therefore, defendant Slough could not have fired the shot that killed Ali. [Dkt. # 765 at 20-21]. The defendants' syllogism rests on the false premise that defendant Slough necessarily fired one type of ammunition to the exclusion of any other type. In reality, defendant Slough could readily have

fired at least two types of 7.62mm ammunition that day.[20]

As Marine Gunner (Infantry Weapons Officer) Shelby Lasater explained, the M-240 machine gun can fire several types of 7.62 mm ammunition, including armor piercing rounds (black tip), ammunition tracer, and ball ammunition (green tip). *See* Trial T. 7/10/14 a.m. at 72 & Gov. Ex. E202. Gunner Lasater also explained that the M-240 machine gun ammunition is loaded with linked belts of ammunition and has a rate of fire of 650 rounds per minute. *Id.* at 66, 74 & Gov. Ex. E202. And, according to Murphy, the belts typically contain 200 rounds of ammunition. Trial t. 6/30/14 p.m. at 43.

Accordingly, there is no mystery as to how defendant Slough managed to fire both black tipped and non-black tipped ammunition in Nisur Square. His M-240 machine gun simply might have been loaded with a belt (or partial belt) of black tip ammunition,[21] which was linked to a belt of non-black tip ammunition – or vice versa. Alternatively, defendant Slough might have expended one can of black tipped ammunition and reloaded from a separate can of non-black tip ammunition after he had expended the black tipped ammunition – or vice versa.

---

[20]   The defendants do not repeat in their brief the argument made by counsel for defendant Slough twice before – following closing arguments (Trial T. 9/2/14 a.m. at 11-13) and at sentencing (Sentencing T. 4/13/15 at 88) – namely, that defendant Slough could not have fired the shot that killed Ali because the government had information that another Raven 23 contractor (*i.e.*, Heard) had used black-tipped ammunition. It is not surprising that the defendants have abandoned this argument, as it too was based on a faulty premise – *i.e.,* that because Heard had access to black-tipped ammunition, Slough did not. *But cf.* FBI 302 dated Dec. 5, 2008 (attached as Exhibit N) (Ridgeway stated that he was only aware of defendant Heard having black tip ammunition.).

[21]   Although 7.62mm black tip ammunition was not authorized by the Department of State, any of the Raven 23 members could have loaded such ammunition into the M-240 machine gun used by defendant Slough on September 16, 2007. Raven 23 members were able to obtain munitions not authorized for use by the Department of State. *See, e.g.*, Trial T. 7/28/14 a.m. at 81 (Watson testified that "everybody" had unauthorized hand grenades). Additionally, on occasion, fire team members would load and ready the M-240 machine guns for the turret gunner. *See, e.g.*, Trial T. 7/14/14 p.m. at 65; Trial T. 8/11/14 a.m. at 33. Accordingly, the 7.62mm armor piercing rounds that defendant Slough fired that day, including the one that killed Ali, could have been secured by someone other than defendant Slough and loaded into Slough's M-240 by someone other than Slough. This, however, does not change that the evidence supports the fact that defendant Slough fired the 7.62mm round that killed Ali.

Firing more than one belt of ammunition is completely consistent with the wealth of evidence that defendant Slough fired hundreds of rounds from his M-240 machine gun that day. For example, Jimmy Watson testified that defendant Slough was firing his M-240 machine gun at such a fast rate that he "could feel the hot brass . . . *a lot of hot brass* hitting me from Paul Slough's gun."  Trial T. 7/28/14 p.m. at 32 (emphasis added).  Additionally, defendant Slough reported to Twigg that he fired his M-240 machine gun at targets all over Nisur Square.[22] Specifically, he reported firing his machine gun at a hut (Twigg G.J. Transcript, dated 1/24/07 at 27), at a car (*id.* at 31), at a bus stop (*id.* at 37), at a man on an "eave" (*id.* at 35), at a man with an AK-47 (*id.* at 36), and at a bus (*id.* at 36).  Twigg explained that defendant Slough reported firing his M-240 machine gun from left to right on an arc from six to ten o'clock.  *Id.* at 28, 35. Twigg also stated that he could hear over the radio defendant Slough continuing to fire his M-240 as Raven 23 was leaving Nisur Square.  *Id.* at 38.   Murphy, Mealy, and Ridgeway also all testified that defendant Slough was firing his M-240 machine gun.  At bottom, not only was it possible for defendant Slough to fire two types of M-240 ammunition, the evidence fully supports that conclusion.

**F.     The government did not present false identification testimony through Azaldeen Sami Hawas Al-Dulaimi.**

The defendants' claim that the government "presented false identification testimony" is a gross misrepresentation.

Azaldeen Sami Hawas was a passenger in his father's automobile, which was located north of Nisur Square, when defendant Slough shot Azaldeen's father.  Trial T. 7/3/14/ a.m. at

---

[22]     Again, although Twigg's testimony was not presented at trial, it helps to show the government did not make an argument it knew was untrue.

