**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr.  No.  08-360 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **PAUL ALVIN SLOUGH** | : | |
| **EVAN SHAWN LIBERTY** | : | |
| **DUSTIN LAURENT HEARD** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| _____ | : | |

**DEFENDANTS' SUPPLEMENTAL OPPOSITION
TO THE GOVERNMENT'S REQUEST FOR RESTITUTION**

Brian M. Heberlig (No. 455381)
Michael J. Baratz (No. 480607)
Bruce C. Bishop (No. 437225)
Linda C. Bailey (No. 985081)
Scott P. Armstrong (No. 993851)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
Telephone:  (202) 429-3000

*Counsel for Defendant Paul A. Slough*

David Schertler (No. 367203)
Danny Onorato (No. 480043)
Lisa H. Schertler (No. 430754)
Janet Foster (Admitted *Pro Hac Vice*)
Schertler & Onorato, L.L.P.
575 7th Street, N.W., Suite 300 South
Washington, D.C.  20004
Telephone:  (202) 628-4199

*Counsel for Defendant Dustin L. Heard*

William Coffield (No. 431126)
Laina C. Lopez (No. 477412)
Berliner Corcoran & Rowe LLP
1101 17th Street NW, Suite 1100
Washington, D.C.  20036
Telephone:  (202) 293-5555

*Counsel for Defendant Evan S. Liberty*

## **TABLE OF CONTENTS**

I.      The Translations of the Government's Supporting Documents Further Undercut
        the Government's Requests for Restitution ........................................................................2

        A.      Hassan Jabar Salman (Count 19) (*See* Opp. at 17-20)..............................................2

        B.      Mohamed Abbas Mahmoud and Qasim Mohamed Abbas Mahmoud
                (Counts 5 and 6) (*see* Opp. at 20-22).......................................................5

                1.      Food for funeral ................................................... 5

                2.      Automotive repairs.................................................. 5

        C.      Sa'Aid Ali Abbas Alkarkh (Count 7) (*see* Opp. at 22-27) .....................................6

        D.      Majed Salman Abdell Kareem Al-Gharbawi (Count 15)
                (*see* Opp. at 27-29)......................................................6

        E.      Haydar Ahmad Rabie Hussain Al-Khafaji (Count 18)  (*see* Opp. at 29-31) ...........7

II.     This Court Should Deny the Government's Request For Yet More Delay ........................7

On July 3, 2015, Defendants submitted their Memorandum in Opposition (Dkt. 781) ("Opp.") to the Government's Request for Restitution (Dkt. 775, filed May 26, 2015) and Supplement (Dkt. 778, filed June 23, 2015).  Among other things, Defendants observed that most of the supporting documents the government submitted were in Arabic, with no English translations, only conclusory summaries.  *See* Dkt. 781 at 1, 15, 17, 21, 24, 26, 32.

On July 5, 2015, the government for the first time furnished English translations, performed that day, of the Arabic-language documents.  These new translations, which the government did not submit to the Court but are attached hereto,[1] provide additional support for the victim-by-victim arguments set out in Defendants' Opposition.  Part I of this Supplement explains this new additional support for Defendants' arguments.

On July 8, 2015, the government submitted its Reply in support of restitution (Dkt. 785). In its Reply (at 9-10), the government claimed an inability to respond to Defendants' identification of the factual deficiencies in the government's submission, and requested an additional 75 days to respond—beyond the nine months the government has had already to meet its burden, 18 U.S.C. § 3664(e), and beyond the statutory 90-day post-sentencing deadline for determining the amount of restitution, § 3664(d)(5).  Part II of this Supplement responds to the government's belated request for even more time.

For the reasons explained herein and in Defendants' original Opposition, the Court should deny the government's restitution request, or should reduce it for amounts the government has failed to prove by a preponderance, and then offset any order by the amounts the

---

[1] The government's July 5, 2015 cover letter is attached as Exhibit J.  The government's two new exhibits of translations are attached as Exhibits K and L.

(Defendants' Exhibits A through E were attached to their Memorandum in Opposition (Dkt. 781).  Defendants' Exhibits F through H were submitted under seal on July 3, 2015. Defendants' Exhibit I was submitted under seal July 10, 2015.)

victims have recovered in compensatory damages in civil suits for the same losses, including

suits against these Defendants.