60, 64.   Initially, Azaldeen stated that he did not see the shooter.  Subsequently, Alzaldeen explained that he had seen defendant Slough shoot his father, but, at his father's instruction, he had claimed not to have seen anything.  Id. at 84-87.  The Court struck Azaldeen's identification of defendant Slough as the shooter, not because it was false but because the Court found that Azaldeen's prior inconsistent statement had not been disclosed to the defense in a timely manner.  In striking Azaldeen's testimony, the Court stated:  "The defendants could not prepare for trial not knowing that he was now going to claim that his father told him what to say."  Trial T. 7/3/14 a.m. at 102.  In any event, like so many of the issues raised in the defendants' briefs, this aspect of the trial has nothing to do with Monem's veracity.

**G.     The inadvertent, tardy disclosure of a photograph taken by Cap. Decareau is not relevant to assessing Monem's veracity.**

In their desperate attempt to demonstrate that the government somehow mishandled Monem's testimony, the defendants cite the following *non sequitur*:  the government disclosed late a photograph depicting shell casings on the ground behind a bus stop south of Nisur Square.

Due to a series of innocent oversights, a photograph depicting AK-47 shell casings near a bus stop south of Nisur Square was not discovered until after trial began.  Upon its discovery, the photograph was immediately provided to the defense.  The photograph had been taken by then-Cap. Peter Decareau of the United States Army.  He and his platoon were the first Americans to arrive in Nisur Square following the shooting on September 16, 2007.

Decareau was interviewed by the FBI on October 12, 2007, at which time he did not mention observing any AK-47 shell casings in the Nisur Square area.  During that interview, Decareau provided a disc containing photographs of the scene.  Subsequently, on April 15, 2008,

29

when Decareau appeared before the grand jury, he also testified that the only shell casings that

he saw in the Nisur Square area on September 16, 2007, were in the traffic circle itself:  "And we

had walked mainly down – I concentrated mainly from where that burned vehicle was

southbound through the – down to the bus stop in this area. . . . . I did not see any expended brass

other than the stuff that was in the southern end of the traffic circle."  Decareau G.J. Trans. at 20

(Attached as Ex. O).  Specifically, Decareau did not mention observing any AK-47 shell casings

near the bus stop.

Based on his grand jury testimony, the government's former and present trial team and

filter team had all understood that Decareau did not observe any AK-47 shell casings on the

scene, and we incorrectly assumed that a montage of Decareau photographs, which had been

produced to the defense, contained all the photographs from the disc that Decareau had provided

to the FBI on October 12, 2007.  While regrettable, this innocent mistake has nothing to do with

Monem's veracity.

**V.    While a hearing on the defendants' motions for a new trial is unnecessary, the government will endeavor to make Monem available, if the Court is inclined to take testimony on  the defendants' motions.**

When adjudicating a motion for a new trial based on newly discovered evidence arising

from a recantation, it is generally not necessary to conduct a hearing if, as here, the Court can

conclude from the record – including the court's observation of the witness's testimony at trial

and in a pretrial hearing – that the witness at issue did not testify falsely.  *See, e.g.*, *Kearney*, 682

F.2d at 218 (denying without a hearing a motion for new trial based on newly discovered

evidence based on recantation); *Pearson*, 203 F.3d at 1275 ("In this case, we believe that the

district court was able to assess the credibility of [witness's recantation] without holding an

evidentiary hearing."); *Provost*, 969 F.2d at 619 ("We previously have recognized that the need for a hearing is diminished for claims of recanted testimony where the trial judge observed the demeanor and credibility of the witnesses at trial . . . ."). Nevertheless, if the Court is inclined to take testimony, the government will endeavor to obtain Monem's appearance at a hearing.

## VI.   Conclusion.

The defendants' motions for a new trial based on newly discovered evidence should be denied. At trial, no perjured testimony was presented by the government. Instead, Monem's trial testimony – which was consistent with his numerous pretrial statements to the Court, the grand jury, law enforcement, and the media – was true. The imagined "facts" set forth in Monem's VIS constitute, at most, a recantation which the witness has since repudiated by verifying the accuracy of his trial testimony. As such, the VIS is merely impeaching. It provides

no basis for a new trial, and in any event, the defendants have failed to show that they would

probably be acquitted on retrial.

Respectfully submitted,

_____/s/_____
Gregg A. Maisel
Chief, National Security Section
D.C. Bar Number 447902
Gregg.Maisel@usdoj.gov

Jay I. Bratt
Deputy Chief, National Security Section
Illinois Bar Number 6187361
Jay.Bratt2@usdoj.gov

T. Patrick Martin
Special Assistant United States Attorney
D.C. Bar Number 471965
Thomas.Martin@usdoj.gov

Anthony Asuncion
Special Assistant United States Attorney
D.C. Bar Number 420822
Anthony.Asuncion@usdoj.gov

Christopher Kavanaugh
Special Assistant United States Attorney
VA Bar Number 73093
Christopher.Kavanaugh@usdoj.gov

John Crabb Jr.
Assistant United States Attorney
N.Y. Bar No. 2367670
John.D.Crabb@usdoj.gov

David Mudd
Assistant United States Attorney
D.C. Bar No. 995154
David.Mudd2@usdoj.gov

United States Attorney's Office
National Security Section
555 4th Street, N.W., 11th Floor
Washington, D.C. 20530