## I.     THE TRANSLATIONS OF THE GOVERNMENT'S SUPPORTING DOCUMENTS FURTHER UNDERCUT THE GOVERNMENT'S REQUESTS FOR RESTITUTION

Defendants' Opposition explained, victim-by-victim, the factual deficiencies in the

government's effort to satisfy its burden of proof (under § 3664(e)) to support its restitution

requests.  *See* Opp. at 14-34.  We identify here the additional deficiencies and support for

Defendants' Opposition contained in the government's new translations of its supporting exhibits

(and, with respect to Majed Salmen Abdell Kareem Al-Gharbawi, the additional reason for

reduction discussed in Defendants' submission under seal this day, July 10, 2015).

For convenience and to prevent confusion, we present this discussion in the same victim-

by-victim order as in Defendants' Opposition (Dkt. 781).

### A.     Hassan Jabar Salman (Count 19) (*See* Opp. at 17-20)

Five of the ten documents supporting Mr. Salman's claims are submitted by the same

doctor, Dr. Nahidh Sha'Ban.  The translated documents indicate that Dr. Sha'Ban practices

"Internal Medicine and Pediatrics."  *See* Ex. K, translations of pages 5, 11, 13, 19, 21.  The

documents, however, describe many "operations" and "surgeries," which would not have been

performed by an internist.  The documents do not describe the number or dates of these

surgeries, the part(s) of the body operated on, who performed the surgeries, or what the cost of

each operation was.  Instead, they appear to be general summaries written after the fact by

Mr. Salman's internist, at Mr. Salman's request and along lines dictated by Mr. Salman.  *See,*

*e.g.*, Ex. K, translation of page 21 (Dkt. 788-1 at 21) ("It costs thousands of dollars *as he said,*

about $20,000") (emphasis added).

2

Without any description of the specifics of the surgeries, it is well possible, indeed likely, that many of these descriptions and claims are duplicative:

- Ex. K, trans. of page 5 (dated 9/28/2007, "Several operations have been conducted on him, they cost approximately [$20,000]");

- *Id.*, trans. of p.11 11 (dated 11/7/2007, "He was operated on several times inside and outside the country, which cost him excessive amounts of money at the time. This time it has cost him [$50,000]");

- *Id.*, trans. of p.13 (also dated 11/7/2007, "costs of x-rays, investigations, and surgical interferences for his wounds.  It costs about $12,000");

- *Id.*, trans of p. 19 (dated 3/5/2007, "Done for him, Many investigations, x-ray, surgical interference . . . .  It costs about 200,000,000 dinars.");

- *Id.*, trans. of p. 21 (dated 3/2/2008, "Many operations done . . . . It costs thousands of dollars as he said, about $20,000).

There is no way to know from what the government has provided whether the "several" or "many" surgeries and operations described on the earlier statements in 2007 are also among the "many" operations described on later statements in 2008.

In particular, one of the translated documents from Dr. Sha'Ban, claiming "many investigations, x-ray, surgical interference . . . [costing] about 200,000,000 dinars," (Ex. K, translation of page 19), is now dated **March 5, 2007**—six months *before* the Nisur Square incident.  *See id.*  That document states "Patient *H. Jabbir* had a bullet injury since one year ago," *i.e.*, in *March 2006—a year and a half before Nisur Square*.  If the March 5, 2007 date on this translation is accurate, this claim—for 200 million dinars, or approximately $165,000[2]—is

---

[2] *See* Dkt. 778-1 at 18-19, for which the government claims approximately $419,000, *see* Dkt. 778-1 at 2, *but  see* Opp. at 18-19 (correcting conversion error; even if valid, claim should be for approximately $165,000).

Notably, a number of the newly translated documents reflect exchange conversion rates in the neighborhood of 1,200 to 1,300 dinars to the dollar.  *See, e.g.*, Ex. L, translation of page 8 (Dkt. 778-1 at 8) (burial expenses for Messrs. Abbas Mahmoud, conversion rate of 1300:1); *see also id.*, trans. of page 41; *cf.* Dkt. 775-1 at 40 (medical expenses for Sami Hawwas Humud,

clearly inappropriate.[3]  Though the government might claim the new translated date is a

typographical error, there is no evidence for that other than the government's original conclusory

assertion (Dkt. 778-1 at 18).  Even if that were somehow true, it would then be unclear how or

why the "many . . . surgical interferences" claimed on this alleged "March 5, 2008" statement

are not duplicative of the "Many operations done for the patient," for "about $20,000," claimed

on the statement dated just 3 days earlier, March 2, 2008 (Ex. J, trans. of p. 21), or duplicative of

the many other surgeries claimed on the many other earlier statements.

　　　With no description whatsoever of the individual surgeries, their dates, and their costs,

the government has not met its burden to show even by a preponderance that all of these claimed

surgical expenses are independently and reliably supported and not duplicative. Dr. Sha'Ban's

generalized, repetitive, hearsay descriptions of "many operations" and surgeries, none of which

he claims to have performed, allegedly costing hundreds of thousands of dollars,[4] are not

sufficient to support a restitution order by a preponderance under § 3664(e).

　　　Finally, the last translation submitted for Dr. Salman is an invoice for $200 for "F.B.S., H

bl, E.S.R., Liver Function Tests," with the "Clinical Notes: diabetes."  There is no indication this

---

using conversion rate of 1215:1). These conversion rates support Defendants' showing of
massive conversion errors in the two biggest medical expense claims for Mr. Salman.  *See* Opp.
at 18-19.

　　　[3] Indeed, if the March 5, 2007 date is correct, this document likely refers to injuries
Mr. Salman asserts were suffered by his adult son (named Husam Hassan *Jabir* Salman—
compare the spelling with that in the new translation of page 19) in an alleged Blackwater
shooting incident (not involving these defendants) that occurred prior to the incident at Nisur
Square.  A copy of Mr. Salman's FBI interview memorandum describing his son's injuries in the
alleged prior incident is attached as Exhibit M.  (Additional medical and police records
submitted by Mr. Salman concerning that unrelated incident will be filed separately under seal.)

　　　[4] Dr. Sha'Ban's generalized statements total $521,463 of the $692,548 the government
claims (Dkt. 778-1 at 2).  If the government's wildly erroneous currency conversion errors (*see*
Opp. at 18-19) are corrected using an exchange rate of 1,215 to 1, Dr. Sha'Ban's statements
comprise $266,609 of the $273,524 claimed.

lab expense (dated March 11, 2009) was caused by Mr. Salman's injuries in Nisur Square.  The

translation also reduces this expense from the government's original claim of $700 (Dkt. 778-1

at 23) to $200.

> **B.    Mohamed Abbas Mahmoud and Qasim Mohamed Abbas Mahmoud
> (Counts 5 and 6) (*see* Opp. at 20-22)**

> ### 1.   Food for funeral

The translation of the restaurant bill for the funeral states it is "US$10,000" for "One

Hundred meals over three days."  *See* Ex. L, trans. of p. 10.  For one hundred meals, that is

$100/meal.  Even assuming it is 100 meals per day, or 300 meals, a cost of $33.33 per meal is

still an extraordinary sum in Iraq.  As noted in Defendants' Opposition (at 23, 25, and nn.12-13),

the average annual income in Iraq in 2007 was $1,400.  This one-page slip stating a round figure

of US $10,000 suggests a funeral banquet costing seven times the average annual income in Iraq,

and thus seems inflated.  Even if accurate, such an exorbitant expense is not a "necessary funeral

and related service" expense within the meaning of the statute, 18 U.S.C. § 3663A(b)(3).

> ### 2.   Automotive repairs

As noted in Defendants' Opposition, the government has not shown how or why

extensive repairs to the truck in 2009 were necessitated by the 2007 incident, when Ali Abbas

Mahmoud told the FBI in June 2008 that the truck had been repaired and was now being driven

by his nephew.  Opp. at 26.  The new translations show that $3700 of the claimed expense was

for a new engine ($2000) and "Toyota Care one Month warranty" ($1300), Ex. L, trans. of p. 12,

though engine damage was not among the damage Mr. Mahmoud described when he said the

truck had been repaired and was being driven in 2008.  *See* Opp. Ex. C, Dkt. 781-3 at 2.  The

translations also show that one $1800 invoice for mechanic and electrician fees was submitted

twice.  *See* Ex. L., trans. of pp. 12, 16 (Inv. No. 1240 dated March 18, 2009, for $1800).  At a minimum that duplicative expense must be eliminated.

### C.    Sa'Aid Ali Abbas Alkarkh (Count 7) (*see* Opp. at 22-27)

Defendants' Opposition describes the evidence that Sa'aid Ali Abbas Alkarkh was a day laborer, not a car salesman earning $20,000 per month ($240,000 annually) as the government asserts.  Opp. at 24.  The translation of Mr. Ali Abbas Alkarkh's bill of sale for his Volkswagen confirms Mr. Ali Abbas's "Profession" as that of "*Laborer.*"  Ex. L, trans. of p. 22 (line 5, Purchaser).  The document was signed by Mr. Ali Abbas.  *See id.* ("signature of second party, purchaser").

In addition, the new translation shows that the alleged "letter" stating Mr. Ali Abbas Alkarkh was a car salesman earning $20,000 per month was handwritten on a sales receipt form titled, "Receipt of Monies in Exchange for Vehicle Sale."  *See* Ex. L, trans. of p. 26; Dkt. 775-1 at 26.  The "showroom owner" who signed the receipt is Abbas Ali Abbas—likely a relative of Mr. Ali Abbas Alkarkh.  *Cf.* Opp. 24 (citing trial testimony and statement of Mr. Alkarkh's brother Hussein Ali Abbas).  This uncorroborated one-sentence "letter" from Abbas Ali Abbas is hardly sufficient to prove by a preponderance that Mr. Ali Abbas Alkarkh, a self-described "laborer" in 2006 (who was also so described by his brother in 2012 and 2014), was actually a car salesman in 2007 making $240,000 annually. *See* Opp. at 23 & nn.12-14.

### D.    Majed Salman Abdell Kareem Al-Gharbawi (Count 15) (*see* Opp. at 27-29)

Defendants filed an additional exhibit under seal (Ex. I) on July 10, 2015, which supports the argument made in the Opposition (at 28-29) regarding Mr. Al-Gharbawi's reported civil recovery and its effect on any restitution order.

6

    **E.**    **Haydar Ahmad Rabie Hussain Al-Khafaji (Count 18)**
            (*see* **Opp. at 29-31**)

Regarding the purported one-page letter from Mr. Al-Khafaji submitted with the government's initial request (Dkt. 775-1, at 33), the new translator reports that "This appears to be an attempt at translating text through the usage of automated translation software (for example, Google translate).  The text is not intelligible and cannot be translated."  Ex. L., trans. of p. 33 (Translator Note).

Even accepting the purported letter from Mr. Al-Khafji at face value, Defendants stand by the objections submitted in their Opposition at 29-31.

## II.    THIS COURT SHOULD DENY THE GOVERNMENT'S REQUEST FOR YET MORE DELAY

The government has had nine months since the verdict in October 2014 to make its case for restitution.  In that time, it has submitted only a handful of receipts in a mixture of Arabic and English, with no supporting victim statements (signed, sworn, or otherwise) and no analysis.

After Defendants identified the deficiencies of the government's bare-bones submission and its consequent failure to meet its burden of proof, the government now protests it does not have time to meet this "litany" of challenges, and asks another 75 days to respond—beyond the nine months it has already had, including the full 90 days under the statute for determining the amount of restitution post-sentencing.  Dkt. 785 at 9-10.  The government's asserted lack of sufficient time is of its own making, and its request for yet more delay should be denied.

It is true that the Supreme Court held in *Dolan v. United States* (by a 5-4 vote, over a powerful dissent authored by Chief Justice Roberts) that the passing of the 90-day statutory deadline does not deprive a district court of the power to order restitution.  *See* 130 S. Ct. 2533, 2537, 2539 (2010) (cited in Opp. at 17 n.8).  But the fact that the Court has the *power* to

disregard the statutory deadline does not mean the Court *should* do so, much less that it is

*required* to do so, when the government has made only the most rudimentary efforts to comply

with the statute and meet its burden of proof under § 3664(e).

The restitution statute clearly prescribes the obligations of the government in seeking

restitution.  The prosecution is to provide its "listing of the amounts subject to restitution" to the

probation officer "not later than 60 days prior to the date initially set for sentencing."  18 U.S.C.

§ 3664(d)(1).  The probation officer, after consulting with the identified victims, is to include in

the presentence report information sufficient for the court to fashion a restitution order,

including, "to the extent practicable, a complete accounting of the losses to each victim."

§ 3664(a).  All such information is to be disclosed to the defendant (§ 3664(b))—either in the

presentence report, or in a separate report if the court so directs (§ 3664(a)).  In this case, the

government did not seek, nor did the Court direct, a separate report.  The PSIRs, containing the

government's restitution contentions, were required to be disclosed to the Defendants at least 35

days before sentencing.  Fed. R. Crim. P. 32(e)(2).

The government had four and a half months between the October 2014 conviction and its

early March 2015 submission to the probation officer.  It made no submission whatsoever

regarding restitution to probation.  By the time of sentencing on April 13, 2015, it had been

nearly six months since the verdict, yet the government still made no effort to address restitution.

Even after sentencing, when it was aware of the 90-day statutory deadline, the

government insisted on taking six weeks (after initially proposing seven weeks) to submit its

restitution brief.  The government declined the defense's suggestion of 30 days per side, which

would have allowed the government 14 days to reply (with additional time available in which it

could have sought an extension).  The government instead agreed to the current schedule giving

itself six weeks for its submission, the defense five weeks to respond, and allowing only a week for reply and the Court's consideration.

When the government submitted its brief on May 26, it did not submit any statements from any victims (signed, sworn, or otherwise) describing or tabulating their losses.  Instead, the government merely submitted a handful of untranslated receipts, with conclusory summaries totaling their amounts, and no accompanying analysis.  *See* Dkt. 775, 775-1; *see also* Dkt. 778, 778-1 (supplement for Hassan Jabbar Salman).

The government's supposedly limited time to prove restitution is of its own doing: first, in failing to submit any restitution case during the regular sentencing process, and second, in insisting on taking half of the post-sentencing 90 days to submit its initial request.  Even when it made its submission, the government simply packaged and submitted receipts uncritically, failing to notice, for instance, its own evidence showing Mr. Alkarkh was a laborer rather than a $20,000/month car salesman, and failing to check the proper conversion rate from dinars to dollars for Mr. Salman's claimed medical expenses (or even to use the same conversion rate for both claims).  Though the government now protests it needs time to meet the Defendants' "litany" of challenges, the government itself could have addressed many of the deficiencies had it taken the time, prior to filing, to evaluate and analyze its own evidence.  The Court should not grant the government additional time to address challenges it should have foreseen and avoided months ago.

The notice and disclosure requirements of § 3664 and Rule 32(c) and (e) are intended to promote orderly procedure for both the parties and the Court. Such fair and orderly proceedings would be defeated if the government were permitted, as it now tries to do here, to accompany its restitution demand with the disclaimer, "and if this claim is not accepted, we will submit a better

one." The statute and the rule do not authorize multiple seriatim bites.

Moreover, the victims will not be prejudiced by denying the government's request for another bite. As detailed in the Opposition and the Defendants' sealed submissions, the victims have already been compensated by recoveries of compensatory damages in civil proceedings. The full awards of restitution that the government seeks under the MVRA are largely symbolic, as they will be offset by those civil recoveries under § 3664(j)(2) (an issue the government concedes through its silence). The government should not be granted an additional bite to pursue what will be an entirely symbolic order. Instead, the Court should decide whether the government has met its burden under § 3664(e) (and if so, to what limited extent) based on the present record. It should delay its order only long enough to ascertain the amounts of the victims' civil tort recoveries (by granting Defendants' outstanding subpoena request, Dkt. 779), so that those amounts may be offset against any restitution order. The Court has the power to allow such a short additional time under *Dolan*. *See* Opp. at 15-16 & n.8.[5]

## CONCLUSION

For all the reasons explained above and in Defendants' Opposition, the Court should deny restitution as requested by the government in its Submission, Supplement, and Reply. To the extent the Court orders restitution, Defendants ask this Court to grant their pending request to subpoena the amounts of the victims' tort recoveries in the federal civil litigations, and to compel the government, on behalf of the victims for whom it seeks restitution, to disclose the same; and Defendants further ask that all amounts recovered by victims in civil proceedings be credited against any restitution order(s) imposed. Should such credits satisfy restitution as to any victim, the Court should rule that the restitution order as to such victims is satisfied and discharged.

---

[5] Defendants agree that any delay in setting a restitution amount need not postpone Defendants' appeals of their convictions and sentences. *See* Gov. Reply at 10 n.3.

Respectfully submitted,


By: */s/  Brian M. Heberlig*

Brian M. Heberlig (No. 455381)        David Schertler (No. 367203)
Michael J. Baratz (No. 480607)        Danny Onorato (No. 480043)
Bruce C. Bishop (No. 437225)          Lisa H. Schertler (No. 430754)
Linda C. Bailey (No. 985081)          Janet Foster (Admitted *Pro Hac Vice*)
Scott P. Armstrong (No. 993851)       Schertler & Onorato, L.L.P.
Steptoe & Johnson LLP                 575 7th Street, N.W., Suite 300 South
1330 Connecticut Avenue, N.W.         Washington, D.C.  20004
Washington, D.C.  20036-1795          Telephone:  (202) 628-4199
Telephone:  (202) 429-3000            *Counsel for Defendant Dustin L. Heard*
*Counsel for Defendant Paul A. Slough*


William Coffield (No. 431126)
Laina C. Lopez (No. 477412)
Berliner Corcoran & Rowe LLP
1101 17th Street NW, Suite 1100
Washington, D.C.  20036
Telephone:  (202) 293-5555
*Counsel for Defendant Evan S. Liberty*

Dated:  July 10, 2015

11